Elizabeth L. Lewis (DC Bar No. 229702)
(*pro hac vice* application forthcoming)
lizzie@eubankslegal.com
William S. Eubanks II (DC Bar No. 987036)
(*pro hac vice* application forthcoming)
bill@eubankslegal.com
EUBANKS & ASSOCIATES, PLLC
1629 K Street NW, Suite 300
Washington, DC 20006
(970) 703-6060

*Attorneys for Plaintiffs Center for Biological
Diversity and Maricopa Bird Alliance*

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA
### PHOENIX DIVISION

| | |
|---|---|
| Center for Biological Diversity; and Maricopa Bird Alliance, | No. |
| *Plaintiffs*, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| v. | |
| Tom Schultz, *Chief, U.S. Forest Service*; Brooke L. Rollins, *Secretary, U.S. Department of Agriculture*; Brian Nesvik, *Director, U.S. Fish and Wildlife Service*; and Doug Burgum, *Secretary, U.S. Department of the Interior*, *in their official capacities* | |
| *Defendants*. | |

## INTRODUCTION

1.      This action challenges the United States Forest Service ("Forest Service") and the United States Fish and Wildlife Service's ("FWS") ongoing failure to adequately protect and conserve eight listed species and their critical habitat on the Tonto National Forest: the endangered Gila chub, spikedace, razorback sucker, and the southwestern

1

willow flycatcher ("flycatcher"); and the threatened yellow-billed cuckoo ("cuckoo"), Chiricahua leopard frog ("frog"), northern Mexican gartersnake, and narrow-headed gartersnake. Despite the devastating impacts that livestock grazing has had—and will continue to have—on the riparian habitat upon which these species depend (including designated critical habitat) within the Tonto National Forest, the Forest Service and FWS have failed to undertake the measures that are necessary to address the severe ongoing harm directly caused by the agencies' discretionary authorization of grazing activities, and thus have violated the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-1544, in myriad ways. Specifically, the Forest Service and FWS's actions with respect to grazing management within occupied riparian habitat and designated critical habitat for the eight listed species violates the ESA's affirmative mandates to: (1) avoid jeopardizing the continued existence of a listed species; (2) avoid the adverse modification of designated critical habitat; (3) develop and carry out programs for the conservation of listed species on the Tonto National Forest; and (4) avoid the unauthorized take of listed species.

2.    The allotments at issue in this Complaint include: (1) Gisela Allotment; (2) Copper Creek Allotment; (3) Dagger Allotment; (4) Seventy-six Allotment; (5) Pinto Creek Allotment; (6) Buzzard Roost Allotment; (7) Soldier Camp Allotment; (8) Crouch Mesa Allotment; (9) Lyons Fork Allotment; (10) Poison Springs Allotment; (11) Hardt Creek Allotment; (12) Chrysotile Allotment; (13) Tonto Basin Allotment; (14) Bar X Complex, which includes the Bar X, Colcord, Haigler Creek, and Young Allotments; (15) Hick's-Pikes Peak Allotment; (16) Red Lake Complex, which includes Catholic Peak, Gentry Mountain, and Red Lake Allotments; and (17) the Lower Verde Complex, which includes Bull Springs, Deadman Mesa, Cedar Bench, and Pole Hollow Allotments. *See* Fig. 1 (map of the Tonto National Forest spotlighting the allotments at issue in this Complaint).

1



Fig. 1: Map of allotments and complexes in the Tonto National Forest at issue in this Complaint.

3.　　　In several allotments within the Tonto National Forest, livestock grazing is adversely affecting eight imperiled species (i.e., the endangered Gila chub, spikedace, razorback sucker, and flycatcher; and the threatened cuckoo, frog, northern Mexican

gartersnake, and narrow-headed gartersnake) and their habitat (including designated critical habitat). Meanwhile, through consultations and the grazing authorizations that rely upon them, FWS and the Forest Service, respectively, allow the permittees to continue business as usual in the Tonto National Forest, to the severe detriment of federally protected species. By stubbornly adhering to the Forest Service's failed grazing regime that, for decades, has *worsened* the condition of listed species and their habitat (including designated critical habitat) within the forest, the agencies continue to ignore the obvious harm to those species and habitats and with each new grazing decision, arbitrarily conclude that certain mitigation measures that are known to be ineffective will nevertheless minimize or eliminate take of listed species. For example, in the operative consultations for several of the allotments, FWS's determinations that grazing would not jeopardize or otherwise adversely affect listed species relied heavily on the permittees' compliance with forage utilization rates set by the agencies, which lack a causal connection to the authorized level of take, are unconnected to the needs of the listed species, and defy the best available scientific evidence on what is necessary to protect these species and their habitat (including designated critical habitat). Yet, the Forest Service continues to rely on those determinations when it authorizes grazing on allotments within the Tonto National Forest each year.

4.     Some of the allotments within the Tonto National Forest have never undergone any ESA consultation for currently listed species and/or critical habitat that are or may be present. Additionally, in several allotments, grazing is authorized (including through the yearly issuance of annual operating instructions ("AOIs")) in reliance on Biological Opinions ("BiOps") and Incidental Take Statements ("ITSs") and/or concurrences that predate the listing of certain species or the designation of critical habitat. Yet, neither the Forest Service nor FWS reinitiated consultation to address the newly listed species or newly designated critical habitat, despite a clear legal obligation to do so. Because the Forest Service has failed to undertake any consultation for those

4

species and/or critical habitat, it has likewise failed to obtain the necessary determinations from FWS that would enable the Forest Service to avoid jeopardy to listed species or adverse modification to designated critical habitat, let alone authorization from FWS for the incidental take of listed species in connection with ongoing grazing activities. However, the Forest Service continues to authorize grazing that *is adversely affecting* listed species and designated critical habitat on these allotments each year through the issuance of AOIs. Thus, the Forest Service has failed to ensure that its actions authorizing grazing will avoid jeopardy or adverse modification of critical habitat, in violation of Section 7(a)(2).

5.     The Forest Service's failure to implement the mitigation measures that the agency itself proposed as key components of its preferred grazing regime, and upon which FWS subsequently relied in its determinations that ongoing grazing activities would not jeopardize or otherwise adversely affect listed species, has modified the grazing regime in a manner that causes grave adverse effects to the listed species and their habitat (including critical habitat) that have not been previously considered or authorized by FWS in any existing consultation. Indeed, the agencies have conceded as much, admitting that the obligation to reinitiate consultation to address the ESA violations detailed in Plaintiffs' notices of intent ("NOIs") to sue for violations of the ESA submitted in November 2022, January 2025, September 2025, and November 2025 had been triggered, and promising to undertake a Forest-wide consultation on grazing management activities on all active allotments in the Tonto National Forest.[1] However, the Forest Service and FWS have yet to undertake such consultation, in violation of the

---

[1] The Conservation Organizations' November 2022, January 2025, September 2025, and November 2025 NOIs are attached to this Complaint as Exhibit 1, Exhibit 2, Exhibit 3, and Exhibit 4, respectively. The NOIs are also available online: https://tinyurl.com/3zudf58u (November 2022 NOI); https://tinyurl.com/4ja9vtrb (January 2025 NOI); https://tinyurl.com/4nutbnrm (September 2025 NOI); and https://tinyurl.com/2t5anvk5 (November 2025 NOI).

5

ESA and its implementing regulations. Meanwhile, through the issuance of yearly AOIs, the Forest Service continues to authorize extensive grazing on allotments within the Tonto National Forest that is *significantly* adversely affecting listed species and their habitat (including designated critical habitat), in clear violation of the ESA and its implementing regulations.

6.    For these reasons, as well as the reasons below, the Forest Service and FWS are violating the ESA, its implementing regulations, and the ESA's citizen suit provision, 16 U.S.C. § 1540(g). Additionally, the agencies have acted in a manner that is "arbitrary and capricious, an abuse of discretion," "otherwise not in accordance with law," and "without observance of procedure required by law" within the meaning of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), (D). Accordingly, livestock grazing on those allotments where listed species are or may be present should be immediately enjoined and the agencies should be ordered to immediately re-engage in consultation under Section 7 of the ESA, 16 U.S.C. §§ 1536(a)(2), 1540(g); 5 U.S.C. § 706, for all allotments on the Tonto National Forest such that no action may be taken in furtherance of these decisions until the agencies issue new, lawfully compliant decisions. *See* 16 U.S.C. § 1536(d) (prohibiting harmful actions to species or habitat pending completion of ESA consultation)

## JURISDICTION AND VENUE

7.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 16 U.S.C. § 1540(g) (ESA citizen suit provision). Plaintiffs' claims arise under the APA, 5 U.S.C. §§ 701-706, and the ESA, 16 U.S.C. § 1531-1544. Plaintiffs have exhausted the available administrative remedies and have no other remedy at law. In particular, as required by the ESA, *see id.* § 1540(g)(2), Plaintiffs notified all Defendants of the violations of the ESA and its implementing regulations that are the subject of this Complaint over sixty days ago, on November 9, 2022, *see* Ex. 1, January 21, 2025, *see* Ex. 2, September 4, 2025, *see* Ex. 3, and November 13, 2025, *see*

Ex. 4. No federal agency has taken action to redress the violations. *See* 16 U.S.C.
§ 1640(g)(2).

8.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e)(1)(B) because "a substantial part of the events or omissions giving rise to the claim" occurred in this district, and a substantial part of the property that is the subject of this action (i.e., the Tonto National Forest) is situated in this district.

9.     Venue is proper in the Phoenix Division pursuant to Civil Local Rules 77.1 and 5.1 because a significant portion of the dispute arises from Defendants' management of allotments and complexes on the Tonto National Forest that are located in Gila County.

## **PARTIES**

10.     Plaintiff Center for Biological Diversity is a 501(c)(3) non-profit corporation headquartered in Tucson, Arizona, with offices in a number of states and Mexico. The Center works through science, law, and policy to secure a future for all species, great or small, hovering on the brink of extinction. The Center is actively involved in species and habitat protection issues throughout the United States and the world, including protection of plant and animal species, from the impacts of climate change, wildfires, and human-caused habitat destruction. In addition to more than 625,000 supporters and online activists, the Center has more than 70,000 members and more than 1.8 million supporters throughout the United States and the world. The Center brings this action on its own institutional behalf and on behalf of its staff and its members, many of whom regularly enjoy and will continue to enjoy educational, recreational, and scientific activities concerning the flycatcher, cuckoo, Gila chub, razorback sucker, spikedace, frog, northern Mexican gartersnake, and narrow-headed gartersnake, and their habitat (including designated critical habitat), that are harmed by the decisions challenged in this case.

11.    Plaintiff Maricopa Bird Alliance (formerly, the Maricopa Audubon Society) is a 501(c)(3) non-profit organization dedicated to the enjoyment of birds and other wildlife with a primary focus on protection through fellowship, education, and community involvement. Maricopa Bird Alliance is a chapter of the National Audubon Society, and has over 2,300 members, primarily in central Arizona. Maricopa Bird Alliance has played a central role in protecting endangered species in the Southwest— including those at issue in this case—through public education efforts, field surveys, public field trips, and position papers.

12.    Plaintiffs' members regularly use and enjoy the Tonto National Forest (including the specific areas at issue in this case) for a variety of purposes, including hiking, fishing, camping, viewing and photographing scenery and wildlife, and engaging in other vocational, scientific, and recreational activities. Plaintiffs' members derive scientific, aesthetic, recreational, vocational, and spiritual benefits from the Tonto National Forest, including in the specific species at issue here and in the specific habitat (including critical habitat) where the listed species at issue in this lawsuit are found or are likely to be found within the Tonto National Forest.

13.    For instance, Dr. Robin Silver—who is a member of both Plaintiff organizations—began photographing and studying cuckoos (including in the Tonto National Forest) in the late 1980s, and he was a co-author of, and signatory to, the 1998 cuckoo listing petition submitted to FWS that ultimately led to its protections under the ESA. Dr. Silver has also been photographing and studying other endangered species found on the Tonto National Forest since the late 1980s, including the species here at issue (i.e., the southwestern willow flycatcher, Gila chub, razorback sucker, spikedace, Chiricahua leopard frog, northern Mexican gartersnake, and narrow-headed gartersnake). Dr. Silver regularly visits riparian habitat in the Tonto National Forest to observe, photograph, study, and otherwise enjoy these species, including such habitat in each of the allotments at issue in this lawsuit. For instance, Dr. Silver last visited the Copper

Creek Allotment on August 11, 2022; the Hick's-Pikes Peak Allotment on March 6, 2024; the Tonto Basin Allotment on March 9, 2024; the Dagger Allotment on March 8, 2024; the Red Lake Complex (which includes the Catholic Peak, Gentry Mountain, and Red Lake Allotments) and the Chrysotile Allotment on May 21, 2024; the Poison Springs Allotment on March 3, 2025; the Pinto Creek Allotment on March 13, 2025; the Lyons Fork Allotment on July 14, 2025; the Bar X Complex (which includes the Bar X, Colcord, Haigler Creek, and Young Allotments) and the Gisela, Seventy-six, Hardt Creek, Buzzard Roost, Soldier Camp, and Crouch Mesa Allotments on September 10, 2025; and the Lower Verde Complex (which includes the Bull Springs, Deadman Mesa, Cedar Bench, and Pole Hollow Allotments) on September 28, 2025. Chris Bugbee, a member of the Center for Biological Diversity, likewise has concrete recreational, scientific, and aesthetic interests in the species here at issue (i.e., the southwestern willow flycatcher, Gila chub, razorback sucker, spikedace, Chiricahua leopard frog, northern Mexican gartersnake, and narrow-headed gartersnake). He frequently visits the Tonto National Forest to engage in various recreational and scientific activities in pursuit of those concrete interests, including hiking, exploring riparian habitat, and viewing wildlife and wildlife sign (including the listed species and issue in this Complaint). With respect to the allotments named in this lawsuit, Mr. Bugbee visited the following areas to search for, view, and otherwise enjoy listed species and critical habitat on the specified dates: the Red Lake, Gentry Mountain, Crouch Mesa, and Catholic Peak Allotments on September 3, 2020, and again on June 11 and 12, 2023; the Tonto Basin, Hick's-Pikes Peak, Dagger, and Gisela Allotments on July 25 and 26, 2022; the Gisela and Seventy-six Allotments on June 9, 2024; and the Hick's-Pikes Peak and Dagger Allotments on July 21, 2024.

14.     Plaintiffs' members—including Dr. Silver and Mr. Bugbee—intend to, and have concrete plans to, continue enjoying the occupied habitat of the yellow-billed cuckoo, southwestern willow flycatcher, Gila chub, razorback sucker, spikedace,

Chiricahua leopard frog, northern Mexican gartersnake, and narrow-headed gartersnake in the Tonto National Forest, including all of the allotments at issue in this lawsuit, regularly and on an ongoing basis in the future. In particular, beginning in March 2026, Dr. Silver plans to return to these areas (i.e., occupied and critical habitat on each allotment and complex at issue in this lawsuit) in sequence throughout 2026 and into the future, just as he has been doing for decades. During these visits, Dr. Silver plans to engage in various recreational, scientific, and aesthetic activities, including (but not limited to): searching for, viewing, and photographing the threatened and endangered species at issue in this lawsuit; hiking, observing, photographing, and enjoying riparian areas on public lands; and viewing and photographing other wildlife in the Tonto National Forest. Mr. Bugbee likewise has concrete plans to return to the areas he enjoys visiting—i.e., the Red Lake, Gentry Mountain, Crouch Mesa, Catholic Peak, Tonto Basin, Hick's-Pikes Peak, Dagger, Seventy-six, and Gisela Allotments—during the summer and fall of 2026. During those visits, Mr. Bugbee plans to engage in various recreational, scientific, and aesthetic activities, including (but not limited to): searching for, viewing, and photographing the threatened and endangered species at issue in this lawsuit; hiking, observing and enjoying riparian areas on public lands; and viewing other wildlife in the Tonto National Forest.

15.     The health, aesthetic, recreational, inspirational, spiritual, scientific, and educational interests of Plaintiffs and their members, including Dr. Silver and Mr. Bugbee, have been and will continue to be adversely affected and irreparably injured if Defendants' ongoing violations of the ESA and the APA continue. The relief sought will redress Plaintiffs' and their members' injuries by substantially reducing the threats to the survival of the eight listed species at issue; by ensuring that these species' recovery prospects are not impaired or jeopardized by Defendants' actions; by avoiding any further destruction or adverse modification of their critical habitats; and by ensuring that the distribution of the flycatcher, cuckoo, Gila chub, razorback sucker, spikedace, frog,

northern Mexican gartersnake, and narrow-headed gartersnake is not diminished, nor are opportunities to observe and enjoy these species in the Forest reduced, to the detriment of Plaintiffs, their members, and their collective interests in these species and their habitat. The relief sought will also provide additional process under federal law that will bring the best available science to bear on Defendants' decisions, which likely will benefit these species and their habitat of particular importance to Plaintiffs and their members.

16.    Defendant Tom Schultz is the Chief of the Forest Service, an agency within the U.S. Department of Agriculture, and is directly responsible for the supervision, management, and control of the agency. Accordingly, he is responsible for overseeing the Forest Service's actions challenged in this lawsuit, and is sued in his official capacity.

17.    Defendant Brooke L. Rollins is the Secretary of the U.S. Department of Agriculture, and is ultimately responsible for overseeing the work of the Forest Service, an agency within the U.S. Department of Agriculture. She is sued in her official capacity.

18.    Defendant Brian Nesvik is the Director of FWS, an agency within the U.S. Department of Interior, and is directly responsible for the supervision, management, and control of the agency. Accordingly, he is responsible for overseeing FWS's actions challenged in this lawsuit, and is sued in his official capacity.

19.    Defendant Doug Burgum is the Secretary of the U.S. Department of the Interior and is ultimately responsible for overseeing the work of FWS, an agency within the Department of the Interior. He is sued in his official capacity.

## STATUTORY AND REGULATORY FRAMEWORK

### I.    ENDANGERED SPECIES ACT

20.    Recognizing that certain species of plants and animals "have been so depleted in numbers that they are in danger of or threatened with extinction," Congress enacted the ESA to provide both "a means whereby the ecosystems upon which endangered and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C.

1    § 1531. The ESA reflects "an explicit congressional decision to afford first priority to the

2    declared national policy of saving endangered species." *Tenn. Valley Auth. v. Hill*, 437

3    U.S. 153, 185 (1978). "The plain intent of Congress in enacting this statute was to halt

4    and reverse the trend toward species extinction, whatever the cost." *Id.* at 184. As such,

5    the ESA "represent[s] the most comprehensive legislation for the preservation of

6    endangered species ever enacted by any nation." *Id.* at 180.

7        21.    Section 9 of the ESA makes it unlawful for any person to "take" an

8    endangered or threatened species without express authorization from FWS. 16 U.S.C.

9    § 1538(a)(1). "Take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap,

10   capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19).

11   The term "harm" is further defined by FWS regulations to encompass "habitat

12   modification or degradation where it actually kills or injures wildlife by significantly

13   impairing essential behavioral patterns, including breeding, feeding or sheltering." 50

14   C.F.R. § 17.3. FWS's regulations define "harass[ment]" as "an intentional or negligent

15   act or omission which creates the likelihood of injury to wildlife by annoying it to such

16   an extent as to significantly disrupt normal behavioral patterns which include, but are not

17   limited to, breeding, feeding or sheltering." *Id.*

18       22.    Section 7(a)(2) of the ESA requires all federal agencies to "insure that any

19   action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the

20   continued existence of any endangered species." 16 U.S.C. § 1536(a)(2). To carry out this

21   obligation, before undertaking any action that may have direct or indirect effects on listed

22   species, an action agency must engage in consultation with FWS in order to evaluate the

23   impact of the proposed action. *See id.* FWS has defined the term "action" for the

24   purposes of Section 7 broadly to mean "all activities or programs of any kind authorized,

25   funded, or carried out, in whole or in part, by Federal agencies," 50 C.F.R. § 402.02, "in

26   which there is discretionary federal involvement or control," *id.* § 402.03.

27

28

23.     The purpose of consultation is to ensure that the action at issue "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [designated] habitat of such species." 16 U.S.C. § 1536(a)(2). As defined by the ESA's implementing regulations, an action will cause jeopardy to a listed species if it "reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. Under those same regulations, an action will destroy or adversely modify critical habitat if it will cause a "direct or indirect alteration that appreciably diminishes the value of critical habitat as a whole for the conservation of a listed species." *Id.* Thus, during consultation the action agency and FWS must consider, in evaluating the effects to the species and its critical habitat, whether "the agency action will [] appreciably reduce the odds of success for future recovery planning, by tipping a listed species too far into danger." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 936 (9th Cir. 2008). The evaluation of the effects of the proposed action on listed species and their habitat (including critical habitat) during consultation must use "the best scientific . . . data available." 16 U.S.C. § 1536(a)(2).

24.     Consultation under Section 7(a)(2) may be "formal" or "informal" in nature. Informal consultation is "an optional process" consisting of all correspondence between the action agency and FWS, which is designed to assist the action agency, rather than FWS, in determining whether formal consultation is required. *See* 50 C.F.R. § 402.02. During an informal consultation, the action agency requests information from FWS as to whether any listed species may be present in the action area. If listed species may be present, Section 7(c) of the ESA requires the action agency to prepare and submit to FWS a "biological assessment" ("BA") that evaluates the potential effects of the action on listed species and critical habitat. Formal consultation does not begin until the action agency submits the BA to FWS. 50 C.F.R. § 402.14(c)(3). As part of the BA, the action

1  agency must make a finding as to whether the proposed action may affect listed species

2  and submit the BA to FWS for review and potential concurrence with its finding. 16

3  U.S.C. § 1536(c). If the action agency finds that the proposed action "may affect, but is

4  not likely to adversely affect" any listed species or critical habitat, and FWS concurs with

5  this finding (i.e., a "no effect" determination), then the consultation process is terminated.

6  50 C.F.R. § 402.14(b).

7      25.    On the other hand, if the action agency finds that the proposed action "may

8  affect" listed species or critical habitat by having any adverse effect that is not

9  insignificant or discountable, then formal consultation is required. *See* 50 C.F.R.

10  § 402.11. Following completion of the BA, the action agency must initiate formal

11  consultation through a written request to FWS. *See* 50 C.F.R. § 402.14(c). The result of a

12  formal consultation is the preparation of a BiOp by FWS, which is a compilation and

13  analysis of the best available scientific data on the status of the species and how it would

14  be affected by the proposed action. When preparing a BiOp, FWS must: (1) "review all

15  relevant information;" (2) "evaluate the current status of the listed species;" and (3)

16  "evaluate the effects of the action and cumulative effects on the listed species or critical

17  habitat." 50 C.F.R. § 402.14(g). As such, a BiOp must include a description of the

18  proposed action, a review of the status of the species and its designated critical habitat, a

19  discussion of the environmental baseline, and an analysis of the direct and indirect effects

20  of the proposed action and the cumulative effects of reasonably certain future state, tribal,

21  local, and private actions. *Id.*

22      26.    At the end of the formal consultation process, FWS issues either a no-

23  jeopardy or a jeopardy BiOp. With a no-jeopardy BiOp, FWS determines that the

24  proposed action is not likely to jeopardize the continued existence of listed species or

25  adversely modify critical habitat. If, as part of a no-jeopardy BiOp, FWS determines that

26  the proposed action will nevertheless result in the incidental taking of listed species, then

27  FWS must provide the action agency with a written ITS specifying the "impact of such

28

14

1 incidental taking on the species" and "any reasonable and prudent measures that [FWS]

2 considers necessary or appropriate to minimize such impact" and setting forth "the terms

3 and conditions . . . that must be complied with by the [action] agency . . . to implement

4 [those measures]." 16 U.S.C. § 1536(b)(4). Take in excess of that authorized by the ITS

5 violates the prohibition on take contained in Section 9 of the ESA. *Id.* § 1538. With a

6 jeopardy BiOp, FWS determines that the proposed action will jeopardize the continued

7 existence of listed species or destroy or adversely modify critical habitat. In a jeopardy

8 BiOp, FWS may offer the action agency reasonable and prudent alternatives to the

9 proposed action that will avoid jeopardy to a listed species or adverse habitat

10 modification, if they exist. *Id.* § 1536(b)(3)(A).

11        27.    Where a BiOp has been issued and "discretionary Federal involvement or

12 control over the action has been retained or is authorized by law," the action agency is

13 required to reinitiate consultation with FWS in certain circumstances, including: (1) "[i]f

14 the amount or extent of taking specified in the [ITS] is exceeded"; (2) "[i]f new

15 information reveals effects of the action that may affect listed species or critical habitat in

16 a manner or to an extent not previously considered"; (3) "[i]f the identified action is

17 subsequently modified in a manner that causes an effect to the listed species or critical

18 habitat that was not considered" in a prior consultation; or (4) "[i]f a new species is listed

19 or critical habitat designated that may be affected by the identified action." 50 C.F.R.

20 § 402.16(a).

21        28.    The ESA provides that agencies must hold action in abeyance until any

22 legally required consultation is complete. Section 7(d) of the ESA prohibits an action

23 agency from making "any irreversible or irretrievable commitment of resources with

24 respect to the agency action which has the effect of foreclosing the formulation or

25 implementation of any reasonable and prudent alternative measures which would not

26 violate [Section 7] (a)(2)." 16 U.S.C. § 1536(d). "This prohibition . . . continues until the

27 requirements of section 7(a)(2) are satisfied." 50 C.F.R. § 402.09. The purpose of this

28

15

1  requirement is to ensure that the status quo will be maintained during the consultation

2  process. *See Lane Cty. Audubon Soc'y v. Jamison*, 958 F.2d 290, 294 (9th Cir. 1992) ("In

3  order to maintain the status quo, section 7(d) forbids 'irreversible or irretrievable

4  commitment of resources' during the consultation period.").

5  **II.    ADMINISTRATIVE PROCEDURE ACT**

6       29.    The APA, 5 U.S.C. §§ 701–706, provides for judicial review of agency

7  action.

8       30.    Under the APA, a reviewing court "shall" hold unlawful and set aside

9  "agency action, findings, and conclusions" found to be "arbitrary, capricious, an abuse of

10 discretion, or otherwise not in accordance with law," or when they are adopted "without

11 observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D). An agency action

12 is arbitrary and capricious if the agency "relied on factors which Congress has not

13 intended it to consider, entirely failed to consider an important aspect of the problem,

14 offered an explanation for its decision that runs counter to the evidence before the

15 agency," or if the agency's decision "is so implausible that it could not be ascribed to a

16 difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State*

17 *Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

18      31.    When reviewing agency action under the APA, a court must ensure that the

19 agency reviewed the relevant data and articulated a satisfactory explanation establishing a

20 "rational connection between the facts found and the choice made." *State Farm*, 463 U.S.

21 at 43. The agency's failure to do so renders its decision arbitrary and capricious. *Marsh v.*

22 *Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989).

23      32.    The APA also directs reviewing courts to "compel agency action

24 unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

25                            **FACTUAL BACKGROUND**

26      33.    The Forest Service has recognized the crucial importance of riparian areas

27 to conservation and ecosystem stability:

28

                                            16

Rivers and streams are conduits for life. In no other ecosystem can we as an agency have a greater impact in "*Caring for the land and serving people.*" Protection and enhancement of riparian and aquatic areas is paramount in providing habitat and sustainable water for dependent fish, wildlife, plant species, and human communities alike.

U.S. Forest Serv., *Southwestern Region Riparian and Aquatic Ecosystem Strategy* (Aug. 24, 2018), *available at* https://tinyurl.com/retjwp2k.[2] The best available science increasingly demonstrates that the presence of livestock grazing in riparian areas is incompatible with the persistence and recovery of threatened and endangered species. Indeed, as one attorney from the Department of Justice observed during arguments in *New Mexico Cattle Growers' Ass'n. v. U.S. Forest Service*, No. 1:23-cv-00150-JB-GBW (D.N.M. Feb. 1, 2024), *available at* https://tinyurl.com/46s45u9h, "It's well settled that cattle and riparian areas do not mix."[3] In spite of the fact that the Forest Service and FWS continue to rely on monitoring metrics non-applicable to protected riparian species ("utilization" and "stubble height"), FWS biologists likewise acknowledge that "range grazing measures are inadequate to measure needs for sensitive/listed wildlife," Email from Susan Sferra, Biologist, U.S. FWS, to Jeff Servoss, Biologist, U.S. FWS (July 5, 2019), *available at* https://tinyurl.com/drbcpv4k, and that "[g]razing monitoring measures and standards do not accurately assess effects on cuckoo habitat, as well as other listed species," U.S. FWS, *Coronado National Forest Grazing Consultation Supplementary Summary of Concerns* (Oct. 29, 2018), *available at* https://tinyurl.com/mrcw7b8y.[4] Yet, the Forest Service and FWS's collective failure to effectively control extensive, discretionary

---

[2] Attached for the Court's convenience as Exhibit 5.

[3] Attached for the Court's convenience as Exhibit 6.

[4] Attached for the Court's convenience as Exhibit 7 (email) and Exhibit 8 (*Coronado* report), respectively.

livestock grazing throughout the Tonto National Forest is allowing these vital areas—these "conduits for life"—to be systematically degraded, threatening the wildlife that depend on them (including listed species), as well as the integrity of the forest ecosystem.

**I.      THE LISTED SPECIES AT ISSUE**

**A.      The Gila Chub Background, Listing Status, and Critical Habitat**

34.      The Gila chub (*Gila intermedia*) is a thick-bodied fish with dark overall body coloration—sometimes with diffuse, longitudinal stripes—and a lighter belly speckled with gray. Breeding males (and sometimes breeding females) develop red or orange coloration on parts of their heads, bodies, and bases of fins. Female Gila chub can reach ten inches in length, while males generally do not exceed six inches.

35.      Gila chub commonly inhabit pools in smaller streams, cienegas, and artificial impoundments ranging in elevation from 2,000 to 5,500 feet. The species is highly secretive, and individuals thus tend to prefer quiet, deeper waters (e.g., pools) or remain near cover (e.g., terrestrial vegetation, boulders, and fallen logs). Undercut banks created by overhanging terrestrial vegetation with dense roots growing into pool edges provide ideal cover, particularly for young-of-the-year. Gila chub require high water quality to survive, and excessive sedimentation remains a "primary threat" to the species' habitat. Invasive non-native predators are also a primary threat, as Gila chub evolved with few natural predators, and therefore have developed few mechanisms to protect themselves from predation. The introduction of such invasive species has led to significant losses of Gila chub populations.

36.      Historically, the Gila chub occupied approximately forty-three rivers, streams, and spring-fed tributaries throughout New Mexico, Arizona, and northern Sonora, Mexico. However, due to widespread habitat degradation, destruction, and fragmentation, the Gila chub now occurs in just ten to fifteen percent of its former range. The majority of occupied locations are small, isolated, and face one or more threats. The

biological status of several remaining populations is uncertain, and the number of localities currently occupied may overestimate the number of remnant populations, as some of those populations may not persist if the source population was extirpated.

37.    FWS listed the Gila chub as endangered with critical habitat in 2005. 70 Fed. Reg. 66,664 (Nov. 2, 2005). The species' critical habitat is organized into seven river units and encompasses approximately 160.3 miles of stream reaches in Arizona and New Mexico. Relevant here, the Copper Creek and Lyons Fork Allotments in the Tonto National Forest contain designated critical habitat for the Gila chub.

38.    In its listing decision, FWS determined the primary constituent elements— i.e., those physical and biological features that are essential to the conservation of the species and that may require special management considerations or protection—for the Gila chub: (1) perennial pools with areas of higher velocity between pools and areas of shallow water among plants or eddies; (2) appropriate water temperatures; (3) adequate water quality, including reduced levels of contaminants and sediments; (4) appropriate prey base; (5) sufficient cover; (6) absence (or functionally insignificant presence) of nonnative aquatic species; and (7) streams that maintain a natural flow pattern, including periodic flooding.

39.    Relevant here, FWS's listing decision explained that livestock grazing is one of the primary drivers of the Gila chub's deteriorating condition. The Gila chub requires perennial pools, uncontaminated and appropriate-temperature water, healthy instream and riparian vegetation, and a natural hydrologic regime, all of which are severely impacted and altered by livestock grazing. In fact, "[l]ivestock-grazing management is widely believed to have been one of the *most significant factors* contributing to regional streambank downcutting in the late 1800s," which eroded and eventually eliminated the undercut banks and riparian vegetation that are essential to sustaining Gila chub populations. 67 Fed. Reg. at 51,952. Streambank downcutting also lowers the water table, which results in the loss of riparian vegetation. Upland shrub

species, which require less water, may invade the area formerly occupied by riparian vegetation. This loss of riparian vegetation threatens the Gila chub because the upland shrub species lack both the necessary characteristics to provide adequate cover, and the root system to stabilize the soil and streambank. Livestock grazing thus degrades Gila chub habitat by: increasing erosion of streambanks and sedimentation in the stream channels; eliminating the undercut banks that provide cover; altering the channel structure and the composition of the stream bottom; eliminating wetland and riparian vegetation that stabilize the streambank and provide cover; reducing the number of backwater pools; decreasing water quality; and altering base and/or peak flows.

40.    Approximately eighty-five to ninety percent of the Gila chub's habitat has been degraded or destroyed, and much of that habitat is unrecoverable. *Cf.* 70 Fed. Reg. 66679 (Nov. 2, 2005) ("90 percent of the Gila chub's currently occupied habitat has been degraded, either by the presence of nonnative species or land use that degrades habitat, such as livestock grazing."). Hence, one of the major threats to the Gila chub's continued existence is habitat alteration, destruction, and fragmentation due to livestock grazing. Yet, much of the remaining Gila chub habitat is still extensively grazed.

41.    Because the Gila chub's few remaining populations are small and isolated, the species is highly susceptible to discrete threats such as habitat degradation from livestock grazing.

**B.    The Razorback Sucker Background, Listing Status, and Critical Habitat**

42.    The razorback sucker (*Xyrauchen texanus*) is a relatively large suckerfish endemic to warm-water portions of the Colorado River basin. Distinguished by its unique, razor-like keel between its head and dorsal fin, the razorback sucker can reach up to thirty-six inches in length and live for more than forty years.

43.    Historically, razorback suckers occurred in the main channel of the Colorado River and major tributaries in Arizona, California, Colorado, Nevada, Utah,

Wyoming, and New Mexico, including the San Juan River. Razorback suckers were once so numerous that they were a common food source for settlers and were sold commercially in Arizona as recently as 1949. In the lower Colorado River basin, razorback suckers began to decline shortly after the impoundment of Lake Mead in 1935. In that basin, the species has largely been restricted to Lake Mojave, although small numbers of razorback suckers occur in Lake Mead and in the Grand Canyon. With the exception of the population in Lake Mohave, "the remaining extant populations" in the lower basin "are small and recruitment is virtually nonexistent." 59 Fed. Reg. 13,374, 13,375 (Mar. 21, 1994). In the upper Colorado River basin, the present range of the razorback sucker has likewise been drastically reduced from its historic distribution. Some populations remain in the lower Yampa and Green Rivers, the Colorado River, and the lower San Juan River. However, "there is little indication of recruitment in these remnant stocks." *Id.* The largest concentration of razorback suckers in the upper basin can be found in the upper Green River. As early as 1994, FWS predicted that, absent "conservation efforts, it is presumed that all wild populations in the [upper] Basin would soon be lost as old fish die without natural recruitment." *Id.*

44.    Razorback sucker movement is seasonal; individuals move into flooded areas in early spring and begin spawning migrations to specific locations as they become reproductively active. Razorback sucker reproduction requires water temperatures between 51 and 70° F, and occurs over mixed substrates that range from silt to cobble. In non-reproductive periods, adult razorback suckers occupy a variety of lake and riverine habitat types. Although not entirely known, it is believed that young razorback suckers initially prefer shallow, littoral zones before dispersing to deeper water areas a few weeks after hatching.

45.    FWS listed the razorback sucker as endangered in 1991, 56 Fed. Reg. 54,957 (Oct. 23, 1991), designated critical habitat in 1994, 59 Fed. Reg. 13,374 (Mar. 21, 1994), and issued a recovery plan in 1998, which it later supplemented in 2002, 67 Fed.

Reg. 55,270 (Oct. 28, 2002). Relevant here, the Chrysotile and Dagger Allotments in the Tonto National Forest contain designated critical habitat for the razorback sucker.

46.     In its decision designating critical habitat for the razorback sucker, FWS determined the primary constituent elements for the species: (1) water quality parameters, such as temperature, dissolved oxygen, environmental contaminants, nutrients, and turbidity, sufficient to maintain biological processes and to support the various life stages of the species; (2) sufficient physical habitat to support the species and its life-cycle needs, including areas of the Colorado River system that are or could be suitable habitat for spawning, nursery, rearing, and feeding, as well as corridors between such areas; and (3) a favorable biological environment, including sufficient food supply and absence of nonnative fishes that compete with or predate on the razorback sucker.

47.     The 2002 supplement to the recovery plan for the razorback sucker explained that "remaining wild populations are in serious jeopardy." The supplement cited as the main reason for decline in species abundance "streamflow regulation and habitat modification" in the Colorado River basin, including the construction of dams and impoundments that have significantly altered hydrology and water quality, and hindered movement. Changes in the hydrologic regime have led to reductions in available habitat riparian areas dry up and riparian vegetation is removed, as well as to changes in water quality that negatively impact the species. The effects of livestock grazing exacerbate these issues.

48.     Because the razorback sucker's few remaining populations are small and isolated, the species is highly susceptible to discrete threats such as habitat degradation from livestock grazing.

C.     **The Northern Mexican Gartersnake Background, Listing Status, and Critical Habitat**

49.     The northern Mexican gartersnake (*Thamnophis eques megalops*) is a terrestrial-aquatic snake capable of reaching up to forty-four inches in length. Its body

1    ranges in color from olive to olive-brown or olive-gray and is marked by three lighter-

2    colored longitudinal stripes which often darken toward the tail.

3        50.    The northern Mexican gartersnake is considered a "terrestrial-aquatic

4    generalist." While it is often found in riparian habitat, the species may also spend time in

5    terrestrial habitat removed from water. Aquatic habitat is used for foraging, whereas

6    dense riparian vegetation plays a key role in providing cover and foraging opportunities.

7    Terrestrial habitat is additionally used for thermoregulation, protective cover, and

8    maintaining adequate prey populations of small rodents, lizards, or invertebrates.

9        51.    Historically, the northern Mexican gartersnake was found in nearly every

10   major watershed in Arizona and southwestern New Mexico, extending into northwestern

11   Mexico. However, the species' historic range has been severely curtailed due to the

12   introduction of predatory non-native species and habitat degradation. Existing data

13   suggest that there may be only four detectable populations of northern Mexican

14   gartersnakes remaining in the United States. The species' cryptic nature complicates

15   survey efforts.

16       52.    FWS listed the northern Mexican gartersnake as threatened in 2014. 79

17   Fed. Reg. 38,678 (July 8, 2014). In 2021, the Service designated critical habitat for the

18   species, which includes nine units in portions of Arizona and New Mexico, totaling

19   20,326 acres. 86 Fed. Reg. 22,518 (Apr. 28, 2021). FWS has yet to develop a recovery

20   plan for the northern Mexican gartersnake. Relevant here, the Gisela, Hardt Creek,

21   Seventy-Six, and Tonto Basin Allotments in the Tonto National Forest contain designated

22   critical habitat for the northern Mexican gartersnake. The species is also known to occupy

23   the Tonto Basin Allotment.

24       53.    In its rule designating critical habitat for the species, FWS determined the

25   primary constituent elements for the northern Mexican gartersnake: (1) perennial or

26   intermittent streams that exhibit both (a) slow-moving water of sufficient quality and

27   structural features to provide thermoregulation, shelter, foraging opportunities, and

28

23

protection from predators, and (b) adjacent terrestrial habitat that provides sufficient cover and prey base to support the snake's habitat and lifecycle needs; (2) hydrologic processes that maintain aquatic and terrestrial habitat through (a) natural flow regimes, and (b) physical hydrologic and geomorphic connections; (3) a diverse prey base and sufficient prey availability; (4) an absence of non-native fish species that compete with or predate on the species; (5) elevations ranging from 130 to 8,497 feet; (6) lentic wetlands with (a) structural features that support thermoregulation, shelter, foraging opportunities, brumation, and protection from predators, (b) adjacent riparian habitat with structural and biological features that support thermoregulation, shelter, foraging opportunities, and protection from predators, and (c) sufficient water quality; and (7) ephemeral channels that provide connectivity between perennial or spatially intermittent perennial streams and lentic wetlands in areas where water resources are limited.

54.    Livestock grazing severely harms northern Mexican gartersnakes by degrading the primary constituent elements required to support the species' survival and recovery. Historical grazing has damaged approximately eighty percent of riparian ecosystems in the western United States. In addition to direct effects such as trampling of individual snakes, grazing alters the streambank and removes the riparian vegetation required to maintain an adequate prey base and provide cover for gartersnake thermoregulation, predator avoidance, and foraging behaviors. Moreover, the use of stock tanks is thought to facilitate the introduction of nonnative species that compete with and predate upon the northern Mexican gartersnake.

D.    **The Narrow-headed Gartersnake Background, Listing Status, and Critical Habitat**

55.    The narrow-headed gartersnake (*Thamnophis rufipunctatus*) is a small to medium-sized, highly aquatic snake that can reach up to forty-four inches in length. The species is distinguished by its tan or gray-brown body, which is adorned with conspicuous brown, black, or reddish spots. The narrow-headed gartersnake has high-set

1    eyes and an elongated head which narrows towards the snout—giving the species its

2    name.

3         56.    The narrow-headed gartersnake's diet renders the species a prey specialist.

4    The species' prey base consists primarily of fish, as well as certain toad larvae. The

5    narrow-headed gartersnake has thus evolved to be an underwater ambush hunter, and it is

6    believed to be heavily dependent on visual cues when foraging. Therefore, sediment and

7    turbidity levels within the water column can negatively affect foraging success. The

8    species relies heavily on clear, rocky streams with perennial flow, featuring pools and

9    riffles essential for foraging and reproduction. The narrow-headed gartersnake is

10   therefore strongly associated with clear, rocky, often perennial streams, and generally

11   occurs at elevations ranging from approximately 2,300 to 8,200 feet. Due to its

12   dependence on healthy aquatic ecosystems and native fish populations for prey, the

13   narrow-headed gartersnake is particularly vulnerable to changes in habitat quality.

14   Although the species is considered to be one of the most aquatic of the gartersnakes as a

15   function of its prey specificity, data suggest that the species spends a relatively small

16   percentage of its time in the water. The species spends significant time in adjacent

17   terrestrial, upland habitat, which it relies upon for thermoregulation, cover, and dispersal

18   purposes.

19        57.    The narrow-headed gartersnake historically occurred abundantly across the

20   Mogollon Rim and along perennial stream drainages from central and eastern Arizona to

21   southwestern New Mexico. However, the species has experienced significant declines in

22   population density and distribution. In 2011, FWS reported that only five reliably

23   detectable population remain. The species' cryptic nature complicates survey efforts.

24        58.    FWS listed the species as threatened under the ESA in 2014. 79 Fed. Reg.

25   38,678 (July 8, 2014). In 2021, the Service designated critical habitat for the species,

26   which is comprised of eight units in Arizona and New Mexico, totaling 23,785 acres. 86

27   Fed. Reg. 58,474 (Oct. 21, 2021). FWS has yet to develop a recovery plan for the narrow-

28

25

headed gartersnake. Relevant here, the Gisela, Hardt Creek, Seventy-Six, and Tonto Basin Allotments, as well as the Bar X Complex, in the Tonto National Forest contain designated critical habitat for the narrow-headed gartersnake. This species is also known to occupy the Tonto Basin and Hick's-Pikes Peak Allotments.

59.     In its rule designating critical habitat, FWS determined the primary constituent elements for the narrow-headed gartersnake: (1) perennial streams or spatially intermittent streams that exhibit (a) low sedimentation, (b) structural features to support basking, thermoregulation, shelter, prey base maintenance, and protection from predators, (c) sufficient water quality, and (d) adjacent terrestrial habitat with structural features to support thermoregulation, shelter, brumation and protection from predators; (2) hydrologic processes that maintain aquatic and riparian habitat through (a) a natural flow regime that allows for periodic flooding, low sedimentation, and maintenance of native fish populations and (b) physical hydrologic and geomorphic connections between the active stream channel and adjacent terrestrial areas; (3) a sufficient prey base, including a combination of native fishes, and soft-rayed, non-native fish species; (4) an absence of non-native aquatic predators; and (5) elevations ranging from 2,300 to 8,200 feet.

60.     Livestock grazing severely impacts narrow-headed gartersnakes by degrading the primary constituent elements required to support the species' survival and recovery. Historical grazing has damaged approximately eighty percent of riparian ecosystems in the western United States. In addition to direct effects such as trampling of individual snakes, grazing alters the streambank and removes the riparian vegetation required to maintain an adequate prey base and provide cover for gartersnake thermoregulation, predator avoidance, and foraging behaviors. Moreover, the use of stock tanks is thought to facilitate the introduction of nonnative species that compete with and predate upon the narrow-headed gartersnake

1

2       **E.      The Spikedace Background, Listing Status, and Critical Habitat**

3       61.     The spikedace (*Meda fulgida*) is a small fish in the *Cyprinidae* (minnow)

4  family, reaching up to three inches in length. The spikedace has an olive-gray to

5  brownish body, with silvery sides, oblong black specks, and a spined dorsal fin.

6       62.     Spikedace have a lifespan of approximately two years, with reproduction

7  occurring primarily in yearlings. Spikedace spawn from March through May, laying eggs

8  over gravel and cobble where they adhere to the substrate. A dynamic diversity of

9  instream zones (eddies, riffles, broad shallow gravel bars adjacent to fast flowing water)

10  and periodic, recurrent flooding are essential to feeding and reproduction. Spikedace are

11  omnivorous, and feed primarily on insects transported in stream drift.

12       63.     Historically, the spikedace was common throughout riparian areas in

13  Arizona, New Mexico, and Sonora. However, by 1996, the species was already extirpated

14  from over eighty-five percent of its historic range. Since then, declines have continued

15  due to riparian habitat degradation, water diversion, groundwater pumping, and

16  introduction and spread of non-native predatory and competitive fish. Today, only four

17  populations remain, across a mere six percent of the species' former range. Two of these

18  remaining populations are in the Tonto National Forest (along Aravaipa Creek and the

19  Verde River).

20       64.     FWS originally listed the spikedace as threatened in 1986, 51 Fed. Reg.

21  23,769 (July 1, 1986), then reclassified the species as endangered in 2012, 77 Fed. Reg.

22  10,810 (Mar. 26, 2012). FWS has issued several critical habitat designations and

23  revisions for the spikedace, most recently in 2012. 77 Fed. Reg. 10,810 (Feb. 23, 2012).

24  The agency issued a recovery plan for the species in 1991, which the Service amended in

25  2019. 84 Fed. Reg. 38,288 (Aug. 6, 2019). Relevant here, five allotments in the Tonto

26  National Forest contain designated critical habitat for the spikedace: the Buzzard Roost;

27  Gisela; Seventy-six; Soldier Camp; and Tonto Basin Allotments.

28

65.     In its rule designating critical habitat, FWS determined the primary constituent elements for the spikedace: (1) habitat to support the species' life-cycle needs, including streams with (a) perennial flows of a relatively shallow stream depth (i.e., generally less than 3.3 feet) and slow to swift flow velocities, (b) microhabitat types including glides, runs, riffles, and the margins of pools and eddies, and backwater components over sand, gravel, and cobble substrates with low or moderate sedimentation, (c) low gradient habitat below 6,890 feet, and (d) water temperatures between 46.4 and 82.4°F; (2) an abundant aquatic insect food base; (3) high water quality exhibiting no more than low levels of pollutants; (4) dispersal channels and connective corridors between occupied or seasonally occupied habitat; (5) an absence of non-native species that compete with or predate on the spikedace; and (6) a natural, unregulated flow regime that allows for periodic flooding.

66.     Livestock grazing has been one of the most widespread and long-term causes of adverse effects to native fishes and their habitat, including the spikedace. Improper livestock grazing can destabilize stream channels, disturb riparian ecosystem functions, and contribute to nutrient loading in streams, all of which are deleterious to the primary constituent elements the spikedace needs to survive and recover. In particular, FWS reports that grazing on many of the Tonto National Forest allotments, "especially those in the Tonto Creek and Salt River watersheds, [has] contributed to the current habitat degradation and depressed status of the [spikedace] in these areas."

**F.    The Yellow-Billed Cuckoo Background, Listing Status, and Critical Habitat**

67.     The western yellow-billed cuckoo (*Coccyzus americanus*) is a distinct population segment of the yellow-billed cuckoo. This cuckoo is a medium-sized, neotropical migrant bird about twelve inches in length, with grayish-brown and white plumage, reddish primary flight feathers, boldly patterned tail feathers, and a blue-black

and yellow bill. The cuckoo breeds in riparian woodlands in the American southwest before migrating to South America for the winter.

68.    Historically, the cuckoo was widespread throughout California and Arizona, with additional populations in New Mexico, Oregon, Washington, and British Columbia. Today, the cuckoo's distribution and abundance have significantly decreased. The species has likely been extirpated from Oregon, Washington, and British Columbia, and is largely confined to Arizona, New Mexico, and northwestern Mexico. Population declines continue, "primarily" due to "riparian habitat loss and degradation." 79 Fed. Reg. 59,992 (Oct. 3, 2014). Relevant here, the Pinto Creek, Poison Springs, and Tonto Basin Allotments in the Tonto National Forest contain designated critical habitat for the western yellow-billed cuckoo. The species is also known to occupy the Bull Springs, Cedar Bench, Hick's-Pikes Peak, Pole Hollow, and Tonto Basin Allotments. However, to date, neither the Forest Service nor FWS have conducted comprehensive surveys for cuckoos on the Tonto National Forest, and as such, breeding territory numbers have not been compiled. Accordingly, the cuckoo may occupy additional allotments in the Tonto National Forest.

69.    The cuckoo is most commonly found in large tracks of dense, multi-layered riparian forests in the arid southwestern United States, which provide essential breeding habitat. The cuckoo's breeding season lasts from late May through September, although most nesting occurs from late June through August. Adult breeding pairs build loose platform nests composed of dry twigs. Clutch size varies, but usually consists of two or three eggs. Available information suggests that the average daily foraging distance occurs within 0.5 miles from the breeding location. Accordingly, in addition to the dense nesting grove or tree, often referred to as the core area, cuckoos need adequate foraging areas near the nest. Indeed, the cuckoo has a short hatch-to-fledge time—a mere seventeen days, which is among the shortest of bird species—and therefore requires access to abundant food sources to successfully rear their rapidly growing offspring.

Nesting sites must also exhibit above-average cover (i.e., greater than seventy percent) the promote the cool, humid habitat conditions that are essential for successful hatching and rearing of young. The moist and humid conditions that support riparian plant communities typically exist in lower elevation, broad floodplains, as well as where rivers and streams enter impoundments. Foraging areas can be less dense or patchy with lower levels of canopy cover and may be a mix of shrubs, ground cover, and scattered trees. Thus, a portion of the vegetation within an individual cuckoo's home range may be unsuitable for nesting, but may support large numbers of insects, frogs, or lizards for foraging.

70.     FWS listed the western distinct population segment of the cuckoo as threatened in 2014, 79 Fed. Reg. at 59,992, and designated critical habitat for the species in 2021, 86 Fed. Reg. 20798 (Apr. 21, 2021). The Service has yet to develop a recovery plan for the cuckoo.

71.     In its rule designating critical habitat for the species, FWS declined to designate foraging habitat outside of breeding habitat due to the wide variety and extent of such foraging habitat. Instead, FWS focused its designation on breeding and dispersal habitat. FWS determined the primary constituent elements for the cuckoo: (1) rangewide breeding habitat consisting of contiguous patches of riparian woodlands within floodplains or in upland areas or terraces with sufficient cover and other characteristics to support adults and nestlings during the breeding season and enable reproduction; (2) an adequate prey base consisting of large insects, lizards, and frogs to support adults and their young in breeding areas during the nesting season and in post-breeding dispersal areas; and (3) hydrologic processes that maintain and regenerate breeding habitat.

72.     The primary threat to the cuckoo is the loss and fragmentation of high-quality riparian habitat suitable for nesting. Habitat loss and degradation results from several interrelated factors, including the alteration of flows in rivers and streams, mining, encroachment into suitable habitat from agricultural and other development

activities on breeding and wintering grounds, stream channelization and stabilization, diversion of surface and ground water for agricultural and municipal purposes, livestock grazing, wildfire, establishment of non-native vegetation, drought, and prey scarcity due to pesticide use. By fragmenting cuckoo habitat and isolating populations, these ongoing threats have increased the susceptibility of remaining cuckoo populations to further declines and local extirpations due to increased predation, further habitat fragmentation, stochastic events, fluctuating prey availability, collisions (e.g., with buildings or wires, particularly during migration), and habitat degradation brought on by the introduction of the non-native tamarisk leaf beetle. The warmer temperatures already occurring in the southwestern United States may further alter the plant species composition of riparian forests over time, which will subject the cuckoo to additional pressures. Moreover, an altered climate may also disrupt and change food availability for the cuckoo if the timing of peak insect emergence changes in relation to when the cuckoos arrive on their breeding grounds to feed on this critical food source.

73.     Livestock grazing in cuckoo habitat alters streambanks, remove and tramples vegetation, and compacts soils, preventing the growth of the dense, riparian forests that the cuckoo requires for successful reproduction. Cattle consume young age-class riparian woody vegetation that flycatchers could eventually use for territory establishment, nesting, foraging, and cover. Continued forage use on young riparian vegetation can result in long-term adverse effects if suitable breeding habitat cannot develop. Indeed, cuckoo nesting habitat is structurally complex; the nesting cuckoos require tall trees, a multistoried vegetative understory, low woody vegetation, and high shrub areas. By altering understory vegetation, reducing height and density, and/or eliminating new growth in riparian areas, grazing hampers recruitment of woody species that, when mature, would have provided crucial nesting sites. Additionally, the relatively cool, damp, and shady areas that are favored by cuckoos are also preferred by livestock

31

over the surrounding drier uplands. As a result, cattle—and the habitat degradation caused by grazing—are concentrated in vital cuckoo habitat.

74.    By degrading and fragmenting vital breeding and foraging habitat, livestock grazing contributes to the ongoing decline of the cuckoo. The cuckoo preferentially uses large contiguous habitat, and appears to be sensitive to fragmentation and reductions in habitat patch size. Patch-size reduction, combined with the scarcity of larger patches, depresses the cuckoo breeding population size, and prevents the cuckoo from reversing its long-term decline in population and range.

G.    **The Southwestern Willow Flycatcher Background, Listing Status, and Critical Habitat**

75.    The southwestern willow flycatcher (*Empidonax traillii extimus*) is a small neotropical migrant songbird with grayish-green wings and back, whitish throat, pale grey-olive breast, and yellowish belly. The flycatcher is best identified by its distinctive "fitz-bew" song and its frequent tail flicks when perched.

76.    The southwestern United States provides important foraging and nesting habitat for the flycatcher. The flycatcher is an insectivore, foraging in dense shrub and tree vegetation along rivers, streams, and other wetlands. The bird typically perches on a branch and makes short direct flights, or sallies to capture flying insects. The flycatcher breeds exclusively in riparian habitats in the southwestern United States, requiring dense vegetation near surface water or saturated soil. "This habitat was historically rare and sparsely distributed and is currently more rare owing to extensive destruction and modification." 60 Fed. Reg. 10,694 (Feb. 27, 1995). Individuals arrive on breeding grounds in late April and May, and nesting begins in early May and June. Nests are fairly small (3.2 inches tall and wide) and are open cup structures typically placed in the fork of a branch. Flycatchers usually raise one brood per year, but birds have been documented renesting and raising an additional brood after an initial failure. Notably, flycatcher nests can be parasitized by brown-headed cowbirds, which lay their eggs in the host's nest.

1    Flycatcher nestlings fledge from late June through mid-August. The entire breeding

2    cycle, from egg laying to fledging, is approximately twenty-eight days. Tamarisk is an

3    important component of the flycatcher's nesting and foraging habitat, as flycatchers

4    preferentially use tamarisk as nesting sites.

5        77.    The flycatcher's abundance has declined substantially from historic levels;

6    in 2002, the Service estimated that only 900 to 1,100 pairs remained. The primary cause

7    of the flycatcher's decline is the removal, alteration, degradation, and alteration of

8    riparian breeding habitat.  Indeed, as of 1990, "[a]s much as 90 percent of major lowland

9    riparian habitat has been lost or modified in Arizona." 60 Fed. Reg. 10,694, 10,707 (Feb.

10   27, 1995). Since then, the degradation of flycatcher habitat has worsened.

11       78.    FWS listed the flycatcher as endangered in 1995, citing "extensive loss of

12   habitat, brood parasitism, and lack of adequate protective regulations." 60 Fed. Reg.

13   10,694 (Feb. 27, 1995). The Service designated critical habitat for the flycatcher in 1997,

14   62 Fed. Reg. 39,129 (July 22, 1997), and revised its designation in 2005 and 2013, 70

15   Fed. Reg. 60,886 (Oct. 19, 2005); 78 Fed. Reg. 344 (Jan 3, 2013). FWS issued a species

16   recovery plan for the flycatcher in 2003. 68 Fed. Reg. 10,485 (Mar. 5, 2003). Relevant

17   here, six allotments in the Tonto National Forest contain designated critical habitat for the

18   flycatcher: the Dagger; Gisela; Hardt Creek; Hick's-Pikes Peak; Seventy-six; and Tonto

19   Basin Allotments. This species is also known to occupy the Hick's-Pikes Peak, Poison

20   Springs, and Tonto Basin Allotments, and suitable habitat is known to occur in the Pinto

21   Creek Allotment. On information and belief, neither FWS nor the Forest Service have

22   conducted comprehensive surveys for the species on the Tonto National Forest, so the

23   true extent of the flycatcher's presence within the forest is unknown.

24       79.    In its rule designating critical habitat for the species, FWS determined the

25   primary constituent elements for the flycatcher: (1) riparian habitat comprised of trees

26   and shrubs interspersed with areas of dense thickets, shrubs, foliage, or forests; and (2) a

27   diverse insect prey base within or adjacent to riparian floodplains or moist environments.

28

33

80.     Flycatcher habitat in the arid southwest is "especially vulnerable to fragmentation and destruction by livestock," because livestock seek out the rare shade and vegetation in the riparian corridors where flycatchers breed and forage. 60 Fed. Reg. at 10,708. The concentration of livestock—and thus, the impacts of grazing—in these riparian areas "directly affect the habitat characteristics critical to [the flycatcher]." *Id.* at 10707. Indeed, within the Tonto National Forest, grazing within and adjacent to occupied, potential, and/or critical habitat for the flycatcher has "contributed to the current habitat degradation and depressed status of the southwestern willow flycatcher in these areas." Additionally, the presence of livestock can enhance cowbird-feeding sites. When these feeding areas are near flycatcher breeding habitat, cowbird parasitism of flycatcher nests may increase, particularly where the habitat is degraded. Cowbird parasitism could lead to the extirpation of flycatchers from the few suitable breeding habitats that remain.

**H.    Chiricahua Leopard Frog Background, Listing Status, and Habitat Needs**

81.     The Chiricahua leopard frog (*Lithobates chiricahuensis*) is a medium-sized amphibian with a snout-vent length ranging from approximately 2.1 to 5.4 inches. A wetland dweller, the species is distinguishable by greenish coloration on its head and back, and a distinctive pattern of small, raised, cream-colored spots on the rear of the thigh. Chiricahua leopard frogs also have the camouflaging ability to darken their abdominal skin under certain conditions. The frog is also identifiable by its characteristic call—a low, drawn-out snore lasting one to two seconds.

82.     The frog is highly aquatic and is considered a habitat specialist, as "its breeding habitat now falls within a narrow portion of the continuum from small, shallow, ephemeral, and unpredictable waters to large, deep, predictable, and perennial waters." 2007 Recovery Plan at 15. It requires permanent water sources, and thus inhabits cienegas, pools, livestock tanks, lates, reservoirs, streams, and rivers at elevations of

34

3,281 to 8,890 feet in central and southeastern Arizona; west-central and southwestern New Mexico; and, northern Sonora and the Sierra Madre Occidental of Chihuahua and Durango in Mexico.

83.    Almost half of all amphibian species worldwide are declining in abundance or distribution, and a third are immediately threatened with extinction. Among those affected by the precipitous decline are members of the leopard frog genus, including the frog. Indeed, the frog has disappeared from "more than 75 percent of its historical sites and numerous mountain ranges, valleys, and drainages within its former range." 67 Fed. Reg. 40,790, 40,790 (June 13, 2002). Even in those "areas where [the frog] is still present, populations are often small, widely scattered, and occupy marginal and dynamic habitats." *Id.* The disruption of metapopulation dynamics is very likely an important factor in the regional loss of frog populations. A metapopulation is defined as a set of local populations that interact via individuals moving between local populations. Frog populations are often small, and their habitats are dynamic, resulting in a relatively low probability of long-term population persistence. However, the frog is known to move among aquatic sites, and is reasonably likely to disperse up to one mile overland, three miles along ephemeral or intermittent drainages, and five miles along perennial water courses. Movements between such closely located populations are crucial for conserving metapopulations, and may ultimately prove key to recovering the species. Indeed, if local populations are extirpated through drought, disease, or other factors, the populations can be recolonized via dispersal from adjacent populations. Hence, the long-term viability of metapopulations may be enhanced over that of isolated populations, even though local populations experience periodic extirpations. Historically, populations were more numerous and closer together. However, most of the larger source populations along major rivers and in cienega complexes have disappeared. As numbers of populations declined and as populations have become more isolated, they are less likely to be recolonized if a local extirpation occurs.

35

84.    FWS initially listed the frog as threatened in 2002, 67 Fed. Reg. 40790 (June 13, 2002), and issued a Recovery Plan in 2007. 72 Fed. Reg. 30,820 (June 4, 2007). The agency reaffirmed the listing status of the frog in 2012 after a taxonomic revision. 77 Fed. Reg. 16,324 (Mar. 20, 2012). The 2012 listing included a critical habitat designation across thirty-nine critical habitat units, grouped into eight recovery units within the species' range in Arizona and New Mexico. 77 Fed. Reg. 16,324 (Mar. 20, 2012). Relevant here, the Catholic Peak, Crouch Mesa, Gentry Mountain, and Red Lake Allotments in the Tonto National Forest contain designated critical habitat for the frog. This species is known to occupy the Bar X Complex, as well as the Gentry Mountain and Red Lake Allotments.

85.    In its 2012 rule designating critical habitat for the species, FWS identified the primary constituent elements for the frog: (1) suitable aquatic breeding habitat and immediately adjacent uplands exhibiting (a) standing bodies of freshwater that are largely free from pollutants, (b) suitable habitat exhibiting emergent and or submerged vegetation, root masses, undercut banks, fractured rock substrates, or some combination thereof, (c) the absence of nonnative predators, (d) the absence of chytridiomycosis, and (e) suitable adjacent upland areas for foraging and basking; and (2) dispersal corridors consisting of suitable overland and non-wetted habitat to support the dispersal of frogs to other breeding sites.

86.    The direct and indirect effects of livestock grazing, which is nearly ubiquitous within the historical range of the frog, are known to contribute to declines in amphibian diversity, abundance, and species composition, and are likewise known to adversely affect the frog. For instance, the frog uses riparian herbaceous vegetation for important biological functions such as cover, thermoregulation, and foraging. However, grazing removes the bank-line vegetation that the frogs require for escape cover and insect prey. As a result, frogs are exposed to increased predation risk and potential food scarcity. Grazing also exposes the frog—as well as its eggs and tadpoles—to trampling

risk, particularly when the frogs are hibernating at the bottom of pools or stock tanks. Additionally, the overuse of vegetation by livestock—as recently documented in frog riparian critical habitat—causes changes to plant root structures, altering plant species composition and overall biomass. Reduced herbaceous vegetation leads to accelerated soil loss due to increased exposure of soils to downpour events and reduced sediment filtering capabilities of the vegetation. Hoof action likewise causes significant loss of cryptobiotic soil crusts, soil compaction, erosion, and gullying. Where livestock grazing results in increased watershed erosion, the sedimentation of the deep pools used by frogs can likewise accelerate, which in turn, can alter primary productivity and fill interstitial spaces in streambed materials with fine particulates that impede water flow, reduce oxygen levels, and restrict waste removal. Changes in water quality can be exacerbated by increases in fecal contamination and subsequent toxic events (e.g., algal blooms, reduced oxygen levels, etc.). Degraded water quality is known to adversely affect both adult and larval frogs in various ways, including by making frogs more susceptible to disease. Accordingly, the frog likely does not persist in waters severely polluted with cattle feces. The impacts of livestock grazing, including streambank erosion, the stripping of native vegetation, and degraded water quality can also open vectors for the introduction of (or facilitate the spread of) harmful nonnative species, which can predate or outcompete the frog and contribute to local extirpations.

## II.    PRE-NOVEMBER 2022 GRAZING DECISIONS FOR THE ALLOTMENTS AT ISSUE

87.    The Forest Service allows livestock grazing on specified "allotments" within national forests, including the Tonto National Forest. 43 U.S.C. § 1752; 36 C.F.R. § 222.1(b). The Forest Service manages livestock grazing on individual allotments or complexes (i.e., a group of allotments) through an Allotment Management Plan ("AMP"), grazing permits issued in accordance with the AMP, and AOIs that guide grazing on a year-to-year basis (collectively, "grazing authorizations"). Each of these

affirmative, discretionary actions is a site-specific final agency action. *See Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 990 (9th Cir. 2006). Each of the grazing authorizations guide and constrain the occupancy and use for livestock purposes of allotments and complexes in the Tonto National Forest. *See* Letter from Mark A Lamb, Acting Field Supervisor, U.S. FWS, to Neil Bosworth, Forest Supervisor, Tonto National Forest, U.S. Forest Serv. 119, 134-35 (Feb. 1, 2022) (Biological and Conference Opinion for the Tonto National Forest Land and Resource Management Plan).

88.    The Forest Service issues yearly AOIs that re-authorize grazing on each allotment and/or complex at issue in this case on a yearly basis. The AOIs dictate management directives and requirements for grazing activities, including, but not limited to, how many cattle can be grazed, seasonal and area restrictions, forage utilization standards, and monitoring requirements. The AOIs also include provisions allowing the Forest Service to alter the stipulated requirements under certain scenarios, including due to a change in law, such as the listing of a species, or due to changes recognized through ongoing monitoring.

89.    Through the issuance of grazing authorizations (including yearly AOIs), the Forest Service retains discretionary involvement and/or control over grazing on the Tonto National Forest to take action for the benefit of listed species, including the eight species at issue in this lawsuit. For instance, with each reauthorizing action, the Forest Service may place restrictions on grazing (e.g., seasonal or area closures), prohibit grazing in upcoming grazing seasons, and/or require additional protective measures to benefit listed species and their critical and/or occupied habitat.

90.    The allotments at issue in this Complaint include: (1) Gisela Allotment; (2) Copper Creek Allotment; (3) Dagger Allotment; (4) Seventy-six Allotment; (5) Pinto Creek Allotment; (6) Buzzard Roost Allotment; (7) Soldier Camp Allotment; (8) Crouch Mesa Allotment; (9) Lyons Fork Allotment; (10) Poison Springs Allotment; (11) Hardt Creek Allotment; (12) Chrysotile Allotment; (13) Tonto Basin Allotment; (14) Bar X

Complex, which includes the Bar X, Colcord, Haigler Creek, and Young Allotments; (15) Hick's-Pikes Peak Allotment; (16) Red Lake Complex, which includes Catholic Peak, Gentry Mountain, and Red Lake Allotments; and (17) the Lower Verde Complex, which includes Bull Springs, Deadman Mesa, Cedar Bench, and Pole Hollow Allotments. *See* Fig. 1, *supra* ¶ 2 (map of the allotments and complexes at issue in this Complaint).

91. The allotments that have undergone consultation are governed by a hodgepodge of BiOps and concurrences dating back to at least 1995. Only twelve of the twenty-five allotments at issue are covered by decision documents issued within the last ten years.[5] In fact, nine of the allotments have BiOps or concurrences that are so outdated that they contain discussions of grazing's effects on the desert-nesting bald eagle, the final population of which was infamously delisted in 2007. Many of the allotments contain listed species and/or designated critical habitat for which consultation has *never* been completed, meaning that the agencies cannot "insure" that grazing complies with the ESA's strict no-jeopardy and no-adverse-modification commands.

92. For decades, the Forest Service has managed—and continues to manage—grazing on the allotments and complexes at issue in accordance with its preferred grazing regime, consisting of four general elements: (1) area closures, generally enforced through the construction of fencing that purports to exclude livestock from sensitive (usually riparian) areas; (2) seasonal closures (i.e., where grazing occurs during only part of the year) and/or rest-rotation schedules (i.e., where grazing rotates between pastures on a yearly basis such that no pasture is grazed for two consecutive years) that purport to allow vegetation to recover and regrow while livestock are grazed elsewhere; (3) forage utilization standards, where livestock are allocated a certain percentage of vegetative

---

[5] This Complaint concerns fourteen individual allotments and three complexes. The three complexes together consist of eleven allotments. Accordingly, this Complaint concerns twenty-five allotments total.

growth in different habitats, *see infra* ¶ 90; and (4) monitoring to both (a) verify compliance with area/seasonal closures and utilization limits, and (b) ensure that impacts on listed species and/or critical habitat are not greater than contemplated during Section 7 consultation. As described below, for those allotments and complexes that have undergone consultation, FWS substantially relied on the Forest Service's preferred grazing regime when making its substantive determinations under the ESA with respect to ongoing grazing activities.

93.    To manage grazing in those areas where livestock are permitted (i.e., areas that are not fenced to exclude cattle), the Forest Service primarily relies on forage utilization metrics, which are livestock standards that have no relationship whatsoever to the habitat or life-cycle needs of listed species. Relevant here, livestock grazing in riparian and upland habitat across all allotments and complexes on the Tonto National Forest (including those at issue in this lawsuit) is generally managed to the following utilization thresholds:[6]

---

[6] *See, e.g.,* Letter from Jeremy Plain, Dist. Ranger, Tonto Nat'l Forest, U.S. Forest Serv., to Troy Neal & Judy Neal, 76 Ranch 2 (Dec. 2, 2024) (2025 AOI for the Seventy-six Allotment); U.S. Forest Serv., *Biological Assessment for the Lower Verde Subbasin Grazing Allotments* 30 (Oct. 2024); Letter from Jeffrey A. Humphrey, Field Supervisor, U.S. Fish & Wildlife, to Debbie Cress, Tonto Nat'l Forest, U.S. Dep't of Agric. 5 (Aug. 5, 2019) (Biological Opinion for Bar X Grazing Allotment Complex and Heber-Reno Driveway on the Tonto National Forest, Pleasant Valley Ranger District, AESO/SE 02EAAZ00-2019-F-0249).

| Vegetation Type | Allowable Use Standard |
|---|---|
| Upland herbaceous | 30-40% of current year's growth |
| Upland browse | 50% of current year's growth |
| Riparian herbaceous | 40% of plant species biomass and maintain 6 to 8 eight inches of stubble height |
| Riparian woody | 50% of leaders browsed on the upper third of plants up to 6 feet tall |

Hence, livestock are generally permitted to graze up to *forty percent* of riparian vegetation, while maintaining a stubble height of six to eight inches.

A. **Allotments That Have *Never* Undergone Consultation for Any Listed Species or Critical Habitat**

94.     Three of the allotments at issue have never undergone any consultation for any (let alone continued) grazing activities, despite the presence of listed species and/or critical habitat:

- *Gisela Allotment*: Located along Tonto Creek in the Payson Ranger District of the Tonto National Forest, the Gisela Allotment encompasses critical habitat for four listed species: the flycatcher; the northern Mexican gartersnake; the narrow-headed gartersnake; and the spikedace. However, the allotment has *never* undergone *any* ESA consultation for continued grazing activities. Accordingly, there is no assurance that ongoing grazing activities on the Gisela Allotment complies with the ESA's substantive mandates.

- *Hardt Creek Allotment*: Located along Tonto Creek in the Payson Ranger District of the Tonto National Forest, the Hardt Creek Allotment shares a boundary with the Seventy-six Allotment and encompasses critical habitat for four listed species: the flycatcher; the northern

41

Mexican gartersnake; the narrow-headed gartersnake; and the spikedace. The Forest Service last purported to address the effects of grazing on listed species and critical habitat in the allotment in 2008, when it sought FWS's concurrence in its determination that grazing was "not likely to adversely affect" the flycatcher. However, in its concurrence addressing listed species across multiple allotments ("2008 Concurrence"), FWS *refused* to concur with the Forest Service's determination with respect to flycatchers on the Hardt Creek Allotment. 2008 Concurrence at 2-3. While FWS "encourage[d] the Forest Service to reconsider [its] effect determination," over seventeen years later, the Forest Service still has not do, nor has it made a "no effect" determination with respect to flycatchers on the allotment. Additionally, the 2008 Concurrence predates the listing of the northern Mexican gartersnake and narrow-headed gartersnake, as well as the designation of critical habitat for the two species. Accordingly, there has *never* been a consultation to determine whether grazing activities that impact the flycatcher, northern Mexican gartersnake, or narrow-headed gartersnake and/or their critical habitat on the Hardt Creek Allotment can continue consistent with the ESA's substantive mandates. In response to Plaintiffs' January 2025 NOI, the Forest Service cited the 2008 Concurrence as the operative consultation document for the Hardt Creek Allotment, but at the same time, conceded that with respect to the allotment, that concurrence only mentions the bald eagle (which was not even listed at the time). The Forest Service therefore implicitly

42

conceded that there is no valid consultation for *any* listed species or designated critical habitat on the Hardt Creek Allotment.[7]

- *Copper Creek Allotment*: Located within the Cave Creek Ranger District and encompasses portions of Silver Creek, the Copper Creek Allotment contains designated critical habitat for the Gila chub. In 2017, the Forest Service determined that grazing "may affect, but is not likely to adversely affect" Gila chub and their critical habitat due in large part to the potential for habitat recovery and reestablishment of the species, and the proximity of the allotment to occupied habitat. 2017 Envtl. Assessment at 95, 97. Yet, the Forest Service abruptly "discontinued" consultation, insisting that consultation "is not necessary at this time" because neither the Gila chub, nor the its primary constituent elements were present at that time. *Id.* at 128. The Forest Service has *never* revisited its decision to discontinue consultation, nor has it initiated formal or informal consultation for continued grazing activities on the Copper Creek Allotment. As a result, there is no valid BiOp and ITS or concurrence in place to ensure that ongoing grazing activities on the allotment comply with the ESA's substantive mandates.[8]

95.    On information and belief, the Forest Service is continuing to issue AOIs on a yearly basis—up to and including as recently as 2025—to authorize grazing on the Gisela Allotment, despite the fact that the Forest Service has *never* undergone consultation regarding grazing activities on the allotment. In its March 2025 response to

---

[7] Letter from Steve Spangle, Ariz. Field Supervisor, U.S. Fish & Wildlife Serv., to Gene Blankenbaker, Tonto Nat'l Forest Supervisor, U.S. Dep't of Agric. (Jan. 15, 2008) (AESO/SE 22410-2007-I-0221).

[8] U.S. Forest Serv., *Copper Creek Allotment Grazing Authorization: Final Environmental Assessment* (Aug. 2017).

Plaintiffs' NOIs, the Forest Service did not cite to any operative consultation document or "no effect" determination, but instead merely noted that the agency "has been monitoring" the Allotment since 2023 to "ensure compliance" with forest standards (but not with the ESA). Yet, in 2025, the Forest Service issued an AOI authorizing up to 150 cows and fifteen bulls to graze on the allotment through February 28, 2026, including in pastures adjacent to and/or containing designated critical habitat and/or occupied habitat.

96.     On information and belief, the Forest Service is continuing to issue AOIs on a yearly basis—up to and including as recently as 2025—to authorize grazing on the Hardt Creek Allotment, even though there is no valid ESA consultation in place concerning grazing activities on the Allotment. In its March 2025 response to Plaintiffs' NOIs, the Forest Service maintained that the Forest Service cited the 2008 Concurrence as the operative consultation document for the Hardt Creek Allotment, while at the same time acknowledging that the concurrence only governs the bald eagle (which is no longer listed under the ESA). The Forest Service's failure to engage in consultation with respect to the flycatcher on the Hardt Creek Allotment is particularly egregious, as FWS *refused* to concur in the Forest Service's determination that grazing would not adversely affect the species or its critical habitat.

97.     On information and belief, the Forest Service is continuing to issue AOIs on a yearly basis—up to and including as recently as 2025—to authorize grazing on the Copper Creek Allotment, even though there is no valid ESA consultation in place concerning grazing activities on the Allotment. In its March 2025 response to Plaintiffs' NOIs, the Forest Service maintained that grazing would have "no effect" on Gila chub.

98.     As illustrated in photos submitted with the Center and Maricopa Bird Alliance's (collectively, "Conservation Organizations") November 2022, January 2025, September 2025, and November 2025 NOIs, widespread, chronically heavy grazing by livestock is evident in riparian habitat (including critical habitat) on the Gisela, Hardt Creek, and Copper Creek Allotments, including in areas that the consultation documents

assumed would be closed to livestock use. As a result of such grazing (including

unauthorized grazing in closed areas), the riparian vegetation is sparse, and habitat fails

to exhibit the primary constituent elements necessary to sustain the flycatcher, the

northern Mexican gartersnake, the narrow-headed gartersnake, the spikedace, or the Gila

chub. Accordingly, livestock grazing has adversely affected, and continues to adversely

affect important riparian habitat for these species, including critical habitat, on the Gisela,

Hardt Creek, and Copper Creek Allotments.

**B.    The 1995 BiOp for Grazing on the Dagger Allotment**

99.    The Dagger Allotment is located in the Globe Ranger District of the Tonto

National Forest and includes the confluence of Cherry Creek and the Salt River. The

allotment contains designated critical habitat for the razorback sucker and the flycatcher.

100.    The effects of grazing on listed species and designated critical habitat

within the allotment were last examined nearly *thirty years ago*, in a BiOp issued in

December 1995 ("1995 BiOp").[9] Relevant here, the 1995 BiOp analyzed the impacts of

grazing on the razorback sucker and its critical habitat, as well as the flycatcher.

*i.    Razorback Suckers on the Dagger Allotment*

101.    The 1995 BiOp acknowledged that the Dagger Allotment provides

important habitat for the endangered razorback sucker due to "the variety of conditions

present in contrast to more confined portions of the river." 1995 BiOp at 18. The 1995

BiOp further conceded that continued grazing would significantly degrade riparian

habitat for the species, including trampling of the streambeds and riparian vegetation,

increased sedimentation and runoff, and decreased water quality. *Id.* at 17-19. However,

---

[9] *See* Letter from Sam F. Spiller, Field Supervisor, U.S. Fish & Wildlife Serv., to Charles W. Cartwright, Jr., Reg'l Forester, Tonto Nat'l Forest, U.S. Dep't of Agric. (Dec. 1, 1995) (Biological Opinion on the Effects to the Razorback Sucker, Mexican Spotted Owl And Bald Eagle from the Proposed Forest Service Region 3 Activities, AESO/SE 2-21-92-F-693).

relying largely on the Forest Service's proposal to implement its preferred grazing regime (e.g., forage utilization limits, area/seasonal closures, and monitoring requirements), the 1995 BiOp nevertheless determined that continued grazing would not jeopardize the razorback sucker or adversely modify its designated critical habitat. *Id.* at 16-19.

102.    Although the ITS appended to the 1995 BiOp ("1995 ITS") acknowledged that grazing would "take" razorback suckers, it nevertheless insisted that the "extent of incidental take" was not "definable." 1995 BiOp at 24. Instead, FWS maintained that take would be minimized through the implementation of mitigation measures—including fencing and "conservative" utilization standards—intended to protect and improve riparian resources and watershed conditions. 1995 BiOp at 24. FWS thus identified "timely project completion, or the lack of completion" as the surrogate for determining when take has been exceeded, and provided two reinitiation triggers: (1) "[i]f the new grazing rotations are not fully implemented within one full grazing cycle for the particular allotment or five years"; and (2) "[i]f the ongoing and other required monitoring programs are decreased or discontinued." *Id.*

### ii.    *Flycatchers on the Dagger Allotment*

103.    Initially, the 1995 BiOp took the rare step of finding that continued grazing *would* jeopardize the continued existence of the flycatcher. FWS emphasized that the flycatcher population on the Dagger Allotment is "important" because it "may be a 'source' population contributing to the survival of the species in other portions of its range." 1995 BiOp at 21. In fact, according to FWS, "*[a]ny impacts* on [flycatcher habitat], or on individual [flycatchers] along the Salt River, have the potential to negatively impact the survival and recovery of the [flycatcher]." *Id.* (emphasis added).

104.    To avoid a jeopardy BiOp, FWS proposed—and the Forest Service accepted—reasonable and prudent alternatives requiring the Forest Service to monitor the flycatcher population. *Id.* at 26. However, even with the reasonable and prudent

1   alternatives, the 1995 BiOp conceded that the effects of grazing "could result in the take

2   of the entire breeding population." *Id.* at 25.

3       105.    Ultimately, the 1995 BiOp determined that with increased monitoring and

4   other mitigation measures (e.g., area closures and forage utilization limits), continued

5   grazing on the Dagger Allotment would not jeopardize the flycatcher. As a result, despite

6   the habitat's conceded importance and the species' dire baseline condition both within the

7   allotment and range-wide, FWS effectively authorized extensive grazing that the 1995

8   BiOp conceded would result in serious impacts to the species.

9       106.    The 1995 ITS acknowledged that take of the flycatcher "may result" from

10  the direct and indirect effects of grazing, but insisted that FWS was unable to "predict the

11  exact level of take that could occur." *Id.* at 25. Therefore, the 1995 ITS did not authorize

12  take of the flycatcher.

13          *iii.*    <u>*Grazing Management on the Dagger Allotment*</u>

14      107.    On information and belief, the Forest Service is continuing to rely upon the

15  1995 BiOp when it authorizes grazing in the Dagger Allotment on a yearly basis through

16  the issuance of AOIs, up to and including as recently as 2025. In its March 2025 response

17  to Plaintiffs' NOIs, the Forest Service stated, with respect to the Dagger Allotment, that it

18  "has a [BiOp] for . . . [the] flycatcher, [and] razorback sucker and its critical habitat, from

19  1995." The Forest Service therefore considers the 1995 BiOp to be the operative

20  consultation document governing grazing on the Dagger Allotment.

21      108.    On information and belief, the Forest Service has failed to implement the

22  grazing regime as described and authorized in the 1995 BiOp and 1995 ITS, including

23  mandatory mitigation measures (e.g., area closures, seasonal or yearly pasture rotation,

24  monitoring requirements, and forage utilization limits) and reasonable and prudent

25  alternatives that were integral to FWS's no-jeopardy determinations. As illustrated in

26  photos submitted to the Forest Service in the Conservation Organizations' November

27  2022, January 2025, September 2025, and November 2025 NOIs, widespread,

28

chronically heavy grazing by livestock is evident in riparian habitat (including critical habitat), as well as in areas that the consultation documents assumed would be closed to livestock use. As a result of such grazing (including unauthorized grazing in closed areas), the riparian vegetation is sparse, and habitat fails to exhibit the primary constituent elements necessary to sustain razorback suckers or flycatcher populations. Accordingly, livestock grazing has adversely affected, and continues to adversely affect razorback sucker and flycatcher habitat, including critical habitat, on the Dagger Allotment in "a manner or [to] an extent not previously considered" by the 1995 BiOp or the 1995 ITS. 50 C.F.R. § 402.16. Additionally, significant habitat degradation and evidence of cattle impacts on pastures and riparian areas that are ostensibly closed to grazing demonstrate that the Forest Service has consistently and repeatedly failed to implement the action according to the terms of the 1995 BiOp and 1995 ITS. Therefore, the Forest Service has effectively modified the action in a manner that is causing effects to listed species and/or critical habitat that was not considered in the 1995 BiOp. Such failure is particularly egregious with respect to the flycatcher, as FWS determined in the 1995 BiOp that reasonable and prudent alternatives—which on information and belief, the Forest Service has not implemented—were necessary to avoid jeopardy.

109.    On information and belief, the Forest Service has failed to implement the grazing rotations and monitoring program for razorback suckers, as required by the 1995 ITS. Accordingly, take of the razorback sucker has been exceeded, triggering the agencies' duty to reinitiate consultation. Yet, the Forest Service has failed to begin the formal consultation process, even as it impermissibly authorizes significant grazing activities on the allotment that continue to harass, harm, and otherwise take razorback suckers.

110.    The 1995 BiOp predates the designation of flycatcher critical habitat. Therefore, despite the conceded importance of this population and habitat to flycatcher survival and recovery, there has *never* been a consultation regarding the effects of

48

1    continued grazing on flycatcher critical habitat within this allotment. Without a valid

2    BiOp and ITS or Concurrence that covers *all* listed species and critical habitat that will be

3    impacted by the proposed activity, there is no assurance that ongoing grazing activities on

4    the Dagger Allotment comply with the ESA's substantive mandates.

5    **C.    The 2002 BiOp for Grazing on the Seventy-Six and Pinto Creek**
     **Allotments**

6

7    111.    The Seventy-six Allotment is bounded on one side by the Tonto Creek and

8    contains designated critical habitat for four species: the flycatcher; the northern Mexican

9    and narrow-headed gartersnakes; and the spikedace.

10    112.    The Pinto Creek allotment lies southeast of Roosevelt Reservoir and

11    encompasses Pinto Creek. The Allotment contains designated critical habitat for cuckoos.

12    113.    The effects of continued grazing on listed species and critical habitat within

13    the Seventy-six and Pinto Creek Allotments were last examined in a BiOp issued in 2002

14    ("2002 BiOp").[10] Relevant here, the 2002 BiOp analyzed the impacts of grazing on the

15    flycatcher and the spikedace.

16    *i.    Flycatchers in the Seventy-six Allotment*

17    114.    The 2002 BiOp acknowledged that the flycatcher "is *extremely endangered*

18    with loss of riparian habitat as the prime cause." 2002 BiOp at 117. However, while

19    conceding the poor baseline condition of flycatchers and their habitat on the allotment, *id.*

20    at 117, the 2002 BiOp nevertheless concurred with the Forest Service's determination

21    that ongoing grazing on the Seventy-six Allotment was not likely to adversely affect the

22    flycatcher, *id.* at 208. In reaching its concurrence, FWS expressly relied upon the Forest

23    Service's assertion that it would "prevent grazing along Tonto Creek in the Seventy [s]ix

24    ————————————————

25    [10] Letter from David Harlow, Ariz. Field Supervisor, U.S. Fish & Wildlife Serv., to
     Karl Siderits, Tonto Nat'l Forest Supervisor, U.S. Dep't of Agric. (Feb. 28, 2002)

26    (Biological Opinion for On-Going and Long-Term Grazing on the Tonto National
     Forest, AESO/SE 2-21-99-F-300).

27

28

allotment," fence off riparian habitat, and impose "conservative" utilization standards. *Id* at 117.

115.     Although critical habitat for the flycatcher had been designated in 1997, in 2001, a decision by the United States Court of Appeals for the Tenth Circuit vacated the critical habitat rule in districts within its jurisdiction. *Id.* at 93. FWS subsequently set aside the critical habitat rule in all states pending an economic impacts analysis. *Id.* Accordingly, the 2002 BiOp did not examine the impacts of ongoing grazing on flycatcher critical habitat in the Seventy-six Allotment.

ii.     *Spikedace in the Seventy-six Allotment*

116.     The 2002 BiOp also examined the impacts of grazing on spikedace in the Seventy-six Allotment. Relying in significant part on the assumption that "[f]encing and excluding cattle from Tonto Creek . . . will protect riparian vegetation and allow it to regenerate," *id.* at 29, the 2002 BiOp concluded that grazing is "not likely to jeopardize the continued existence of the spikedace" or "destroy or adversely modify designated critical habitat," *id.* at 30. In reaching its no-jeopardy and no-adverse modification determinations, the 2002 BiOp did not acknowledge the significant history of noncompliance with area closures, including the well-documented history of regular exceedances of utilization limits and trespass cattle in unauthorized areas on the allotment. *See, e.g.*, *id.* at 114. Nor did the 2002 BiOp acknowledge that this foundational assumption—i.e., that fencing riparian habitat would successfully exclude livestock and as a result, improve riparian habitat—was *already known* (i.e., in 2002, over twenty years ago) to be faulty due to the ineffectiveness of exclusion methods (e.g., wire and pipe fencing) and irregular, inconsistent monitoring.

117.     The 2002 ITS appended to the 2002 BiOp explained that FWS did "not anticipate any incidental take of spikedace" based on the purported lack of spikedace occurring in the area and the Forest Service's insistence that "livestock are excluded from critical habitat on Tonto and Rye Creeks." *Id.* at 29-30.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

iii.    _Flycatchers on the Pinto Creek Allotment_

118.    The 2002 BiOp explained that "upland range and riparian habitat along" Pinto Creek "play[s] a _crucial role_" in "providing potential nesting habitat and protecting riparian habitat on larger streams from flooding." _Id._ at 118 (emphasis added). Yet, despite the conceded importance of this "crucial" habitat, the 2002 BiOp proposed to continue the Forest Service's preferred grazing regime on the allotment with minimal changes.

119.    The 2002 BiOp ultimately determined that allowing nearly all of the potential flycatcher nesting habitat along Pinto Creek to be grazed would not jeopardize the continued existence of the flycatcher. _Id._ at 119. In support of its no-jeopardy determination, the 2002 BiOp relied in substantial part on  the assumption that "monitoring will be conducted as proposed" and grazing would be restricted "short distance[s]" of riparian areas. _Id._ at 119. Although The 2002 BiOp stressed the importance of regular, consistent monitoring to ensure compliance with the ESA's substantive mandates but also conceded that for many years the Forest Service had experienced serious, pervasive difficulties in complying with monitoring protocols because "there are typically no personnel available to conduct these monitoring activities adequately," _id._ at 116. The 2002 BiOp also relied on the fact that the Forest Service's proposed utilization standard for livestock grazing in potential flycatcher habitat—i.e., twenty percent—was "lower" than the previous standard. _Id._ 113. The 2002 BiOp insisted that if "strictly followed," the twenty percent standard would "reduce, but not eliminate" grazing impacts on flycatcher habitat. _Id._ The 2002 BiOp did not acknowledge the Forest Service's repeated failures to adhere to utilization standards on the allotment (and indeed, across the Tonto National Forest).

120.    In the 2002 ITS, despite acknowledging that "comprehensive survey data documenting presence or absence of the [flycatcher] is lacking," FWS summarily concluded that "no take" of flycatchers was "anticipate[d]." _Id._ at 119. The 2002 ITS

provided that reinitiation was required where a flycatcher is "located in an allotment or nearby, and it may be adversely affected by" grazing activities.

121.    FWS's no-jeopardy determinations for the spikedace (Seventy-six Allotment) and flycatcher (Pinto Creek Allotment), as well as its no-adverse-effects concurrence for the flycatcher (Seventy-six Allotment) in the 2002 BiOp substantially relied upon FWS's assumption that mitigation measures—in particular, monitoring of utilization limits and the fencing of critical habitat to exclude grazing in riparian areas— would be successful in minimizing grazing impacts. Yet, at the same time, the 2002 BiOp acknowledged a history of noncompliance with applicable utilization limits and closures, both within the allotments and across the Tonto National Forest. *See, e.g.*, *id.* at 114 (explaining that in 1999, "trespass cattle in the Tonto Creek Riparian Unit . . . nearly exceeded use limits before the time cattle were supposed to be in the pasture"); *id.* at 89 (reporting that "[h]igh levels of use went undetected in the Pinto Creek winter pastures during the 2000 grazing season," due in large part to the fact that the Forest Service has limited ability to "monitor levels and note rapid changes").

       iv.    *Grazing Management on the Seventy-six and Pinto Creek Allotments*

122.    On information and belief, the Forest Service is continuing to rely upon the 2002 BiOp (and the concurrences memorialized therein) when it authorizes grazing in the Seventy-six and Pinto Creek Allotments on a yearly basis through the issuance of AOIs, up to and including as recently as 2025. In its March 2025 response to Plaintiffs' NOIs, the Forest Service stated, with respect to the Seventy-six Allotment, that it "has a [BiOp] for . . . [the] spikedace and its critical habitat, and . . . [the] flycatcher from 2002." The 2002 BiOp is likewise the last time that the Forest Service underwent consultation for grazing activities on the Pinto Creek Allotment. The Forest Service therefore considers the 2002 BiOp to be the operative consultation document governing grazing on the Seventy-six and Pinto Creek Allotments.

123.    On information and belief, the Forest Service has failed to implement the grazing regime as described and authorized in the 2002 BiOp, including the mitigation measures upon which FWS relied in reaching its determinations (e.g., area closures, seasonal or yearly pasture rotation, monitoring requirements, and forage utilization limits). As illustrated in photos submitted to the Forest Service in the Conservation Organizations' November 2022, January 2025, September 2025, and November 2025 NOIs, widespread, chronically heavy grazing by livestock is evident in riparian habitat (including critical habitat), as well as in areas that the consultation documents assumed would be closed to livestock use. As a result of such grazing (including unauthorized grazing in closed areas), the riparian vegetation is sparse, and habitat fails to exhibit the primary constituent elements necessary to sustain spikedace or flycatcher populations. Accordingly, livestock grazing has adversely affected, and continues to adversely affect, spikedace and flycatcher habitat, including critical habitat, on the Seventy-six and Pinto Creek Allotments in "a manner or [to] an extent not previously considered" by the 2002 BiOp or the 2002 ITS. 50 C.F.R. § 402.16. Additionally, significant habitat degradation and evidence of cattle impacts on pastures and riparian areas that are ostensibly closed to grazing demonstrate that the Forest Service has consistently and repeatedly failed to implement the action according to the terms of the 2002 BiOp. Therefore, the Forest Service has effectively modified the action in a manner that is causing effects to listed species and/or critical habitat that was not considered in the 2002 BiOp.

124.    The 2002 BiOp predates: (1) the listing of the northern Mexican and narrow-headed gartersnakes and the designation of critical habitat for the two species; (2) the listing of the cuckoo and the designation of critical habitat for the species; and (3) the designation of critical habitat for the flycatcher. Accordingly, there has never been a consultation to determine whether grazing on the allotments will jeopardize the continued existence of the two gartersnakes or the cuckoo, nor whether such grazing will adversely modify designated critical habitat for the two snakes, the cuckoo, or the flycatcher.

1    Without a valid BiOp and ITS or concurrence in place that covers all listed species and

2    critical habitat on the allotments that are likely to be impacted ongoing grazing activities,

3    there is no assurance that such activities comply with the ESA's substantive mandates.

**D.    The 2005 BiOp for Grazing on the Buzzard Roost and Soldier Camp Allotments**

125.    The Buzzard Roost Allotment is comprised of approximately 35,345 acres of Tonto National Forest land. The northern half of the allotment is drained by Buzzard Roost Canyon which flows into Rock Creek. Rock Creek flows north to Spring Creek, which eventually forms the eastern boundary of the Soldier Camp Allotment. The Soldier Camp Allotment encompasses approximately 33,000 acres of forest land. Both the Buzzard Roost and Soldier Camp Allotments contain designated critical habitat for the spikedace.

126.    The effects of continued grazing in the Buzzard Roost and Soldier Camp Allotments on the spikedace and its critical habitat were last examined in a BiOp issued in 2005 ("2005 BiOp").[11] The 2005 BiOp summarily concurred with the Forest Service's determination that grazing would not adversely affect the spikedace because the species "do[es] not currently occupy the analysis area." 2005 BiOp at 34. The 2005 BiOp did not address the effects of the action on spikedace critical habitat, nor examine whether grazing would adversely modify such habitat. Accordingly, despite being designated as "*essential*" for the conservation of the species, these areas are left largely unprotected.

127.    On information and belief, the Forest Service is continuing to rely upon the concurrences documented in the 2005 BiOp when it authorizes grazing in the Buzzard

---

[11] Letter from Steve Spangle, Ariz. Field Supervisor, U.S. Fish & Wildlife Serv., to Gene Blankenbaker, Tonto Nat'l Forest Supervisor, U.S. Dep't of Agric. (June 21, 2005) (Biological Opinion on Grazing Permit Renewal and Implementation of Allotment Management Plans for the Buzzard Roost and Soldier Camp Allotments, Gila County, Arizona. AESO/SE 02-21-04-F-0273).

Roost and Soldier Camp Allotments on a yearly basis through the issuance of AOIs, up to and including as recently as 2025. In its March 2025 response to Plaintiffs' NOIs, the Forest Service stated, with respect to the Buzzard Roost and Soldier Camp Allotments, that it "has a . . . letter of concurrence for . . . spikedace critical habitat," and cited the 2005 BiOp. The Forest Service therefore considers the 2005 BiOp to be the operative consultation document governing grazing on the Buzzard Roost and Soldier Camp Allotments.

128.    On information and belief, the Forest Service has failed to implement the grazing regime as described in the 2005 BiOp, including mandatory mitigation measures (e.g., area closures, seasonal or yearly pasture rotation, monitoring requirements, and forage utilization limits). As illustrated in photos submitted to the Forest Service in the Conservation Organizations' November 2022, January 2025, September 2025, and November 2025 NOIs, widespread, chronically heavy grazing by livestock is evident in riparian habitat (including critical habitat), as well as in areas that the consultation documents assumed would be closed to livestock use. As a result of such grazing (including unauthorized grazing in closed areas), the riparian vegetation is sparse and streambanks are trampled. Hence, the habitat fails to exhibit the primary constituent elements necessary to sustain spikedace populations. Accordingly, livestock grazing has adversely affected, and continues to adversely affect spikedace habitat, including critical habitat, on the Buzzard Roost and Soldier Camp Allotments in "a manner or [to] an extent not previously considered" by the 2005 BiOp. 50 C.F.R. § 402.16. Additionally, significant habitat degradation and evidence of cattle impacts on pastures and riparian areas that are ostensibly closed to grazing demonstrate that the Forest Service has consistently and repeatedly failed to implement the action according to the terms of the 2005 BiOp. Therefore, the Forest Service has effectively modified the action in a manner that is causing effects to listed species and/or critical habitat that was not considered in the 2005 BiOp. These failures have resulted—and are currently resulting—in severe

1

2

habitat degradation and harm to listed species and designated critical habitat present on

the allotments.

3

4

**E.    The 2008 Concurrence for Grazing on the Lyons Fork and Poison Springs Allotments**

5

6

7

8

9

10

129.    The Lyons Fork Allotment is located in the Globe Ranger District and contains portions of Mineral Creek. A three-mile portion of Mineral Creek within the Allotment has been designated as critical habitat for the Gila chub. While Gila chub have been documented in Mineral Creek downstream of the Allotment, the portion of the creek that runs through the Allotment lacks perennial water. As a result, Gila chub are not known to exist on the Allotment.

11

12

13

14

15

130.    The Poison Springs Allotment is located east of Roosevelt Reservoir within the Tonto Basin Ranger District and encompasses the Salt River. The allotment contains occupied flycatcher habitat. Additionally, designated critical habitat for the flycatcher and cuckoo lie immediately adjacent to the Poison Springs Allotment, and are impacted by ongoing grazing activities within the allotment.

16

17

18

131.    The effects of grazing on listed species and designated critical habitat within the Lyons Fork and Poison Springs Allotments were last examined in a no-adverse-effects concurrence issued in 2008 ("2008 Concurrence").[12]

19

*i.    Gila Chub on the Lyons Fork Allotment*

20

21

132.    In the 2008 Concurrence, FWS agreed with the Forest Service's determination that continued grazing was not likely to adversely affect the Gila chub on

22

23

24

25

26

27

[12] *See* 2008 Concurrence, *supra* note 7. As explained, in the 2008 Concurrence, FWS also refused to concur with the Forest Service's determination that grazing was not likely to adversely affect flycatchers on the Hardt Creek Allotment. However, on information and belief, the Forest Service never pursued formal consultation, nor did it make a "no effect" determination with respect to listed species or critical habitat on the Hardt Creek Allotment.

28

1    the Lyons Fork Allotment. 2008 Concurrence at 14. FWS's concurrence substantially

2    relied upon the Forest Service's proposal to implement its preferred grazing regime (e.g.,

3    "conservative" use standards). *Id.* Accordingly, despite being designated as "*essential*"

4    for the conservation of the species, Gila chub critical habitat on the Lyons Fork

5    Allotment is left largely unprotected.

6                              ii.    *Flycatchers on the Poison Springs Allotment*

7           133.    The 2008 Concurrence also reported the Forest Service's determination that

8    ongoing grazing would not adversely affect the flycatcher or its critical habitat on the

9    Poison Springs Allotment. Although FWS acknowledged that portions of the Allotment

10   contain occupied and suitable/potential flycatcher breeding habitat, the agency

11   nevertheless concurred in the Forest Service's no-adverse-effect determination. FWS

12   rested its concurrence primarily on its assumptions that "livestock will not be allowed to

13   graze in potential, suitable or occupied habitat." 2008 Concurrence at 16. Hence, FWS

14   asserted that there would be no "direct impacts to breeding, migrating, or dispersing"

15   flycatchers from "livestock, livestock management, or herbivory of riparian vegetation."

16   *Id.* Additionally, FWS insisted that any adverse effects to nesting flycatchers from

17   cowbird parasitism would be "prevent[ed]" by excluding livestock from flycatcher

18   nesting habitat during the breeding season. *Id.* The 2008 Concurrence did not address the

19   fact that fencing and area closures have proven to be ineffective at protecting and

20   restoring riparian habitat from the effects of grazing.

21                              iii.   *Grazing Management on the Lyons Fork and Poison Springs*
22                                     *Allotments*

23          134.    On information and belief, the Forest Service is continuing to rely upon its

24   "not likely to adversely affect" determinations and the 2008 Concurrence when it

25   authorizes grazing in the Lyons Fork and Poison Springs Allotments on a yearly basis

26   through the issuance of AOIs, up to and including as recently as 2025. In its March 2025

27   response to Plaintiffs' NOIs, the Forest Service cited the 2008 concurrence as the

28

57

1    operative consultation document governing grazing on the two allotments. Specifically,

2    the Forest Service stated that the 2008 concurrence addresses the "Gila chub and its

3    critical habitat" on the Lyons Fork Allotment and the "flycatcher and its critical habitat"

4    on the Poison Springs Allotment.

5         135.    On information and belief, the Forest Service has failed to implement the

6    grazing regime envisioned by the 2008 Concurrence, including by failing to prevent

7    livestock use of riparian areas and adhere to (arbitrary) utilization limits. As illustrated in

8    photos submitted to the Forest Service in the Conservation Organizations' November

9    2022, January 2025, September 2025, and November 2025 NOIs, widespread,

10   chronically heavy grazing by livestock is evident in riparian habitat (including critical

11   habitat), as well as in areas that the consultation documents assumed would be closed to

12   livestock use. As a result of such grazing (including unauthorized grazing in closed

13   areas), the riparian vegetation is sparse, and habitat fails to exhibit the primary

14   constituent elements necessary to sustain Gila chub or flycatcher populations.

15   Accordingly, livestock grazing has adversely affected, and continues to adversely affect

16   Gila chub and flycatcher habitat, including critical habitat, in "a manner or [to] an extent

17   not previously considered" by the 2008 Concurrence. 50 C.F.R. § 402.16. Additionally,

18   the Forest Service's failure to implement the action as contemplated in the 2008

19   Concurrence has modified the action in a manner that is causing effects to listed species

20   and/or critical habitat that were not considered in the 2008 Concurrence. These failures

21   have resulted—and are currently resulting—in severe habitat degradation and harm to

22   listed species and designated critical habitat present on the Lyons Fork and Poison

23   Springs Allotments.

24        136.    The 2008 Concurrence predates the listing of the cuckoo and both

25   gartersnakes, as well as the designation of critical habitat for the three species.

26   Accordingly, there has *never* been a consultation to determine whether grazing activities

27   that impact the cuckoo, northern Mexican gartersnake, or narrow-headed gartersnake

28

and/or their critical habitat on the allotments can continue consistent with the ESA's

substantive mandates.

**F.    The 2009 BiOp for Grazing on the Chrysotile Allotment**

137.    The Chrysotile Allotment consists of 44,764 acres of National Forest land

along the Salt River in the Globe Ranger District. The Allotment contains designated

critical habitat for the razorback sucker.

138.    The effects of grazing on razorback sucker and its critical habitat were last

examined in a BiOp issued in 2009 ("2009 BiOp"), in which FWS concurred with the

Forest Service's determination that grazing in the allotment was not likely to adversely

affect designated critical habitat for the razorback sucker. 2009 BiOp at 44.[13] In reaching

this conclusion, FWS primarily relied upon the Forest Service's representation that

"[t]here is no proposed grazing within the Salt River or surrounding riparian areas" that

provide habitat for the razorback sucker. *Id.* FWS's no-adverse-effect determination also

substantially relied on the Forest Service's proposal to implement ostensibly

"conservative" utilization limits "in the upland ranges of the allotment" and prohibit

livestock "use within the floodplain." *Id.* According to the 2009 BiOp, these measures

would ensure that no "potential indirect watershed impacts from upland grazing could

measurably be detected to adversely affect razorback sucker critical habitat." *Id.* The

2009 BiOp did not address the fact that similar mitigation measures have consistently

failed to adequately protect and conserve riparian habitat and the listed species that

depend upon such habitat across the Tonto National Forest.

———————————————

[13] Letter from Steve Spangle, Ariz. Field Supervisor, U.S. Fish & Wildlife Serv., to Gene Blankenbaker, Tonto Nat'l Forest Supervisor, U.S. Dep't of Agric. (Aug. 17, 2009) (Biological for Ongoing Grazing for Three Allotments on the Tonto National Forest, AESO/SE 02-21-95-F-0303-R1; 22410-2007-F-0075; 02-22-03-F-366; 22410-2007-F-0218).

139.    On information and belief, the Forest Service is continuing to rely upon its "not likely to adversely affect" determination and FWS's concurrence documented in the 2009 BiOp when it authorizes grazing in the Chrysotile Allotment on a yearly basis through the issuance of AOIs, up to and including as recently as 2025. In its March 2025 response to Plaintiffs' NOIs, the Forest Service stated, with respect to the Chrysotile Allotment, that it "has a [BiOp] for . . . [the] razorback sucker and its critical habitat . . . from 2009." The Forest Service therefore considers the 2009 BiOp to be the operative consultation document governing grazing on the Chrysotile Allotment.

140.    On information and belief, the Forest Service has failed to implement the grazing regime as described in the 2009 BiOp, including mitigation measures that FWS relied upon in reaching its no-adverse-effects determination (e.g., area closures, seasonal or yearly pasture rotation, monitoring requirements, and forage utilization limits). As illustrated in photos submitted to the Forest Service in the Conservation Organizations' November 2022, January 2025, September 2025, and November 2025 NOIs, widespread, chronically heavy grazing by livestock is evident in riparian habitat (including critical habitat), as well as in areas that the consultation documents assumed would be closed to livestock use. As a result of such grazing (including unauthorized grazing in closed areas), the riparian vegetation is sparse, and habitat fails to exhibit the primary constituent elements necessary to sustain razorback suckers populations. Accordingly, livestock grazing has adversely affected, and continues to adversely affect razorback sucker habitat, including critical habitat, on the Chrysotile Allotment in "a manner or [to] an extent not previously considered" by the 2009 BiOp. 50 C.F.R. § 402.16. Additionally, the Forest Service's failure to implement the action according to the terms of the 2009 BiOp has modified the action in a manner that is causing effects to listed species and/or critical habitat that were not considered in the 2009 BiOp. These failures have resulted— and are currently resulting—in severe habitat degradation and harm to listed species and designated critical habitat present on the allotment.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### G.    The 2010 BiOp for Grazing on the Crouch Mesa Allotment

141.    The Crouch Mesa Allotment is located within the Pleasant Valley Ranger District on the Tonto National Forest. The Allotment is managed in conjunction with the Pleasant Valley Allotment and consists of 7,510 acres of National Forest System land. Cherry Creek and Couch Creek run through the Crouch Mesa Allotment, as do several intermittent and ephemeral streams, which all provide important riparian habitat. The Cherry and Couch Creek areas within the Payson Ranger District are referred to as the Gentry Creek Management Area ("MA"). Relevant here, the Crouch Mesa Allotment contains designated critical habitat for the frog.

142.    The impacts of grazing on listed species were last examined in a BiOp issued in 2010 ("2010 BiOp").[14] Because FWS "anticipate[d] that the [frog] will occur on the allotment during the life" of the grazing permit (i.e., ten years), FWS concluded that grazing was "reasonably certain" to result in take. 2010 BiOp at 9.

143.    The 2010 BiOp concluded that ongoing grazing on the Crouch Mesa Allotment "is not likely to jeopardize the continued existence of the [frog]." *Id.* at 12. The 2010 BiOp rested this determination on the faulty assumption that the Forest Service's preferred grazing regime would "maintain or improve the existing range and watershed conditions," despite mounting evidence that similar management strategies had failed to maintain—much less restore—riparian habitat under similar circumstances. *Id.*

144.    The 2010 BiOp included an ITS ("2010 ITS") that authorized incidental take in two scenarios: (1) direct mortality or injury through trampling; and (2) harm from habitat alteration due to livestock impacts. *Id.* at 13-14. The 2010 ITS provided that take

---

[14] Letter from Steve Spangle, Ariz. Field Supervisor, U.S. Fish & Wildlife Serv., to Gene Blankenbaker, Tonto Nat'l Forest Supervisor, U.S. Dep't of Agric. (Apr. 1, 2010) (Biological Opinion on the Crouch Mesa Allotment on the Tonto National Forest Pleasant Valley Ranger District AESO/SE 22410-F-2009-0217).

would be exceeded if, "after a period of two consecutive years, the total number of occupied [frog] sites totals less than four in the Pleasant Valley Ranger District as a result of livestock management." *Id.* at 14.

145.    On information and belief, the Forest Service is continuing to rely upon the 2010 BiOp when it authorizes grazing in the Crouch Mesa Allotment on a yearly basis through the issuance of AOIs, up to and including as recently as 2025. In its March 2025 response to Plaintiffs' NOIs, the Forest Service stated, with respect to the Crouch Mesa Allotment, that it "has a [BiOp] . . . [for the] frog" from 2010. The Forest Service therefore considers the 2010 BiOp to be the operative consultation document governing grazing on the Crouch Mesa Allotment.

146.    On information and belief, the Forest Service has failed to implement the grazing regime as described in the 2010 BiOp and 2010 ITS, including mandatory mitigation measures (e.g., area closures, seasonal or yearly pasture rotation, monitoring requirements, and forage utilization limits). As illustrated in photos submitted to the Forest Service in the Conservation Organizations' November 2022, January 2025, September 2025, and November 2025 NOIs, widespread, chronically heavy grazing by livestock is evident in riparian habitat (including critical habitat), as well as in areas that the consultation documents assumed would be closed to livestock use. As a result of such grazing (including unauthorized grazing in closed areas), the riparian vegetation is sparse, and habitat fails to exhibit the primary constituent elements necessary to sustain frog populations. Accordingly, livestock grazing has adversely affected, and continues to adversely affect frog habitat, including critical habitat, on the Crouch Mesa Allotment in "a manner or [to] an extent not previously considered" by the 2010 BiOp or the 2010 ITS. 50 C.F.R. § 402.16. Additionally, the Forest Service's failure to implement the action according to the terms of the 2010 BiOp has modified the action in a manner that is causing effects to listed species and/or critical habitat that were not considered in the 2010 BiOp. These failures have resulted—and are currently resulting—in severe habitat

1  degradation and harm to listed species and designated critical habitat present on the

2  allotment

3      147.    The 2010 BiOp predates the designation of critical habitat for the frog.

4  Accordingly, there has *never* been a consultation to determine whether grazing activities

5  that impact the frog's critical habitat on the allotment can continue consistent with the

6  ESA's substantive mandates.

7      **H.**    **The 2014 BiOp for Grazing on the Tonto Basin Allotment**

8      148.    The Tonto Basin Allotment consists of 118,552 acres located in the

9  foothills of the Sierra Ancha and Mazatzal Mountains in the Tonto Basin Ranger District

10  of the Tonto National Forest. The unit contains the Tonto Creek Riparian Unit

11  ("TCRU"), a special riparian exclosure established in 1989 that purports to address

12  concerns for wildlife habitat loss when Roosevelt Dam was raised. The Allotment

13  contains designated, occupied critical habitat for five listed species: the flycatcher; the

14  northern Mexican gartersnake; the narrow-headed gartersnake; the cuckoo; and the

15  spikedace.

16      149.    The Tonto Basin Allotment last underwent consultation for continued

17  grazing activities in 2014, which concluded in the issuance of a BiOp ("2014 BiOp") that

18  assessed the impacts of grazing on the flycatcher and its critical habitat, the spikedace

19  and its critical habitat, and the then-candidate northern Mexican gartersnake and narrow-

20  headed gartersnake and their respective proposed critical habitat designations.[15]

21      150.    With respect to the flycatcher, the 2014 BiOp acknowledged that the

22  Allotment contained "flycatcher breeding habitat." 2014 BiOp at 15. Yet, despite

[15] Letter from Steve Spangle, Ariz. Field Supervisor, U.S. Fish & Wildlife Serv., to Neil Bosworth, Tonto Nat'l Forest Supervisor, U.S. Dep't of Agric. (July 24, 2014) (Biological Opinion for Reauthorization of Permitted Livestock Grazing on the Tonto Basin, Walnut, and 7/K Allotments on the Tonto National Forest, AESO/SE 02EAAZ00-2012-F-0423; 02EAAZ00-2007-I-0221).

63

evidence of heavy use and riparian degradation, the 2014 BiOp determined that the proposed grazing activities—which would dramatically increase the number of livestock authorized in pastures adjacent to flycatcher habitat, *see* 2014 BiOp at 18—would not jeopardize the flycatcher, *id.* at 15. The 2014 BiOp based this conclusion in substantial part on its assumption that the implementation of the Forest Service's preferred grazing regime would effectively minimize any adverse effects to the flycatcher and its habitat. In particular, the 2014 BiOp relied on the erroneous premises that fencing would exclude livestock from occupied habitat, and that upland and riparian areas would be grazed to "conservative" utilization limits (i.e., thirty to forty percent). *Id.* at 20.

151.    The 2014 ITS reported FWS's determination that incidental take was "not anticipate[d]." *Id.* at 20. However, FWS's conclusion primarily relied on the premise that mitigation measures (e.g., fencing) "will sufficiently protect suitable habitat conditions." *Id.* at 20-21.

152.    The 2014 BiOp also reported FWS's concurrence in the Forest Service's no-adverse-effects determinations for: flycatcher critical habitat; the spikedace and its critical habitat; the cuckoo and its critical habitat; the northern Mexican gartersnake and its proposed critical habitat; and the narrow-headed gartersnake and its proposed critical habitat. 2014 BiOp at 27, 29-31. For each concurrence, FWS's "not likely to adversely affect" concurrence primarily relied on three assumptions: (1) fencing would effectively exclude cattle from the TCRU and other occupied areas; (2) adverse effects to upland habitat would be minimized through the implementation of ostensibly "conservative" utilization limits (i.e., thirty to forty percent); and (3) the use of adaptive management (e.g., frequent monitoring, pasture rotation, and other mitigation measures) would effectively protect listed species and designated critical habitat. *See id.* at 27, 29-31.

153.    On information and belief, the Forest Service is continuing to rely upon the concurrences documented in the 2005 BiOp when it authorizes grazing in the Tonto Basin Allotment on a yearly basis through the issuance of AOIs, up to and including as

recently as 2025. In its March 2025 response to Plaintiffs' NOIs, the Forest Service stated, with respect to the Tonto Basin Allotment, that it "has a [BiOp] for [the] . . . flycatcher and its critical habitat . . . from 2014." The Forest Service therefore considers the 2014 BiOp to be the operative consultation document governing grazing on the Tonto Basin Allotment.

154.    On information and belief, the Forest Service has failed to implement the grazing regime as described in the 2014 BiOp and 2014 ITS, including mandatory mitigation measures that FWS relied upon in reaching its determinations (e.g., area closures, seasonal or yearly pasture rotation, monitoring requirements, and forage utilization limits). As illustrated in photos submitted to the Forest Service in the Conservation Organizations' November 2022, January 2025, September 2025, and November 2025 NOIs, widespread, chronically heavy grazing by livestock is evident in riparian habitat (including critical habitat), as well as in areas that the consultation documents assumed would be closed to livestock use. As a result of such grazing (including unauthorized grazing in closed areas), the riparian vegetation is sparse, and habitat fails to exhibit the primary constituent elements necessary to sustain populations of the flycatcher, the spikedace, or either gartersnake species. Accordingly, livestock grazing has adversely affected, and continues to adversely affect habitat for these four listed species, including critical habitat, on the Tonto Basin Allotment in "a manner or [to] an extent not previously considered" by the 2014 BiOp or the 2014 ITS. 50 C.F.R. § 402.16. Additionally, the Forest Service's failure to implement the action according to the terms of the 2014 BiOp has modified the action in a manner that is causing effects to listed species and/or critical habitat that were not considered in the 2014 BiOp. These failures have resulted—and are currently resulting—in severe habitat degradation and harm to listed species and designated critical habitat present on the allotment.

155.    The 2014 BiOp predated the designation of critical habitat for the cuckoo, the northern Mexican gartersnake, and the narrow-headed gartersnake. Accordingly, there

has *never* been a consultation to determine whether grazing activities that impact those species' critical habitat areas on the allotment can continue consistent with the ESA's substantive mandates.

## I.   <u>The 2019 BiOp for Grazing on the Bar X Complex</u>

156.   The Bar X Complex is located in the Pleasant Valley Ranger District of the Tonto National Forest. The Complex consists of approximately 27,423 acres across four allotments: the Bar X Allotment; the Colcord Allotment; the Haigler Creek Allotment; and the Young Allotment. The Complex contains critical habitat for two species: the frog and the narrow-headed gartersnake.

157.   The Complex supports two extant frog sites, and overlaps the Gentry Creek Management Area in Recovery Unit 5 outlined in the frog's Recovery Plan. The Complex also contains potential and suitable frog habitat, including stock tanks, springs, and streams, including over seventeen miles of perennial streams. The most recent assessment of the watersheds encompassed by the Complex was conducted in 2011 and determined that most of the watersheds are "functioning at risk" or "impaired."

158.   The Complex last underwent consultation for ongoing grazing activities in 2019, which concluded with the issuance of a BiOp ("2019 BiOp").[16] Relevant here, the 2019 BiOp reported that the Forest Service would implement on the Complex the same grazing regime that has repeatedly failed to protect listed species or their habitat throughout the Tonto National Forest. For example, the 2019 BiOp imposes a forty percent utilization standard on upland and riparian vegetation, *id.* at 5, and requires that livestock be excluded from areas "known to be occupied by [the frog]," *id.* at 12. The

_____

[16] Letter from Jeffrey A. Humphrey, Field Supervisor, U.S. Fish & Wildlife, to Debbie Cress, Tonto Nat'l Forest, U.S. Dep't of Agric. (Aug. 5, 2019) (Biological Opinion for Bar X Grazing Allotment Complex and Heber-Reno Driveway on the Tonto National Forest, Pleasant Valley Ranger District, AESO/SE 02EAAZ00-2019-F-0249).

2019 BiOp also relied upon the Forest Service's assurances that it would implement a pasture rotation schedule, but does not discuss any particular rotation schedule. *Id.* at 4.

159.   The 2019 BiOp concluded that grazing within the Bar X Complex would not jeopardize the continued existence of the frog. 2019 BiOp at 32. In support of this determination, the 2019 BiOp cited insisted that the same grazing regime for decades has failed to adequately protect frog habitat both on the Complex and across the Tonto National Forest (e.g., monitoring, utilization limits, and seasonal closures) will somehow now work to "reduce or prevent overgrazing of vegetation adjacent to streams/ponds that can be used by [frogs]." *Id.* at 32.

160.   The 2019 BiOp attached an ITS acknowledging that incidental take of the frog by grazing activities was likely. *Id.* at 33. The 2019 ITS identified as a take surrogate "the amount or extent" of sites occupied by the frog, *id.*, and provided that take would be exceeded where the "distribution and abundance of [frog] populations on the Bar X Grazing Complex . . . decline due to effects of livestock grazing and tank maintenance." *Id.* at 34.

161.   The 2019 BiOp also concurred in the Forest Service's determination that any effects of grazing to the narrow-headed gartersnake would not adversely affect the species. *Id.* at 59-60. In particular, FWS principally relied upon the Forest Service's proposal to implement its failed grazing regime—including area and seasonal closures, "regulated use of vegetation," and "monitoring"—to conclude that any effects to the gartersnake would be "insignificant or discountable." *Id.* at 59. The 2019 BiOp did not acknowledge that this same grazing regime had failed to forestall the deterioration— much less facilitate the improvement—of vital riparian habitat across the Tonto National Forest.

162.   On information and belief, the Forest Service is continuing to rely upon the 2019 BiOp when it authorizes grazing on allotments within the Bar X Complex on a yearly basis through the issuance of AOIs. Indeed, in March 2025, the Forest Service

1    issued an AOI for the Bar X Complex specifying the pasture rotation schedule, including

2    "timing, livestock numbers, and duration," as required by the 2019 BiOp. at 4.

3         163.    On information and belief, the Forest Service has failed to implement the

4    grazing regime as described in the 2019 BiOp and 2019 ITS, including mandatory

5    mitigation measures that were key to FWS's no-jeopardy determination (e.g., area

6    closures, seasonal or yearly pasture rotation, monitoring requirements, and forage

7    utilization limits). As illustrated in photos submitted to the Forest Service in the

8    Conservation Organizations' November 2022, January 2025, September 2025, and

9    November 2025 NOIs, widespread, chronically heavy grazing by livestock is evident in

10   riparian habitat (including critical habitat), as well as in areas that the consultation

11   documents assumed would be closed to livestock use. As a result of such grazing

12   (including unauthorized grazing in closed areas), the riparian vegetation is sparse, and

13   habitat fails to exhibit the primary constituent elements necessary to sustain frog

14   populations. Accordingly, livestock grazing has adversely affected, and continues to

15   adversely affect frog habitat on the Bar X Complex in "a manner or [to] an extent not

16   previously considered" by the 2019 BiOp or the 2019 ITS. 50 C.F.R. § 402.16.

17   Additionally, the Forest Service's failure to implement the action according to the terms

18   of the 2019 BiOp has modified the action in a manner that is causing effects to listed

19   species and/or critical habitat that were not considered in the 2019 BiOp. These failures

20   have resulted—and are currently resulting—in severe habitat degradation and harm to

21   listed species and designated critical habitat present on the allotment.

22        164.    The 2019 BiOp predates the designation of critical habitat for the narrow-

23   headed gartersnake. Accordingly, there has never been a consultation to determine

24   whether grazing on the allotment will adversely modify designated critical habitat for the

25   species.

26

27

28

1

2

**J.**    **The 2020 Concurrence for Grazing on the Hick's-Pikes Peak Allotment**

165.    The Hick's-Pikes Peak Allotment is located in the Globe Ranger District of the Tonto National Forest. The Allotment shares a boundary with the adjacent Daggar Allotment. The Hick's-Pikes Peak Allotment is bounded by the Salt River to the north and contains fifty-six miles of creeks and washes. The Allotment provides important riparian habitat for the flycatcher, the cuckoo, and the narrow-headed gartersnake. The Allotment also contains designated critical habitat for the flycatcher and the cuckoo.

166.    The Allotment last underwent consultation for ongoing grazing activities in 2020 when FWS issued its concurrence in the Forest Service's determination that grazing was not likely to adversely affect: the flycatcher or its critical habitat; the cuckoo or its critical habitat; or the narrow-headed gartersnake ("2020 Concurrence").[17]

167.    In concurring with the Forest Service's determination that grazing would not adversely affect listed species or their critical habitat, FWS once again relied on the Forest Service's proposal to implement its failed grazing regime. For instance, the 2020 Concurrence stated that the effects of grazing on the flycatcher, cuckoo, and narrow-headed gartersnake will be "insignificant and discountable" because livestock will be excluded from riparian habitat, *id.* at 4, 5. When taken together with range improvements and mitigation measures designed to maintain "adequate upland herbaceous cover" (e.g., the use of ostensibly "moderate to conservative grazing" utilization limits and "effectiveness monitoring"), the 2020 Concurrence concluded that grazing would not adversely affect listed species or their critical habitat. *Id.*

168.    On information and belief, the Forest Service is continuing to rely upon the concurrences documented in the 2020 BiOp when it authorizes grazing in the Hick's-

_____

[17] Letter from Jeffrey A. Humphrey, Field Supervisor, U.S. Fish & Wildlife, to B. Chad Harold, Dist. Ranger, Tonto Nat'l Forest, U.S. Dep't of Agric. (May 19, 2020) (AESO/SE 02EAAZ00-2020-I-0183).

Pikes Peak Allotment on a yearly basis through the issuance of AOIs, up to and including as recently as 2025. In its March 2025 response to Plaintiffs' NOIs, the Forest Service stated, with respect to the Hick's-Pikes Peak Allotment, that it "has a letter of concurrence from 2020 for . . . [the] flycatcher and its critical habitat, . . . [the] cuckoo, . . . and [the] narrow-headed gartersnake." The Forest Service therefore considers the 2020 BiOp to be the operative consultation document governing grazing on the Hick's-Pikes Peak Allotment.

169.    On information and belief, the Forest Service has failed to implement the grazing regime as described in the 2020 Concurrence, including mandatory mitigation measures upon which FWS relied in reaching its no-adverse-effects determination (e.g., area closures, seasonal or yearly pasture rotation, monitoring requirements, and forage utilization limits). As illustrated in photos submitted to the Forest Service in the Conservation Organizations' November 2022, January 2025, September 2025, and November 2025 NOIs, widespread, chronically heavy grazing by livestock is evident in riparian habitat (including critical habitat), as well as in areas that the consultation documents assumed would be closed to livestock use. As a result of such grazing (including unauthorized grazing in closed areas), the riparian vegetation is sparse, and habitat fails to exhibit the primary constituent elements necessary to sustain flycatcher, cuckoo, or narrow-headed gartersnake populations. Accordingly, livestock grazing has adversely affected, and continues to adversely affect habitat for these listed species, including critical habitat, on the Hick's-Pikes Peak Allotment in "a manner or [to] an extent not previously considered" by the 2020 Concurrence. 50 C.F.R. § 402.16. Additionally, the Forest Service's failure to implement the action as described in the 2020 Concurrence has modified the action in a manner that is causing effects to listed species and/or critical habitat that were not considered in the 2020 Concurrence. These failures have resulted—and are currently resulting—in severe habitat degradation and harm to listed species and designated critical habitat present on the allotment.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### K.     The 2022 BiOp for Grazing on the Red Lake Complex

170.     The Red Lake Complex consists of three allotments—the Red Lake, Gentry Mountain, and Catholic Peak Allotments— in the Pleasant Valley Ranger District of the Tonto National Forest. The Complex is bordered by the Crouch Mesa Allotment to the south. 2022 BiOp at 12.

171.     The Complex contains two units of designated critical habitat for the frog: the Crouch, Gentry, and Cherry Creeks Unit and Parallel Canyon Unit. *Id.* at 23. Two of the allotments, Red Lake Allotment and Gentry Mountain Allotment, contain occupied frog sites. *Id.* at 17-18. Although frogs have been released at sites in the Catholic Peak Allotment, such releases have failed to establish persistent populations. *Id.* at 21. Within each allotment, certain riparian areas and stock tanks have been fenced in an attempt to exclude livestock, including but not limited to Bottle Springs, Carroll Spring, Gentry Creek, and Pine Spring. *Id.* at 18-21.

172.     FWS last examined the effects of grazing on frogs and their critical habitat within the Complex in a BiOp issued in 2022 ("2022 BiOp").[18] The 2022 BiOp determined that continued grazing "is not likely to jeopardize the continued existence of the [frog], and is not likely to destroy or adversely modify designated critical habitat." 2022 BiOp at 35. The 2022 BiOp based its no-jeopardy and no-adverse-modification conclusions primarily on the Forest Service's proposal to implement its preferred grazing regime, including: monitoring frog populations and threats; forage utilization limits and area/seasonal closures, which purport to "trend[] towards improved conditions"; and "range improvements"(e.g., fencing). The 2022 BiOp assumed, contrary to the evidence

---

[18] Letter from Heather Whitlaw, Ariz. Field Supervisor, to Matthew Paciorek, Dist. Ranger, Tonto Nat'l Forest, U.S. Dep't of Agric. (June 22, 2022) (Effects of continued livestock grazing on the Red Lake, Catholic Peak, and Gentry Mountain grazing allotments in the Pleasant Valley Ranger District of the Tonto National Forest for 10 years, AESO/SE 2022-0004460-S7; 02EAAZ00-2022-f-0407).

before the agency, that the implementation of this regime would ensure that "[c]ritical habitat on [the Complex] will continue to serve the function and conservation role of critical habitat for the [frog]," *id.* at 36, and thus avoid jeopardy or adverse modification.

173.    The 2022 BiOp stated that the primary effects of grazing on frogs (e.g., trampling of individual frogs, sedimentation of waterways and stock tanks, elimination of riparian vegetation, and the introduction and spread of disease and nonnative predators) would be "minimize[d]" through grazing and adaptive management strategies. *Id.* at 32-33. The 2022 BiOp further stated that the "[c]onsequences of continued livestock grazing on [the Complex] has not resulted in extirpation of [the frog]" from the Complex, and that the effects of grazing are "unlikely to preclude achievement of the Recovery Criteria." *Id.* Accordingly, the 2022 BiOp concluded that grazing will "not move the [frog] past a tipping point where the species can no longer be recovered." *Id.* The 2022 BiOp likewise determined that grazing would not prevent critical habitat from "contribut[ing] to the recovery of the species"—and thus, "will not push the species past a tipping point where recovery would no longer be possible"—because "the critical habitat within the action area will retain its function." *Id.* However, this recovery analysis failed to acknowledge that the frog faces significant grazing pressure throughout much of its range, as well as the significant and growing threat of climate change. Additionally, the recovery analysis, like the 2022 BiOp and 2022 ITS, primarily focused on stock tanks, largely ignoring the significant, adverse impacts that grazing will have—and is having—on riparian critical habitat.

174.    The 2022 ITS appended to the 2022 BiOp explained that take of the frogs was likely from harassment, direct mortality, or injury of individual frogs; harm from loss of habitat functionality; and/or harassment or direct mortality from the spread of non-native predators and/or disease. *Id.* at 37. Because the take of individual frogs is difficult to detect, the 2022 ITS used a surrogate, attributing take from grazing in the Complex "at the metapopulation level." *Id.* at 38. Specifically, the 2022 ITS used "occupancy and

breeding of [frogs]" at certain established breeding sites as a surrogate measure for take. *Id.* "Incidental take will be considered to have been exceeded if: 1) there is a loss of documented breeding at one of known six breeding sites in a given pasture over a three-year consecutive period; and 2) loss of that breeding site is attributed to the proposed livestock management." *Id.*

175.    As the most recent consultation concerning grazing on the Red Lake Complex, the Forest Service relies upon the 2022 BiOp when it issues AOIs on a yearly basis to authorize grazing activities. In its March 2025 response to Plaintiffs' NOIs, the Forest Service stated, with respect to the Red Lake Complex, that it "has a [BiOp] for . . . [the] frog . . . from 2022."

176.    On information and belief, the Forest Service has failed to implement the grazing regime as described in the 2022 BiOp and 2022 ITS, including mandatory mitigation measures that were central to FWS's determinations (e.g., area closures, seasonal or yearly pasture rotation, monitoring requirements, and forage utilization limits). As illustrated in photos submitted to the Forest Service in the Conservation Organizations' November 2022, January 2025, September 2025, and November 2025 NOIs, widespread, chronically heavy grazing by livestock is evident in riparian habitat (including critical habitat), as well as in areas that the consultation documents assumed would be closed to livestock use. As a result of such grazing (including unauthorized grazing in closed areas), the riparian vegetation is sparse, and habitat fails to exhibit the primary constituent elements necessary to sustain frog populations. Accordingly, livestock grazing has adversely affected, and continues to adversely affect frog habitat, including critical habitat, within the Red Lake Complex in "a manner or [to] an extent not previously considered" by the 2022 BiOp or the 2022 ITS. 50 C.F.R. § 402.16. Additionally, the Forest Service's failure to implement the action according to the terms of the 2022 BiOp has modified the action in a manner that is causing effects to listed species and/or critical habitat that were not considered in the 2022 BiOp. These failures

have resulted—and are currently resulting—in severe habitat degradation and harm to listed species and designated critical habitat present on the allotment.

### III.   THE CONSERVATION ORGANIZATIONS' NOVEMBER 2022 NOI

177.   On November 9, 2022, in accordance with 16 U.S.C. § 1540(g)(2), the Center and Maricopa Bird Alliance notified USFS and FWS of its intent to prosecute unremedied violations of the ESA arising from the agencies' oversight and implementation of the ongoing grazing program in the Tonto National Forest. In that Notice of Intent ("November 2022 NOI"), Plaintiffs identified numerous legal violations of the ESA and its implementing regulations, including those raised in this Complaint.

178.   In particular, the November 2022 NOI documented the Forest Service's unlawfully lackadaisical approach to ESA compliance, resulting in serious harm to listed species and critical habitat, as well as the utter failure of the agencies' preferred grazing regime to adequately protect listed species and their critical habitat from the severe adverse impacts of grazing. For example, despite a clear legal obligation to reinitiate consultation in response to newly listed species or newly designated critical habitat, the November 2022 NOI identified several instances where the Forest Service failed to do so. The November 2022 NOI explained that as a result of this failure, the impacts of ongoing grazing activities on the newly protected species and habitat areas have *never* been examined in any ESA consultation, in clear violation of the statute and its implementing regulations. Additionally, the November 2022 NOI contained a substantial volume of information, photographs, and other evidence raising questions as to the continuing validity of the conclusions and determinations made in the BiOps and concurrences detailed above. In particular, the November 2022 NOI documented (through field visits conducted during the prior two years) extensive overgrazing far exceeding riparian habitat utilization limits contemplated by the operative BiOps or concurrences and/or authorized by the ITSs. Furthermore, despite requirements across the BiOps and concurrences that livestock be excluded from riparian habitat to avoid adverse effects to

listed species or critical habitat, the November 2022 NOI documented across the allotments damaged exclosure fencing, major livestock intrusions into areas purportedly closed to livestock grazing, and significant unauthorized use by cattle. The NOI explained that the extensive habitat degradation and the major deviations from the grazing regime as proposed and examined in the BiOps and concurrences constituted new information showing that significant, destructive grazing pressure is affecting the listed species and critical habitat present in the allotments in a manner or to an extent not previously considered or authorized in the operative BiOps/ITSs and concurrences. The NOI likewise established that the Forest Service's failures to implement the mitigation measures and/or reasonable and prudent alternatives relied upon by FWS in reaching its no-jeopardy, no-adverse-modification, an/or no-adverse-effects determinations (including, but not limited to, utilization limits, monitoring programs, and seasonal or yearly rotations) constitute significant deviations from the proposed grazing program that were not contemplated in the operative BiOps and concurrences. Finally, the November 2022 NOI documented that overgrazing and severe habitat degradation had resulted—and is resulting—in take that far exceeds the amounts contemplated in any of the ITSs. Accordingly, the November 2022 NOI triggered the duty for the Forest Service and FWS to initiate and/or reinitiate consultation.

179.    On January 9, 2023, the Forest Service and FWS issued a joint response to the November 2022 NOI. Although the agencies insisted that monitoring and notification protocols were sufficient to protect listed species and critical habitat on the allotments at issue, the agency nevertheless *conceded* that the reinitiation of consultation "is needed on nine of the allotments" named in the NOI, including: Dagger Allotment; Poison Springs Allotment; Hardt Creek Allotment; Seventy-six Allotment; Soldier Camp Allotment; Gisela Allotment; Buzzard Roost Allotment; and Crouch Mesa Allotment. In particular, the agencies recognized that the November 2022 NOI contained evidence of numerous instances of noncompliance with mandatory mitigation measures in the allotments at

issue, and insisted that the Forest Service was "either already aware of and taking steps to address some of these issues, or is investigating the cause of these issues and the circumstances surrounding them." With respect to the remaining allotments identified in the November 2022 NOI—including the Hick's-Pikes Peak, Red Lake, Catholic Peak, Gentry Mountain, Copper Creek, and Tonto Basin Allotments—the Forest Service reported that it had "reviewed [its] internal files and concluded that" the allotments "are in compliance with section 7 of the ESA."

180.    Notwithstanding any individual allotment's compliance with the ESA, the Forest Service and FWS *conceded* that "it would be most efficient to complete consultation for all allotments across the entire Tonto National Forest in one package, which would include all allotments named in the NOI *including those we believe are currently in compliance*." (emphasis added). Accordingly, the Forest Service reported that it "intend[s] to begin work on the forest-wide consultation immediately." The agencies' response did not address the November 2022 NOI's assertion that the Forest Service's use of utilization limits to manage grazing within occupied and critical habitat for listed species is arbitrary because such metrics have nothing to do with the unique needs of listed species or the measures necessary to ensure their survival and recovery. Nor did the agencies' response explain how grazing could continue consistent with the procedural and substantive mandates of the ESA in allotments where the agencies conceded that new consultation was necessary.

181.    In February 2023, the Forest Service and FWS met with the Conservation Organizations to discuss the organization's ongoing concerns. At that meeting, the Conservation Organizations agreed to refrain from filing a lawsuit challenging the agencies' ESA compliance in connection with grazing on the Tonto National Forest on the express basis of the Forest Service's assurances that the agency would provide quarterly reports to the Conservation Organizations detailing the agencies' efforts to exclude cattle from designated critical habitat, including by monitoring and maintaining

fencing. The agencies also reiterated their commitment to reinitiate consultation on all of the allotments named in the 2022 NOI. The Conservation Organizations expressly reserved their right to pursue judicial review of the Forest Service and FWS's violations of the ESA in the event that livestock continue to graze riparian and critical habitat in the allotments at issue.

182.   The November 2022 NOI provided the agencies with concrete evidence that the grazing regime envisioned and established by the BiOps and concurrences detailed above is premised on false assumptions that have been demonstrably disproven—e.g., that livestock would be effectively excluded from critical and riparian habitat, that utilization limits would adequately protect such habitat, and that seasonal rotations and monitoring would ensure that habitat damage is effectively minimized and mitigated. Indeed, the Forest Service and FWS *conceded* that such evidence triggered the duty to reinitiate consultation. However, on information and belief, the Forest Service continued with "business as usual" by issuing yearly AOIs in the allotments at issue that authorized extensive grazing activities with few, if any, changes to better protect riparian and designated critical habitat.

183.   As it waited for the promised forest-wide consultation, the Center continued to conduct cattle impact and habitat surveys on the allotments at issue in the Tonto National Forest. Those surveys documented that the Forest Service's authorization of grazing under the same, tired regime that to date, has failed to protect listed species or their critical habitat, has predictably continued to cause severe, pervasive deterioration and degradation of critical and occupied riparian habitat.

## IV.   THE CONSERVATION ORGANIZATIONS' JANUARY 2025 NOI

184.   On January 21, 2025, the Conservation Organizations submitted a second NOI ("January 2025 NOI") identifying the ongoing violations of the ESA set forth in this Complaint, including: (1) the Forest Service's failure to ensure against jeopardy and adverse modification of critical habitat by allowing grazing within occupied and critical

habitat for eight listed species present on allotments within the Tonto National Forest, (2) the Forest Service and FWS's failure to initiate and/or reinitiate consultation on the Forest Service's continued implementation of ongoing grazing activities in response to newly listed species and/or newly designated critical habitat, (3) the Forest Service and FWS's failure to reinitiate consultation on the Forest Service's continued implementation of ongoing grazing activities in response to new information demonstrating that grazing is affecting listed species and critical habitat to an extent not previously considered in the operative consultations, (4) the Forest Service and FWS's failure to reinitiate consultation on the Forest Service's continued implementation of ongoing grazing activities in light of the Forest Service's failure to implement mandatory mitigation measures and reasonable and prudent alternatives, and (5) the Forest Service's unlawful take of listed species in excess of the limits set by the operative ITSs, where they exist.

185.    The January 2025 NOI explained that two years after the Forest Service *conceded* issues with its ESA compliance for ongoing grazing activities and promised to undertake a comprehensive, forest-wide consultation to resolve those issues, the legal violations identified in the November 2022 NOI "remain unresolved." In particular, the January 2025 decried the Forest Service's continued adherence to the failed grazing regime established in the operative BiOps and concurrences, despite concrete evidence that key assumptions underlying the regime were false. Meanwhile, as documented by additional field surveys of critical habitat within the Tonto National Forest conducted in 2024, cattle are continuing to cause "moderate to severe environmental damage . . . throughout many of the same allotments."

186.    The January 2025 NOI also included extensive evidence suggesting that the Forest Service's monitoring reports tend to "underreport[] damage" and contain "incomplete" data. For example, the NOI noted several instances where the Forest Service's data were collected from inappropriate places that obscured the full extent of habitat damage (e.g., from vistas overlooking the allotments instead of from the riparian

78

areas themselves). According to the January 2025 NOI, the new information, photographs, and evidence reinforced the legal violations detailed in the November 2022 NOI and raised additional questions as to the continuing validity of the conclusions and determinations made in the operative BiOps and concurrences, where they exist. The January 2025 NOI thus again triggered the duty for the Forest Service and FWS to initiate and/or reinitiate consultation on the allotments at issue.

187.    On March 19, 2025, FWS responded to the Conservation Organizations' January 2025 NOI, insisting that the agency "is presently awaiting receipt of a [BA] from the [Forest Service] to either initiate or re-initiate consultation" on the allotments identified in the NOI. FWS maintained that "[o]nce the [BA] is received from the [Forest Service], the FWS stands ready to engage in consultation."

188.    On March 21, 2025, the Forest Service responded to the Conservation Organizations' January 2025 NOI. The Forest Service insisted that work on the forest-wide consultation was ongoing, and that the agency "continues to dedicate substantial staff time to this effort." The Forest Service acknowledged the Conservation Organizations' concerns with the timing of consultation, but maintained that its timeline was reasonable in light of competing priorities and staffing issues. The agency reported that "all of the allotments referenced in the [January 2025 NOI] will be included in the forest-wide" consultation, and that it "anticipate[s] submission of a BA" to FWS "within 9-12 months." The Forest Service also provided "specific details regarding allotment conditions and efforts by [the Forest Service] to address" listed species. In essence, the agency insisted that monitoring of the allotments was conducted "at least quarterly," and that those efforts "show compliance" with applicable requirements on all allotments. According to the agency, any problems identified (e.g., trespass cattle or downed fences) had been remedied. The Forest Service therefore ignored the damage that unauthorized grazing and damaged fences have caused, as well as the fact that, as demonstrated by the significant history of noncompliance with area closures across all of the allotments at

issue, such problems are likely to recur. The Forest Service likewise failed to

meaningfully acknowledge the additional surveys and photographs submitted with the

January 2025 NOI showing the extensive, worsening degradation of riparian and critical

habitat directly caused by livestock grazing. Nor did the agency respond to the evidence

submitted with the January 2025 NOI suggesting that the Forest Service's monitoring

reports tend to "underreport[] damage" and contain "incomplete" data. In effect, the

Forest Service refused to confront the substantial evidence that its grazing regime has

failed to stall (let alone reverse) the widespread habitat degradation and deterioration

caused by grazing, and thus cannot be said to actually prevent take of and/or adverse

effects to listed species and critical habitat.

## V.    THE AGENCIES' CONTINUED ADHERENCE TO A FAILED MANAGEMENT SYSTEM IN THE 2025 BIOP FOR GRAZING ON THE LOWER VERDE COMPLEX

189.    The Lower Verde Complex encompasses four grazing allotments in the

Payson Ranger District of the Tonto National Forest: Deadman Mesa Allotment; Cedar

Bench Allotment; Bull Springs Allotment; and Pole Hollow Allotment. The Complex

contains 1,116 acres of important breeding habitat for the cuckoo, located primarily along

Fossil Creek within the Deadman Mesa Allotment, the East Verde River and Mineral

Creek within the Poll Hollow Allotment, and the East Verde River and Pine Creek on the

Bull Springs Allotment. Suitable habitat also occurs adjacent to the Complex along the

Verde River, some of which has been designated as critical habitat. The below map of

cuckoo habitat is reproduced from the 2025 BiOp. 2025 BiOp at 27.

Fig. 2: Potential cuckoo habitat on the Lower Verde Complex

190.    Cuckoo habitat within and adjacent to the Complex is under threat; the Complex has suffered from years of noncompliant grazing, both from permittees and feral cattle, and watersheds on the allotments within the Complex are functioning at risk.

81

191.    The Complex last underwent consultation for ongoing grazing activities in a BiOp issued in February 2025 ("2025 BiOp").[19] According to Forest Service supervisors at an in-person meeting on July 22, 2025, the Lower Verde Complex was bifurcated from the (unreasonably delayed) forest-wide consultation in order to expedite authorized grazing for the new grazing permittee on Bull Springs Allotment. However, as the Forest Service acknowledged in its March 2025 response to the Conservation Organizations' November 2022 and January 2025 NOIs, the Forest Service "*agreed* to begin work on *a forest-wide ESA section 7 consultation to cover all grazing allotments on the Tonto*." (emphasis added). Accordingly, consultation for the Lower Verde Complex should have been included in the yet-to-materialize "forest-wide" consultation.

192.    According to the 2025 BiOp, the Forest Service proposed to continue to authorize grazing on the Cedar Bench and Pole Hollow Allotments, and reauthorize grazing activities on the then-vacant Deadman Mesa and Bull Springs Allotments. 2025 BiOp at 3. With respect to the cuckoo, the 2025 BiOp explained that the impacts to cuckoos would vary by location:

- *Deadman Mesa Allotment*: The 2025 BiOp predicted that grazing in the Deadman Mesa Allotment would have "no effects" because "grazing [is] excluded" from cuckoo habitat along the portion of Fossil Creek within the allotment. *Id.* at 33, 38. While acknowledging that grazing in the upland areas of pastures on the allotment may result in "impacts to downgradient riparian habitat," the 2025 BiOp insisted that the Forest Service's "grazing strategy and monitoring protocols"—i.e., the same

---

[19] Letter from Heather Whitlaw, Ariz. Field Supervisor, to Matthew Paciorek, Dist. Ranger, Tonto Nat'l Forest, U.S. Dep't of Agric. (Feb. 12, 2025) (Biological Opinion for the Lower Verde Subbasin Grazing Allotments, Gila County, Arizona, AESO/SE 2022-0002114-S7).

grazing regime that has to date failed to effectively minimize and mitigate grazing impacts on listed species and critical habitat in the Tonto National Forest—"will be effective in minimizing" such impacts *this time*. *Id.* at 33.

- *Cedar Bench Allotment*: Although livestock would "have access" to cuckoo habitat along the portion of Fossil Creek within the allotment— including during the first and last months of the cuckoo's summer breeding season (i.e., April, May, September, and October)—which could "negatively impact the regeneration and recruitment of riparian plant species that are important components of cuckoo habitat," *id.* at 33-34, the 2025 BiOp nevertheless insisted that grazing on pastures in the Cedar Bench Allotment would have, at most, "insignificant" effects on the cuckoo because "grazing would not alter habitat or otherwise disturb individuals" during the "portion[] of the breeding season (late June through August)" when nests, eggs, or nestlings are present. *Id.* at 34, 38. Additionally, despite the "lack[]" of monitoring data, the 2025 BiOp predicted that "grazing pressure" on cuckoo habitat would "likely be of low magnitude and short duration." *Id.* at 34. The 2025 BiOp also determined that, while the Ceder Bench Allotment also encompasses potential breeding habitat near the Verde River confluence, such habitat "is excluded" from grazing and thus, would not be affected. *Id.* at 35. With respect to upland habitat adjacent to cuckoo habitat, the 2025 BiOp assumed without evidence that because "key areas" were trending towards recovery, the Forest Service's overall "grazing strategy will continue to minimize downgradient impacts." *Id.* at 33.

- *Pole Hollow Allotment*: The 2025 BiOp relied on purported "improve[ments]" to key areas to insist that grazing in adjacent upland

areas "is not expected to impact downgradient cuckoo habitat" in the Pole Hollow Allotment because "the proposed action represents a continuation of the existing grazing regime." *Id.* at 34. With respect to riparian habitat, the 2025 BiOp recognized that grazing in certain pastures would overlap with some or all of the cuckoo's breeding season, which could "reduce regeneration and recruitment of riparian vegetation" and "negative[ly] impact[] [cuckoo] habitat quantity and quality." *Id.* at 36-37. The 2025 BiOp nevertheless insisted that impacts would be minimized or mitigated by the Forest Service's implementation of the same grazing regime that has to date failed to effectively minimize and mitigate grazing impacts on listed species and critical habitat in the Tonto National Forest (e.g., ineffective area closures and seasonal rotations, forage utilization limits that have no relationship to the cuckoo's habitat requirements, amorphous and undefined "adaptive management" measures). *Id.* 36-38.

- *Bull Springs Allotment*: The 2025 BiOp acknowledged that grazing within the uplands on the Bull Springs Allotment "has a greater potential to negatively impact downgradient riparian vegetation" because the habitat remains in poor condition "due to years of mismanagement." *Id.* at 34. The 2025 BiOp nevertheless insists, contrary to the best available science and considerable documentary evidence of its ineffectiveness, that the Forest Service's grazing regime will ensure that any such downgradient impacts will be "insignificant." *Id.* at 34-35. With respect to riparian habitat, the 2025 BiOp acknowledged that the drainages on the Allotment remain in poor condition due to past mismanagement. *Id.* at 37. Additionally, the Forest Service's "ability to quickly implement adaptive management"

strategies in the allotment "is limited due to difficulty of access." *Id.* The 2025 BiOp nevertheless insisted that any adverse impacts to cuckoos would be minimized or mitigated by the Forest Service's implementation of the same grazing regime that has to date failed to effectively minimize and mitigate grazing impacts on listed species and critical habitat in the Tonto National Forest (e.g., ineffective area closures and seasonal rotations, forage utilization limits that have no relationship to the cuckoo's habitat requirements, amorphous and undefined "adaptive management" measures). *Id.* 36-38.

193.    The 2025 BiOp ultimately concluded that grazing within the Complex was "not likely to jeopardize the continued existence of the" cuckoo. *Id.* at 40. In support of this conclusion, the 2025 BiOp insisted that the effects of grazing would be limited to a small fraction of the cuckoo's "relatively broad" range. According to the 2025 BiOp, 557 acres of cuckoo habitat on the complex will be affected by grazing. Of those 557 acres, 243 acres of cuckoo habitat will experience reductions in habitat quality and abundance; the remaining affected habitat (334 acres) "is expected to persist in its current condition" through the implementation of the mitigation measures. *Id.* at 40-41. However, the no-jeopardy determination primarily relied on the Forest Service's promise to implement many of the same mitigation measures that, as demonstrated by the best available science and documentary evidence, have *repeatedly* proven to be ineffective addressing or forestalling (much less reversing) the serious habitat degradation and deterioration caused by grazing across the Tonto National Forest. *See id.* For instance, while the 2025 BiOp insisted that the Tonto National Forest's general utilization limits, *see supra* ¶ 93, would "reduce" the negative impacts of grazing on cuckoos, 2025 BiOp at 31, it failed to explain how forage utilization—which is ultimately a livestock management metric that measures stubble height—has any bearing on whether grazed areas maintain their functionality to support the cuckoo's structural habitat requirements and life-cycle needs.

1    The 2025 BiOp likewise insisted that impacts to cuckoo habitat would be minimized by

2    range improvement projects to exclude cattle (e.g., fencing), *id.* at 31-32, but failed to

3    acknowledge that such methods are known to be ineffective at actually excluding cattle

4    and have a significant history of non-compliance both within the complex and across the

5    Tonto National Forest. The 2025 BiOp thus demonstrates that FWS merely rubber

6    stamped the same ineffective, unreasonable, and unlawful grazing regime, no matter the

7    scientific rigor of the underlying premises (or lack thereof), or evidence of widespread

8    environmental baseline degradation.

9        194.    The 2025 BiOp's analysis suffers from additional fatal substantive and

10   procedural deficiencies. For instance, the 2025 BiOp's cursory discussion of the effects

11   of grazing on cuckoos and their habitat failed to meaningfully analyze the actual impact

12   of those harms to the species both within the Complex and range-wide grazing on many

13   pastures. Although the 2025 BiOp admits that grazing in cuckoo habitat—including

14   grazing occurring outside of the breeding season—can "negatively affect[] the quantity

15   and quality of habitat," which in turn, "harm[s]" the cuckoo's "ability to breed, feed,

16   and/or shelter," the discussion ends there. *Id.* at 27. The 2025 BiOp did not discuss the

17   relative importance of the various affected drainages and breeding habitat areas to the

18   affected population. Nor did the 2025 BiOp examine, whether quantitatively or

19   qualitatively, the actual impact of the "harms" from grazing on this population or the

20   species as a whole. The 2025 BiOp is also flawed because it relied on "conservative"

21   grazing utilization limits that purport to minimize the adverse effects of grazing on

22   cuckoo breeding habitat, *id.* at 6, but in fact are meaningless to the cuckoo's life-cycle

23   and habitat requirements. Instead, the 2025 BiOp quickly discounted any ill effects from

24   grazing on the cuckoo and its habitat as insignificant, insisting that FWS "expect[s] that

25   the combination of utilization [limits], the [Forest Service's] rest-rotation system,

26   monitoring protocols, and conservation measures [i.e., mitigation measures, including the

27

28

1    fencing of riparian habitat] . . . will reduce potential effects to cuckoo habitat at a broad

2    scale." *Id.* at 32.

3        195.    The 2025 BiOp purported to examine the effects of grazing on the cuckoo's

4    recovery. While acknowledging that FWS is obligated to "identify when a species would

5    pass the tipping point for recovery and determine whether the proposed action would

6    cause the species to reach that tipping point," the 2025 BiOp asserted that such a

7    determination for the cuckoo "is difficult to determine in the absence of a recovery plan."

8    *Id.* at 39. In any event, the 2025 BiOp insisted that the Forest Service's grazing regime

9    "would reduce the impacts" of grazing "such that they are not anticipated to preclude the

10   continued existence of cuckoos in these areas." *Id.* The 2025 BiOp thus concluded that

11   grazing "is unlikely to reduce the species' potential for recovery." *Id.* However, the 2025

12   BiOp did not acknowledge that its recovery analysis, like the no-jeopardy conclusion, is

13   based on a false premise: that the Forest Service's grazing regime will somehow be

14   effective at minimizing and mitigating the impacts of grazing on important riparian

15   habitat *this time*.

16       196.    The 2025 BiOp also impermissibly relied on mitigation measures that are

17   not reasonably certain to occur, either because they are not within the control of the

18   Forest Service, or because they fail to take into account the ongoing staffing challenges

19   facing the agency. For example, the 2025 BiOp failed to acknowledge that many of the

20   structural improvements aimed at controlling livestock access to cuckoo habitat would

21   not be completed until 2028. *Id.* at 7. Therefore, for at least three years (assuming no

22   unexpected delays), areas that the 2025 BiOp's no-jeopardy conclusion assumed would

23   be off-limits to cows would in fact be accessible and subject to grazing impacts. *Id.* at 7.

24   Yet, the 2025 BiOp never examined these interim effects on the cuckoo or its habitat.

25   Similarly, 2025 BiOp's no-jeopardy conclusion substantially relied on the Forest

26   Service's promise to monitor cuckoo habitat to ensure that any impacts are in fact

27   "insignificant" or minimized. However, the Forest Service's "monitoring strategy relies

28

1    heavily on photopoint monitoring," *id.* at 43-45, which in turn, is entirely dependent on

2    *volunteer* labor, *id.* at 12, and thus, is not reasonably within the control of the Forest

3    Service. Worse, the 2025 BiOp failed to report the Forest Service's past difficulties in

4    securing the necessary photos to conduct the monitoring, meaning that the selected

5    protocols are unlikely to yield the data necessary to ensure that the impacts of grazing on

6    cuckoos are not substantially greater than those contemplated by the BiOp.

7         197.   The 2025 BiOp included an ITS ("2025 ITS") explaining that incidental

8    take was expected to "result from reduced habitat abundance and quality," resulting in the

9    "impair[ment]" of essential "behavioral patterns." *Id.* at 42. Citing the purported

10   difficulty in detecting the take of cuckoos due to a lack of "baseline survey . . . for most

11   of the [affected] habitat" and variability in cuckoo abundance on the Lower Verde

12   Complex, the 2025 ITS identified as a take surrogate "the acreage of adversely affected"

13   potential breeding habitat. *Id.* Specifically, the 2025 ITS authorized take in two scenarios:

14   (1) a "[d]ecline[]" in quantity and quality of 243 acres of cuckoo breeding habitat along

15   the East Verde River within" three pastures on the Bull Springs Allotment; (2) the

16   "[c]ontinued suppression of habitat quality on 334 acres of cuckoo breeding habitat"

17   along the East Verde River and its tributaries within certain pastures on the Pole Hollow

18   and Bull Springs Allotments "with no new measurable declines." *Id.* at 43.

19        198.   The 2025 ITS explained that take would be "considered exceeded" if

20   livestock grazing "causes measurable declines in [habitat] quantity and quality" either:

21   "outside the 243 acres of cuckoo breeding habitat within" the three pastures on the Bull

22   Springs Allotment; or "in 334 acres of cuckoo breeding habitat in other portions of the

23   Bull Springs Allotment or within the Pole Hollow Allotment." *Id.* "Measurable declines"

24   are defined to occur "when a combination of the following is observed for two

25   consecutive years and attributed to the proposed action": (1) contracting riparian areas;

26   (2) lack of vigorous growth of native riparian plants; (3) declines in bank stabilizing

27   species (4) increases in the abundance of invasive species; (5) decreases in the vertical

28
                                                88

and horizontal cover of riparian and xeroriparian vegetation; (6) decreases in seedling recruitment after two consecutive flood events; and (7) reductions in age structures for recovery and maintenance of riparian vegetation. *Id.*

199.   On information and belief, the Forest Service has failed to implement the grazing regime as described in the 2025 BiOp and 2025 ITS, including mandatory mitigation measures that were central to FWS's determinations (e.g., area closures, seasonal or yearly pasture rotation, monitoring requirements, and forage utilization limits). As illustrated in photos submitted to the Forest Service in the Conservation Organizations' November 2022, January 2025, September 2025, and November 2025 NOIs, widespread, chronically heavy grazing by livestock is evident in riparian habitat, as well as in areas that the consultation documents assumed would be closed to livestock use. As a result of such grazing (including unauthorized grazing in closed areas), the riparian vegetation is sparse, and habitat fails to exhibit the primary constituent elements necessary to sustain cuckoo populations. Accordingly, livestock grazing has adversely affected, and continues to adversely affect important cuckoo habitat, including breeding and foraging, within the Lower Verde Complex in "a manner or [to] an extent not previously considered" by the 2025 BiOp or the 2025 ITS. 50 C.F.R. § 402.16. Additionally, the Forest Service's failure to implement the action according to the terms of the 2025 BiOp has modified the action in a manner that is causing effects to listed species and/or critical habitat that were not considered in the 2025 BiOp. These failures have resulted—and are currently resulting—in severe habitat degradation and harm to listed species and designated critical habitat present on the allotment.

## VI.   THE CONSERVATION ORGANIZATIONS' SEPTEMBER 2025 AND NOVEMBER 2025 NOIS

200.   In or about mid-2025, the Center compiled the results of habitat surveys conducted between 2017 and 2024 on public lands administered by the National Forest Service (including the Tonto National Forest) and the Bureau of Land Management

1   ("BLM") in the southwestern United States into a summary report. Relevant here, the
2   report included a summary of the data collected between 2019 and 2024 regarding cattle
3   impacts in the Tonto National Forest, including on many of the allotments at issue in this
4   lawsuit. The below table, reproduced from the summary report, *see* Ctr. for Biological
5   Diversity, *Livestock Damage to Aquatic and Riparian Critical Habitat in the U.S.*
6   *Southwest: Field Assessment Results 2017-2024* 32 (2025), *available at*
7   https://tinyurl.com/yrs69jsw, demonstrates that as of 2024, a majority of stream miles
8   surveyed on the Tonto National Forest showed moderate to significant damage from
9   cattle.[20]

---

[20] Attached for the Court's convenience as Exhibit 9.

**Percent of critical habitat survey miles moderately to significantly impacted by cattle on the Tonto National Forest, by allotment, from 2019-2024.**

| Allotment | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|
| **Cave Creek Ranger District** | 56% | | | 0% | 75% | 56% |
| Bartlett | 63% | | | | | |
| Bull Springs | 97% | | | | | |
| Cedar Bench | 100% | | | | | |
| Copper Creek | | | | | | 56% |
| Deadman Mesa/ Skeleton Ridge | 47% | | | | | |
| Red Creek | 32% | | | | | |
| Sears Club/Chalk Mountain | 0% | | | 0% | | |
| Skeleton Ridge | 92% | | | | 67% | |
| Skeleton Ridge/Cedar Bench | 100% | | | | 100% | |
| Skeleton Ridge/Red Creek | 0% | | | | | |
| **Globe Ranger District** | | | 67% | 77% | | 100% |
| Bohme | | | 0% | | | |
| Chrysotile | | | | 77% | | 100% |
| Pinto Creek | | | 72% | | | |
| **Payson Ranger District** | | | 100% | 0% | 100% | 68% |
| Cedar Bench | | | | | 100% | |
| Gisela | | | 100% | 0% | | 100% |
| Green Valley | | | | 0% | | 54% |
| **Pleasant Valley Ranger District** | | 63% | 97% | 39% | | 83% |
| Bar X | | | 100% | | | |
| Buzzard Roost | | | 100% | 32% | | |
| Catholic Peak | | 57% | | | | 100% |
| Crouch Mesa | | 71% | | | | 100% |
| Ellinwood/Diamond Butte | | | | 7% | | |
| Gentry Mountain | | 59% | | | | 100% |
| Haigler Creek | | | 100% | | | |
| Marsh Creek | | | | 42% | | |
| OW | | | 93% | | | 0% |
| Red Lake | | 64% | | | | 83% |
| Soldier Camp | | | 100% | 100% | | |
| Spring Creek | | | 100% | | | |
| **Tonto Basin Ranger District** | | | 69% | | | 36% |
| Havens | | | 100% | | | |
| Poison Spring | | | 0% | | | |
| Seventy-Six | | | 100% | | | 91% |
| Tonto Basin | | | 51% | | | 18% |
| Walnut | | | 0% | | | |
| Dagger & Hicks/Pike Peak | | | 70% | | | 48% |

201.    On July 22, 2025, the Center presented the results of its report, *Livestock Damage to Aquatic and Riparian Critical Habitat in the U.S. Southwest: Field*

1    *Assessment Results 2017-2024*, *available at* https://tinyurl.com/5e8j2k2u, to leadership in

2    the Forest Service.[21] As illustrated by the below chart, hundreds of miles of riparian

3    habitat across public lands in the southwestern United States are being moderately and

4    significantly impacted by livestock grazing.



19    202.    The Center continued to conduct habitat and cattle impact surveys on the

20    allotments at issue throughout 2025. Those surveys documented that, of the 121.9 miles

21    of streams in designated critical habitat for listed species that are ostensibly protected

22    from grazing (and that are encompassed by the allotments in this lawsuit), fifty-five

23    percent were at least moderately damaged by cattle, with many miles significantly

24    damaged by grazing pressures. Hence, the surveys established the recent, degraded

---

[21] Attached for the Court's convenience as Exhibit 10.

92

condition of riparian habitat (including critical habitat) on the allotments at issue within the Tonto National Forest, as well as the continued deterioration of such habitat both inside and outside of closed areas. Indeed, in the nearly three years since the Forest Service and FWS agreed that forest-wide consultation was necessary to comply with the procedural and substantive mandates of the ESA, the Center's surveys revealed the continued absence of the primary constituent elements that the flycatcher, cuckoo, razorback sucker, spikedace, Gila chub, northern Mexican gartersnake, narrow-headed gartersnake, and frog require for their habitat and life-history needs, as well as multiple instances of cattle trespass into riparian and critical habitat areas that are ostensibly closed to grazing. The data and photographs collected during the surveys thus demonstrate that any efforts that the Forest Service has made to protect listed species and critical habitat have been ineffective.

203.   The Center's 2025 surveys included allotments within the Lower Verde Complex containing suitable habitat for the cuckoo: Bull Springs, Cedar Bench, and Pole Hollow Allotments. Those surveys showed that grazing within the Complex is continuing to result in significant adverse impacts to listed species, including habitat within purportedly "off-limits" pastures and livestock exclosures. *See* Sept. 2025 NOI, Attach. 3 at 80-99. For instance, within the Bull Springs Allotment, the damage to cuckoo breeding habitat along the East Verde River is "significant," and cattle were observed grazing in areas ostensibly "off-limits" to livestock use. *Id.* at 82-83. Similarly, within the Cedar Bench Allotment, the Center observed "trespass cattle and significant damage to occupied [cuckoo] breeding habitat along" the East Verde River. *Id.* at 89. Finally, within the Pole Hollow Allotment, the Center documented significant "trespass cattle damage along the East Verde River, in the off-limits Bull Pasture." *Id.* at 98. Thus, the Forest Service's grazing regime has once again predictably failed to abate habitat deterioration due to grazing.

204.    The Center's surveys demonstrate the failure of the Forest Service's preferred grazing regime in the Tonto National Forest—in particular, the common mitigation measures relied upon in the 2025 BiOp and in consultations across the Tonto National Forest by both the Forest Service and FWS to ensure that grazing complies with the mandates of the ESA (e.g., area closures, seasonal and yearly rotations, monitoring, and utilization limits)—to protect and conserve listed species and their habitat. The surveys thus demonstrate that grazing is harming listed species and their habitat (including designated critical habitat) in a manner and to an extent not previously considered during ESA consultation. The data and photographs further reveal that the Forest Service is not implementing its grazing regime as described in the BiOps and concurrences at issue, and hence, has substantially modified the action (i.e., grazing) in a manner not considered in the original consultations. Yet, on information and belief, the Forest Service is continuing to rely on those BiOps and concurrences to implement its failed grazing regime on the allotments at issue by issuing yearly AOIs that reauthorize grazing with few, if any, meaningful changes to address ongoing damage. As a result, ongoing grazing continues to cause severe deterioration of riparian habitat, including designated critical habitat, and consequently harm listed species. Accordingly, the surveys establish that the Forest Service and FWS have failed to remedy the legal violations identified in the Conservation Organizations' November 2022 and January 2025 NOIs.

205.    On September 4, 2025, the Conservation Organizations submitted yet another NOI to FWS and the Forest Service documenting (through surveys conducted during 2025) extensive overgrazing far exceeding that contemplated and/or authorized by the BiOps/ITSs and concurrences at issue ("September 2025 NOI"). This NOI again explained the failures of the Forest Service's preferred grazing regime and decried FWS's decision in the 2025 BiOp to rubber stamp the Forest Service's request to continue this doomed system in the Lower Verde Complex, despite extensive evidence of ongoing

damage to listed species and their habitat. The September 2025 NOI likewise identified the ESA violations set forth in this Complaint, including: (1) the Forest Service's failure to ensure against jeopardy and adverse modification of critical habitat by allowing grazing within occupied and critical habitat for eight listed species present on allotments within the Tonto National Forest, (2) the Forest Service and FWS's failure to initiate consultation on the Forest Service's continued implementation of ongoing grazing activities in response to newly listed species and/or newly designated critical habitat, (3) the Forest Service and FWS's failure to reinitiate consultation on the Forest Service's continued implementation of ongoing grazing activities in response to new information demonstrating that grazing is affecting listed species and critical habitat to an extent not previously considered in the operative consultations, (4) the Forest Service and FWS's failure to reinitiate consultation on the Forest Service's continued implementation of ongoing grazing activities in light of the Forest Service's failure to implement mandatory mitigation measures and reasonable and prudent alternatives that were essential to the agencies' determinations that grazing could continue consistent with the ESA's requirements, (5) the Forest Service's failure to administer a program to conserve the eight listed species and their critical habitat within the Tonto National Forest; and (6) the Forest Service's unlawful take of listed species in excess of the limits set by the operative ITSs, where they exist. In light of these failures, as well as the fatal flaws identified in the November 2022 and January 2025 NOIs, new survey data, and the agencies' promise to complete a forest-wide consultation, the September 2025 NOI concludes that the initiation and/or reinitiation of consultation—and the conclusion of such process—is promptly required.

206.    The September 2025 NOI also reminded the agencies of their obligation under Section 7(d) of the ESA to avoid "mak[ing] any irreversible or irretrievable commitment of resources" until a lawful reinitiated consultation is completed. 16 U.S.C. § 1536(d). Accordingly, the September 2025 NOI informed the Forest Service and FWS

that, to ensure compliance with the procedural and substantive mandates of the ESA, the agencies must: (1) initiate (or reinitiate) *and complete* comprehensive formal consultation for grazing activities on all listed species and designated critical habitat that may be present on the allotments and complexes at issue; (2) immediately halt all grazing activities, including the issuance of permits and authorizations, in areas of the allotments and complexes at issue where listed species and/or critical habitat may be present pending the *completion* of a comprehensive consultation on such activities; and (3) comply with section 7(a)(1) by developing and implementing a *program* to conserve listed species, including these eight listed species, within the Tonto National Forest.

207.    On November 13, 2025, the Conservation Organizations submitted a fourth NOI to the Forest Service and FWS documenting (through surveys conducted during October 2025) extensive overgrazing in Marsh Creek and the Bar X Complex far exceeding that contemplated and/or authorized by the BiOps/ITSs and concurrences at issue ("November 2025 NOI"). This NOI notified the agencies of the ESA violations in this Complaint, including: (1) the Forest Service's yearly issuance of AOIs authorizing grazing on the allotments at issue under a grazing regime that the Forest Service *knows* has failed to "insure" that grazing neither jeopardizes listed species, nor adversely modifies critical habitat, prior to the completion of the site-specific consultation that the agencies have conceded is necessary violates the substantive and procedural mandates of section 7(a) of the ESA; (2) the Forest Service's issuance of AOIs authorizing grazing on those allotments and/or complexes that are either (a) based on fatally flawed BiOps and/or unlawfully deficient concurrences, or (b) issued without compliance with the ESA's procedural and/or substantive mandates —violates Section 7(d) of the ESA; and (3) the Forest Service's issuance of yearly AOIs in reliance on legally deficient consultations violates section 9 of the ESA. The November 2025 NOI also reminded the Forest Service that, contrary to its commitment in the Tonto National Forest Plan to conduct a "tipping point analysis" on "all future actions that may affect listed species in

the Tonto [National Forest]," Forest Plan BiOp at 175., fourteen of the allotments and one of the complexes here at issue have *never* undergone an examination to determine a "tipping point" or similar objective metric at which listed species' prospects of recovery or survival would be (or have already been) appreciably diminished, based on the habitat and life-cycle needs of the species, as well as ongoing and worsening threats to the species. Consequently, the agencies have never evaluated whether the effects of ongoing grazing on those allotments, when added to listed species' baseline conditions, will jeopardize such species by impeding their recovery (or survival). In light of these failures, as well as the fatal flaws identified in the November 2022, January 2025, and September 2025 NOIs, new survey data, and the agencies' promise to complete a forest-wide consultation, the November 2025 NOI concludes that the initiation and/or reinitiation of consultation—and the conclusion of such process—is promptly required.

208.    On December 15, 2025, the Forest Service responded to the September 2025 and November 2025 NOIs. The Forest Service "acknowledge[d] the concerns raised" in the NOIs, and reiterated its intent to reinitiate formal consultation with FWS "for all active grazing allotments, including those identified in the NOI." The Forest Service reported its expectation that a BA would be submitted in February 2026. The Forest Service did not respond to the September 2025 NOI's assertions that the mitigation measures relied upon by the agencies to "minimize" impacts to listed species and critical habitat (e.g., area closures, seasonal or yearly rotations, monitoring, and utilization limits) have been proven ineffective and inadequate to protect—much less recover—such species and habitat.

# PLAINTIFFS' CLAIMS FOR RELIEF

## Claim I – The Forest Service's Failure to Ensure that Ongoing Grazing in the Tonto National Forest Does Not Jeopardize Listed Species, Inhibit Their Recovery, or Adversely Modify Critical Habitat Violates the ESA

209.    Plaintiffs hereby incorporate all preceding paragraphs by reference.

210.    Except in extraordinary circumstances not present here, the ESA mandates that federal agencies, in consultation with FWS, "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification of habitat of such species" that has been determined to be "critical." 16 U.S.C. § 1536(a)(2). Accordingly, with respect to every discretionary action undertaken by an agency, the ESA "requires that [the] agency 'insure' that the actions it authorizes, funds, or carries out are not likely to jeopardize listed species or their habitats." *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 666-67 (2007).

211.    The Forest Service has *never* undergone *any* consultation, nor made a "no effect" determination, for grazing activities that are currently being authorized through the issuance of yearly AOIs on the Gisela Allotment. Yet, ongoing grazing on the Gisela Allotment at the very least "may affect" listed species and/or critical habitat present on the allotment, including, but not limited to: the northern Mexican gartersnake; narrow-headed gartersnake; flycatcher; cuckoo; and the spikedace. By failing to undertake the legally mandated consultation process for analyzing and addressing the impacts to listed species and their designated critical habitat that not only will result, but that are already occurring as a result of ongoing grazing, the Forest Service has violated, and is in ongoing violation of, the ESA. The Forest Service is violating and will continue to violate its substantive Section 7(a)(2) duties until such time that the agency: (1) prepares a BA and submits it to FWS; (2) completes consultation on ongoing grazing activities in the Gisela Allotment; (3) implements any actions necessary to avoid the unlawful take of listed species. The decision not to *immediately* halt all grazing activities that are currently

unlawfully taking species and/or adversely modifying critical habitat on the Gisela Allotment until the Forest Service undertakes all of these actions violates Section 7 of the ESA, its implementing regulations, and is also arbitrary and capricious.

212.    The Forest Service has *never* undergone *any* consultation, nor made a "no effect" determination, regarding the effects of grazing activities that are currently being authorized through the issuance of yearly AOIs on *currently* listed species and designated critical habitat that are or may be present on the Hardt Creek Allotment, including, but not limited to: the northern Mexican gartersnake; narrow-headed gartersnake; flycatcher; and spikedace.. Yet, ongoing grazing on the Hardt Creek Allotment at the very least "may affect" those listed species and/or critical habitat. By failing to undertake the legally mandated consultation process for analyzing and addressing the impacts to listed species and their designated critical habitat that not only will result, but that are already occurring as a result of ongoing grazing, the Forest Service has violated, and is in ongoing violation of, the ESA. The Forest Service is violating and will continue to violate its substantive Section 7(a)(2) duties until such time that the agency: (1) prepares a BA and submits it to FWS; (2) completes consultation on ongoing grazing activities in the Hardt Creek Allotment; (3) implements any actions necessary to avoid the unlawful take of listed species. The decision not to *immediately* halt all grazing activities that are currently unlawfully taking species and/or adversely modifying critical habitat on the Hardt Creek Allotment until the Forest Service undertakes all of these actions violates Section 7 of the ESA, its implementing regulations, and is also arbitrary and capricious.

213.    The Forest Service has *never* undergone *any* consultation regarding the effects of grazing activities that are currently being authorized through the issuance of yearly AOIs on *currently* listed species and designated critical habitat that are or may be present on the Copper Creek Allotment, including, but not limited to the Gila chub. Yet, ongoing grazing on the Copper Creek Allotment at the very least "may affect" those listed species and/or critical habitat. By failing to undertake the legally mandated

consultation process for analyzing and addressing the impacts to listed species and their designated critical habitat that not only will result, but that are already occurring as a result of ongoing grazing, the Forest Service has violated, and is in ongoing violation of, the ESA. The Forest Service is violating and will continue to violate its substantive Section 7(a)(2) duties until such time that the agency: (1) prepares a BA and submits it to FWS; (2) completes consultation on ongoing grazing activities in the Copper Creek Allotment; (3) implements any actions necessary to avoid the unlawful take of listed species. The decision not to *immediately* halt all grazing activities that are currently unlawfully taking species and/or adversely modifying critical habitat on the Copper Creek Allotment until the Forest Service undertakes all of these actions violates Section 7 of the ESA, its implementing regulations, and is also arbitrary and capricious.

214.    With respect to all of the allotments and complexes at issue in this lawsuit, the Forest Service is in violation of the ESA's overarching mandate to "insure" its actions neither jeopardize listed species, nor destroy or adversely modify their designated critical habitat. Through its decisions that manage grazing activities (including the issuance of yearly AOIs to authorize grazing activities on the allotments at issue)—which are made in the absence of the legally mandated consultation process (i.e., the Gisela and Hardt Creek Allotments), or in reliance on outdated BiOps and concurrences that implement the same grazing regime that for *decades* has failed to adequately protect listed species and the riparian and critical habitat that they depend upon (i.e., all remaining allotments and complexes)—the Forest Service is responsible for the degradation and destruction of the herbaceous riparian habitat (including critical habitat) that the northern Mexican gartersnake, narrow-headed gartersnake, flycatcher, cuckoo, Gila chub, razorback sucker, spikedace, and frog require to survive and record. Moreover, the Forest Service has consistently failed to implement (let alone effectively implement) the mitigation measures ostensibly designed to ensure that grazing activities do not adversely affect or jeopardize the listed species, nor adversely modify their critical habitat (e.g., exclosure

fencing, forage utilization limits, monitoring, seasonal rotations, etc.). Yet, beyond merely announcing its intent to undertake a "forest-wide" consultation covering all grazing allotments and complexes in the Tonto National Forest (including those at issue in this lawsuit), the Forest Service has neither undertaken, nor committed to implement, any of the mitigation measures that are necessary to address the devastating impacts of its actions. Thus, the Forest Service has violated the ESA, its implementing regulations, and the APA.

215.    The Forest Service's mere declaration that it will reinitiate consultation when agency resources allow—particularly when its declaration is unaccompanied by any commitment to curtail or halt the grazing activities that are harming the northern Mexican gartersnake, narrow-headed gartersnake, flycatcher, cuckoo, Gila chub, razorback sucker, spikedace, and frog and their critical habitat—is not tantamount to avoiding species jeopardy or the destruction or adverse modification of critical habitat, as required by the ESA and its implementing regulations. The Forest Service has not ensured that its actions—in particular, its issuance of yearly AOIs to authorize grazing activities on the allotments and complexes at issue—are unlikely to jeopardize those species or impair their critical habitat merely by announcing that it will eventually undergo consultation on continuing actions that are presently harming these species' ability to survive and recover. Rather, the Forest Service can only satisfy the unequivocal statutory mandate of Section 7(a)(2) by taking the concrete measures necessary to mitigate the impacts of its jeopardizing actions—most important, by immediately curtailing or halting grazing in occupied riparian habitat and critical habitat, and restoring riparian habitat to improve connectivity and mitigate the habitat losses that the Forest Service's grazing management practices have caused and will continue to cause— measures that the Forest Service simply has not taken here. Thus, the Forest Service has violated the ESA, its implementing regulations, and the APA.

101

216.    Alternatively, with respect to those allotments supporting listed species and encompassing critical habitat for which consultation has *never* been completed, the Forest Service's failure to initiate consultation while authorizing grazing in those allotments constitutes agency action that has been "unlawfully withheld or unreasonably delayed" in violation of 5 U.S.C. § 706(1).

217.    Similarly, the Forest Service's failure to engage in any form of consultation since the agency acknowledged that a forest-wide consultation was necessary—including its failure to transmit a BA to FWS, as the first step in the consultation process—constitutes agency action that has been "unlawfully withheld or unreasonably delayed" in violation of 5 U.S.C. § 706(1).

**Claim II – The Forest Service and FWS's Failure to Reinitiate Consultation on Ongoing Grazing Activities on the Tonto National Forest in Response to Newly Listed Species and/or Newly Designated Critical Habitat Violates the ESA**

218.    Plaintiffs hereby incorporate all preceding paragraphs by reference.

219.    Under 50 C.F.R. § 402.16, "[r]einitiation of consultation is required and shall be requested by the Federal agency or by [FWS], where discretionary Federal involvement or control over the action has been retained or is authorized by law," and where "a new species is listed or critical habitat designated that may be affected by the identified action." 50 C.F.R. § 402.16. Both the Forest Service and FWS conceded that this trigger was met with respect to ongoing grazing in the Tonto National Forest over three years ago in response to Plaintiffs' November 2022 NOI documenting severe habitat degradation in riparian and critical habitat areas on several allotments within the forest. Yet, both agencies continue to drag their feet and, upon information and belief, have not completed even the preliminary phases of this legally required consultation. As with their failure to examine the impacts of grazing on listed species and critical habitat within the Tonto National Forest, the Forest Service's and FWS's refusal to reinitiate consultation as to ongoing grazing on the allotments at issue falls well short of those agencies' duties to "'insure' that the actions [the Forest Service] authorizes, funds, or

1   carries out are not likely to jeopardize listed species or their habitats." *Nat'l Ass'n of*

2   *Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 666-67 (2007).

3        220.   The Forest Service has both "retained" discretion and is "authorized by

4   law" to engage in "discretionary Federal involvement or control" of grazing on National

5   Forest System lands, including the Tonto National Forest.

6        221.   Several of the operative BiOps and concurrences for grazing allotments in

7   the Tonto National Forest predate the listing of new species and/or the designation of

8   critical habitat:

9       •   The 1995 BiOp governs grazing activities on the Dagger Allotment.

10         However, the 1995 BiOp predates the designation of flycatcher critical

11         habitat. Consequently, although the Dagger Allotment contains critical

12         habitat that is occupied by an "important" population that is crucial to

13         the species' recovery, the Forest Service has never undergone *any*

14         consultation on the effects of grazing on the flycatcher's critical habitat,

15         nor has it made a "no effect" determination. Yet, the Forest Service

16         continues to rely upon the 1995 BiOp when issuing yearly AOIs to

17         authorize grazing activities on the Dagger Allotment.

18       •   The 2002 BiOp governs grazing activities on the Seventy-six Allotment.

19         However, the 2002 BiOp predates: (1) the listing of the northern

20         Mexican gartersnake and designation of its critical habitat; (2) the

21         listing of the narrow-headed gartersnake and designation of its critical

22         habitat; and (3) the designation of critical habitat for the flycatcher.

23         Consequently, although the Seventy-six Allotment may be occupied

24         by—and at the very least, contains critical habitat for—the northern

25         Mexican gartersnake, narrow-headed gartersnake, and flycatcher, the

26         Forest Service has never undergone *any* consultation on the effects of

27         grazing on the three species or their critical habitat, nor has it made any

28

"no effect" determinations. Yet, the Forest Service continues to rely upon the 2002 BiOp when issuing yearly AOIs to authorize grazing activities on the Seventy-six Allotment.

- The 2002 BiOp also governs grazing activities on the Pinto Creek Allotment. However, the 2002 BiOp predates the listing of the yellow-billed cuckoo and designation of its critical habitat. Consequently, although the Pinto Creek Allotment may be occupied by—and at the very least, contains critical habitat for—the cuckoo, the Forest Service has never undergone *any* consultation on the effects of grazing on the cuckoo species or its critical habitat, nor has it made a "no effect" determination. Yet, the Forest Service continues to rely upon the 2002 BiOp when issuing yearly AOIs to authorize grazing activities on the Pinto Creek Allotment.

- The 2008 Concurrence governs grazing activities on the Poison Springs Allotment. However, the 2008 Concurrence predates the listing of the yellow-billed cuckoo and designation of its critical habitat. Consequently, although the Poison Springs Allotment may be occupied by—and at the very least, contains critical habitat for—the cuckoo, the Forest Service has never undergone *any* consultation on the effects of grazing on the cuckoo or its critical habitat, nor has it made a "no effect" determination. Yet, the Forest Service continues to rely upon the 2008 Concurrence when issuing yearly AOIs to authorize grazing activities on the Poison Springs Allotment.

- The 2008 Concurrence also governs grazing activities on the Hardt Creek Allotment. However, the 2008 Concurrence predates: (1) the listing of the northern Mexican gartersnake and designation of its critical habitat; and (2) the listing of the narrow-headed gartersnake and

the designation of its critical habitat. Consequently, although the Hardt Creek Allotment may be occupied by—and at the very least, contains critical habitat for—the northern Mexican gartersnake and narrow-headed gartersnake, the Forest Service has never undergone *any* consultation on the effects of grazing on the two species or their critical habitat, nor has it made any "no effect" determinations. Yet, the Forest Service continues to rely upon the 2008 Concurrence when issuing yearly AOIs to authorize grazing activities on the Hardt Creek Allotment.

- The 2010 BiOp governs grazing activities on the Crouch Mesa Allotment. However, the 2010 BiOp predates the designation of critical habitat for the Chihuahua leopard frog. Consequently, although the Crouch Mesa Allotment contains critical habitat for the frog, the Forest Service has never undergone *any* consultation on the effects of grazing on the frog's critical habitat, nor has it made a "no effect" determination. Yet, the Forest Service continues to rely upon the 2010 BiOp when issuing yearly AOIs to authorize grazing activities on the Crouch Mesa Allotment.

- The 2014 BiOp governs grazing activities on the Tonto Basin Allotment. However, the 2014 BiOp predates: (1) the designation of critical habitat for the yellow-billed cuckoo; (2) the listing and designation of critical habitat for the northern Mexican gartersnake; and (3) the listing and designation of critical habitat for the narrow-headed gartersnake. Consequently, although the Tonto Basin Allotment may be occupied by—and at the very least, contains critical habitat for—the cuckoo, the northern Mexican gartersnake, and the narrow-headed gartersnake, the Forest Service has never undergone *any* consultation on

105

the effects of grazing on these three species or their critical habitat, nor has it made any "no effect" determinations. Yet, the Forest Service continues to rely upon the 2014 BiOp when issuing yearly AOIs to authorize grazing activities on the Tonto Basin Allotment.

- The 2019 BiOp governs grazing activities on the Bar X Complex. However, the 2019 BiOp predates the designation of critical habitat for the narrow-headed gartersnake. Consequently, although the Bar X Complex contains critical habitat for the narrow-headed gartersnake, the Forest Service has never undergone *any* consultation on the effects of grazing on either gartersnake's critical habitat, nor has it made a "no effect" determination. Yet, the Forest Service continues to rely upon the 2019 BiOp when issuing yearly AOIs to authorize grazing activities on the Bar X Complex.

For these allotments, grazing activities that indisputably have impacted—*and are continuing to impact*—listed species and their critical habitat are continuing without any assurance that such activities will neither jeopardize the continued existence of listed species or adversely modify designated critical habitat. This is arbitrary and capricious, 5 U.S.C., § 706(2), and contravenes Section 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2), and the ESA's implementing regulations, 50 C.F.R. § 402.16(a). Therefore, the Forest Service and FWS must initiate *and complete* consultation *prior* to allowing any further grazing on these allotments, and FWS must timely produce the long-awaited forest-wide BiOp that fully addresses all of the direct, indirect, and cumulative effects associated with the Forest Service's grazing program, ultimately determining whether continued grazing can be carried out in compliance with the ESA's substantive mandates.

**Claim III – The Forest Service and FWS's Failure To Reinitiate Consultation Concerning the Full Scope of the Forest Service's Continued Authorization of <u>Grazing on the Tonto National Forest Violates the ESA</u>**

222.    Plaintiffs hereby incorporate all preceding paragraphs by reference

223.    Under 50 C.F.R. § 402.16, "[r]einitiation of consultation" is also "required and shall be requested by the Federal agency or by [FWS], where discretionary Federal involvement or control over the action has been retained or is authorized by law," and where (1) "the amount or extent of taking specified in the [ITS] is exceeded"; (2) "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered"; or (3) "the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered" in a prior BiOp or concurrence." 50 C.F.R. § 402.16. Once again, both the Forest Service and FWS conceded that one or more of these triggers was met with respect to ongoing grazing in the Tonto National Forest over three years ago in response to Plaintiffs' November 2022 NOI documenting severe habitat degradation in riparian and critical habitat areas on several allotments within the forest. For the same reasons described above, *supra* ¶ 219, the agencies have failed to meet their duties to "'insure' that the actions [the Forest Service] authorizes, funds, or carries out are not likely to jeopardize listed species or their habitats." *Nat'l Ass'n of Home Builders*, 551 U.S. at 666-67.

224.    The Forest Service has both "retained" discretion and is "authorized by law" to engage in "discretionary Federal involvement or control" of grazing on National Forest System lands, including the Tonto National Forest.

225.    The information, data, and other evidence submitted in connection with Plaintiffs' November 2022, January 2025, September 2025, and November 2025 NOIs showing ongoing, significant habitat degradation due to grazing constitutes "new information [that] reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered." 50 C.F.R. § 402.16. Since the Forest Service and FWS conceded that the initiation and/or reinitiation of consultation was necessary to address ongoing violations of the ESA with respect to its grazing management program, Plaintiffs have documented significant grazing impacts to listed

species and critical habitat on the Tonto National Forest, worsening habitat degradation, and repeated failures by the Forest Service to enforce the grazing regime as considered and authorized in the operative BiOps/ITSs and concurrences. Specifically, the NOIs collectively demonstrate:

- In the **Gisela Allotment**, extensive livestock impacts and riparian degradation within designated critical habitat for the flycatcher, northern Mexican gartersnake, narrow-headed gartersnake, and spikedace, including fresh cow sign and evidence of extensive streamside grazing and erosion, grazed riparian areas (including critical habitat) far exceeding the applicable utilization standards, and obvious cattle impacts in areas that are ostensibly closed to livestock use. In light of this new information, the Forest Service and FWS were required to engage in consultation regarding the effects of ongoing grazing on listed species and critical habitat in the Gisela Allotment. Yet, to date, the Forest Service has *never* initiated consultation, nor has it made a "no effect" determination. Instead, the Forest Service continues to issue yearly AOIs that implement the same grazing regime that, for decades, has failed to adequately protect listed species and critical habitat on the Gisela Allotment, resulting in continued habitat degradation and harm to listed species.

- In the **Copper Creek Allotment**, extensive livestock impacts and riparian degradation within designated critical habitat for the Gila chub, including streambeds stripped of vegetation and grazed riparian areas (including critical habitat) far exceeding the applicable utilization standards. In light of this new information, the Forest Service and FWS were required to engage in formal consultation regarding the effects of ongoing grazing on listed species and critical habitat in the Copper

Creek Allotment. Yet, to date, the Forest Service has *not* reinitiated consultation regarding grazing on the allotment. Instead, the Forest Service continues to issue yearly AOIs that implement the same grazing regime that, for decades, has failed to adequately protect listed species and critical habitat on the Copper Creek Allotment, resulting in continued habitat degradation and harm to listed species.

- In the **Dagger Allotment**, extensive livestock impacts and riparian degradation within occupied and/or designated critical habitat for the razorback sucker and the southwestern willow flycatcher, including well-defined hoofprints and grazing impacts in areas that are ostensibly closed to livestock, cow dung in critical habitat areas, and grazed riparian areas (including critical habitat) far exceeding the applicable utilization standards. These adverse impacts are particularly egregious in light of the 1995 BiOp's initial determination that grazing within the Dagger Allotment would jeopardize the continued existence of the flycatcher. In light of this new information, the Forest Service and FWS were required to engage in consultation regarding the effects of ongoing grazing on listed species and critical habitat in the Dagger Allotment. Yet, to date, the Forest Service has *not* reinitiated consultation and instead, continues to rely on the 1995 BiOp when issuing yearly AOIs that implement the same grazing regime that, for decades, has failed to adequately protect listed species and critical habitat on the Dagger Allotment, resulting in continued habitat degradation and harm to listed species.

- In the **Seventy-six Allotment**, extensive livestock impacts and riparian degradation within occupied and/or designated critical habitat for the southwestern willow flycatcher, northern Mexican gartersnake, narrow-

headed gartersnake, and spikedace, including the near complete removal of ground cover in critical habitat, cows present in areas ostensibly closed to livestock, and grazed riparian areas (including critical habitat) far exceeding the applicable utilization standards. In light of this new information, the Forest Service and FWS were required to engage in consultation regarding the effects of ongoing grazing on listed species and critical habitat in the Seventy-six Allotment. Yet, to date, the Forest Service has *not* reinitiated consultation and instead, continues to rely on the 2002 BiOp when issuing yearly AOIs that implement the same grazing regime that, for decades, has failed to adequately protect listed species and critical habitat on the Seventy-six Allotment, resulting in continued habitat degradation and harm to listed species.

- In the **Pinto Creek Allotment**, extensive livestock impacts and riparian degradation within occupied and/or designated critical habitat for the cuckoo and the flycatcher, including cows present in areas ostensibly closed to livestock, non-functional exclosure fencing, and grazed riparian areas (including critical habitat) far exceeding the applicable utilization standard (e.g., twenty percent in potential flycatcher habitat). In light of this new information, the Forest Service and FWS were required to engage in consultation regarding the effects of ongoing grazing on listed species and critical habitat in the Pinto Creek Allotment. Yet, to date, the Forest Service has *not* reinitiated consultation and instead, continues to rely on the 2002 BiOp when issuing yearly AOIs that implement the same grazing regime that, for decades, has failed to adequately protect listed species and critical habitat on the Pinto Creek Allotment, resulting in continued habitat degradation and harm to listed species.

110

- In the **Buzzard Roost Allotment**, extensive livestock impacts and riparian degradation within occupied and/or designated critical habitat spikedace, including streambank trampling and erosion, cow sign present in areas ostensibly closed to livestock and grazed riparian areas (including critical habitat) far exceeding the applicable utilization standards. In light of this new information, the Forest Service and FWS were required to engage in consultation regarding the effects of ongoing grazing on listed species and critical habitat in the Buzzard Roost Allotment. Yet, to date, the Forest Service has *not* reinitiated consultation and instead, continues to rely on the 2005 BiOp when issuing yearly AOIs that implement the same grazing regime that, for decades, has failed to adequately protect listed species and critical habitat on the Buzzard Roost Allotment, resulting in continued habitat degradation and harm to listed species.

- In the **Soldier Camp Allotment**, extensive livestock impacts and riparian degradation within occupied and/or designated critical habitat for the spikedace, including streambank trampling and erosion, cow sign present in areas ostensibly closed to livestock, and grazed riparian areas (including critical habitat) far exceeding the applicable utilization standards. In light of this new information, the Forest Service and FWS were required to engage in consultation regarding the effects of ongoing grazing on listed species and critical habitat in the Soldier Camp Allotment. Yet, to date, the Forest Service has *not* reinitiated consultation and instead, continues to rely on the 2005 BiOp when issuing yearly AOIs that implement the same grazing regime that, for decades, has failed to adequately protect listed species and critical

habitat on the Soldier Camp Allotment, resulting in continued habitat degradation and harm to listed species.

- In the **Lyons Fork Allotment**, extensive livestock impacts and riparian degradation within designated critical habitat for the Gila chub, including non-functional exclosure fencing, cows present in areas ostensibly closed to livestock, and grazed riparian areas (including critical habitat) far exceeding the applicable utilization standards. In light of this new information, the Forest Service and FWS were required to engage in consultation regarding the effects of ongoing grazing on listed species and critical habitat in the Lyons Fork Allotment. Yet, to date, the Forest Service has *not* reinitiated consultation and instead, continues to rely on the 2008 Concurrence when issuing yearly AOIs that implement the same grazing regime that, for decades, has failed to adequately protect listed species and critical habitat on the Lyons Fork Allotment, resulting in continued habitat degradation and harm to listed species.

- In the **Poison Springs Allotment**, extensive livestock impacts and riparian degradation within occupied and/or designated critical habitat for the flycatcher and the cuckoo, including significant streamside grazing impacts in areas ostensibly closed to grazing, indicating prolonged unauthorized use by livestock, recent cattle tracks and fresh cow dung in habitat within livestock exclosures, and grazed riparian areas (including critical habitat) far exceeding the applicable utilization standards. In light of this new information, the Forest Service and FWS were required to engage in formal consultation regarding the effects of ongoing grazing on listed species and critical habitat in the Poison Springs Allotment. Yet, to date, the Forest Service has *not* reinitiated

consultation and instead, continues to rely on the 2008 Concurrence when issuing yearly AOIs that implement the same grazing regime that, for decades, has failed to adequately protect listed species and critical habitat on the Poison Springs Allotment, resulting in continued habitat degradation and harm to listed species.

- In the **Hardt Creek Allotment**, extensive livestock impacts and riparian degradation within occupied and/or designated critical habitat for the flycatcher, northern Mexican gartersnake, narrow-headed gartersnake, and the spikedace, including recent cattle sign in habitat ostensibly "off limits" to livestock and grazed riparian areas (including critical habitat) far exceeding the applicable utilization standards. In light of this new information, the Forest Service and FWS were required to engage in consultation regarding the effects of ongoing grazing on listed species and critical habitat in the Hardt Creek Allotment. Yet, to date, the Forest Service has *never* initiated consultation, nor has it made a "no effect" determination with respect to *currently* listed species and/or designated critical habitat. Instead, the Forest Service continues to rely on the 2008 Concurrence—which does not discuss the effects of grazing on *any* currently listed species or designated critical habitat—to issue yearly AOIs that implement the same grazing regime that, for decades, has failed to adequately protect listed species and critical habitat on the Hardt Creek Allotment, resulting in continued habitat degradation and harm to listed species.

- In the **Chrysotile Allotment**, extensive livestock impacts and riparian degradation within occupied and/or designated critical habitat for the razorback sucker, including significant streamside grazing impacts in areas ostensibly closed to grazing, indicating prolonged unauthorized

113

use by livestock, recent cattle tracks and a cow carcass in habitat within livestock exclosures, and grazed riparian areas (including critical habitat) far exceeding the applicable utilization standards. In light of this new information, the Forest Service and FWS were required to engage in consultation regarding the effects of ongoing grazing on listed species and critical habitat in the Chrysotile Allotment. Yet, to date, the Forest Service has *not* reinitiated consultation and instead, continues to rely on the 2009 Concurrence when issuing yearly AOIs that implement the same grazing regime that, for decades, has failed to adequately protect listed species and critical habitat on the Chrysotile Allotment, resulting in continued habitat degradation and harm to listed species.

- In the **Crouch Mesa Allotment**, extensive livestock impacts and riparian degradation within occupied and/or designated critical habitat for the frog, including significant grazing impacts in areas ostensibly closed to grazing and grazed riparian areas (including critical habitat) far exceeding the applicable utilization standards. In light of this new information, the Forest Service and FWS were required to engage in consultation regarding the effects of ongoing grazing on listed species and critical habitat in the Crouch Mesa Allotment. Yet, to date, the Forest Service has *not* reinitiated consultation and instead, continues to rely on the 2010 BiOp when issuing yearly AOIs that implement the same grazing regime that, for decades, has failed to adequately protect listed species and critical habitat on the Crouch Mesa Allotment, resulting in continued habitat degradation and harm to listed species.

- In the **Tonto Basin Allotment**, extensive livestock impacts and riparian degradation within occupied and/or designated critical habitat for the flycatcher, cuckoo, spikedace, northern Mexican gartersnake, and

114

narrow-headed gartersnake, including widespread streamside grazing impacts in areas ostensibly closed to grazing, recent cow sign (and even a cow carcass) in habitat within livestock exclosures, and grazed riparian areas (including critical habitat) far exceeding the applicable utilization standards. In light of this new information, the Forest Service and FWS were required to engage in consultation regarding the effects of ongoing grazing on listed species and critical habitat in the Tonto Basin Allotment. Yet, to date, the Forest Service has *not* reinitiated consultation and instead, continues to rely on the 2014 BiOp when issuing yearly AOIs that implement the same grazing regime that, for decades, has failed to adequately protect listed species and critical habitat on the Tonto Basin Allotment, resulting in continued habitat degradation and harm to listed species.

- In the **Bar X Complex**, extensive livestock impacts and riparian degradation within occupied and/or designated critical habitat for the frog and narrow-headed gartersnake, including widespread grazing impacts in areas ostensibly closed to grazing and grazed riparian areas (including critical habitat) far exceeding the applicable utilization standards. In light of this new information, the Forest Service and FWS were required to engage in consultation regarding the effects of ongoing grazing on listed species and critical habitat in the Bar X Complex. Yet, to date, the Forest Service has *not* reinitiated consultation and instead, continues to rely on the 2019 BiOp when issuing yearly AOIs that implement the same grazing regime that, for decades, has failed to adequately protect listed species and critical habitat on the Bar X Complex, resulting in continued habitat degradation and harm to listed species

115

- In the **Hick's-Pikes Peak Allotment**, extensive livestock impacts and riparian degradation within occupied and/or designated critical habitat for the flycatcher, cuckoo, and narrow-headed gartersnake, including widespread grazing impacts in areas ostensibly closed to grazing, nonfunctional exclosure fencing, recent cow sign in habitat within livestock exclosures, and grazed riparian areas (including critical habitat) far exceeding the applicable utilization standards. In light of this new information, the Forest Service and FWS were required to engage in consultation regarding the effects of ongoing grazing on listed species and critical habitat in the Hick's-Pikes Peak Allotment. Yet, to date, the Forest Service has *not* reinitiated consultation and instead, continues to rely on the 2020 Concurrence when issuing yearly AOIs that implement the same grazing regime that, for decades, has failed to adequately protect listed species and critical habitat on the Hick's-Pikes Peak Allotment, resulting in continued habitat degradation and harm to listed species.

- In the **Red Lake Complex**, extensive livestock impacts and riparian degradation within occupied and/or designated critical habitat for the frog, including widespread grazing impacts in areas ostensibly closed to grazing, nonfunctional exclosure fencing, and grazed riparian areas (including critical habitat) far exceeding the applicable utilization standards. In light of this new information, the Forest Service and FWS were required to engage in consultation regarding the effects of ongoing grazing on listed species and critical habitat in the Red Lake Complex. Yet, to date, the Forest Service has *not* reinitiated consultation and instead, continues to rely on the 2022 BiOp when issuing yearly AOIs that implement the same grazing regime that, for decades, has failed to

116

adequately protect listed species and critical habitat on the Red Lake Complex, resulting in continued habitat degradation and harm to listed species.

- In the **Lower Verde Complex**, extensive livestock impacts and riparian degradation within occupied and/or designated critical habitat for the cuckoo, including widespread grazing impacts in areas ostensibly closed to grazing, nonfunctional exclosure fencing, cows within livestock exclosures, and grazed riparian areas (including critical habitat) far exceeding the applicable utilization standards. In light of this new information, the Forest Service and FWS were required to engage in consultation regarding the effects of ongoing grazing on listed species and critical habitat in the Lower Verde Complex. Yet, to date, the Forest Service has *not* reinitiated consultation and instead, continues to rely on the 2025 BiOp when issuing yearly AOIs that implement the same grazing regime that, for decades, has failed to adequately protect listed species and critical habitat on the Lower Verde Complex, resulting in continued habitat degradation and harm to listed species

Hence, the Forest Service and FWS were immediately required upon receiving each NOI to engage in formal consultation regarding the full complement of ongoing adverse effects associated with the Forest Service's authorization of grazing activities on the Tonto National Forest. The agencies' failure to do so violates the ESA, its implementing regulations, and the APA.

226.    In reaching its substantive determinations in each of the BiOps and concurrences here at issue, FWS substantially relied on the Forest Service's proposed grazing regime, which incorporates common mitigation measures, including area and seasonal closures, forage utilization limits, and monitoring. However, as demonstrated by the Plaintiffs' NOIs, the Forest Service continues to issue yearly AOIs authorizing

117

grazing activities on allotments where listed species and/or critical habitat are present without fully implementing or enforcing the mitigation measures and/or reasonable and prudent alternatives set forth in those BiOps/ITSs and/or concurrences. For example, as described above, *supra* ¶ 225:

- Area closures and seasonal rotations are not being enforced: Plaintiffs' NOIs showed extensive damage to occupied riparian and critical habitat areas within the Dagger, Seventy-six, Pinto Creek, Buzzard Roost, Soldier Camp, Lyons Fork, Poison Springs, Hardt Creek, Chrysotile, Crouch Mesa, Tonto Basin, and Hick's-Pikes Peak Allotments, as well as within the Bar X, Red Lake, and Lower Verde Complexes, that is directly attributable to livestock, including serious cattle impacts on habitat that is purportedly closed to livestock use. Thus, Plaintiffs' NOIs demonstrate that the Forest Service's methods of exclusion (e.g., fencing) are ineffective, and further, that area and seasonal closures/rotations are not being implemented and enforced, leading to widespread riparian habitat degradation (including critical habitat) and harm to listed species.

- Plaintiffs' NOIs revealed that across those same allotments and complexes, livestock grazing in riparian and critical habitat areas is far exceeding the applicable forage utilization metrics. Thus, Plaintiffs' NOIs demonstrate that the forage utilization standards underlying the BiOps and concurrences for the allotments at issue are not being implemented or enforced, leading to widespread riparian habitat degradation (including critical habitat) and harm to listed species.

- The extent of habitat degradation and deterioration further suggests that the Forest Service is failing to monitor riparian and critical habitat to ensure that the mitigation measures (e.g., area closures, forage

118

utilization limits, seasonal rotations, etc.) are being consistently implemented and are *effectively* protecting riparian and critical habitat, as required by each of the BiOps and/or concurrences. Similarly, on information and belief, the Forest Service is failing to monitor for the presence or absence of listed species, as required by the BiOps and/or concurrences. On information and belief, the Forest Service's ability to comply with monitoring protocols is severely compromised across the Tonto National Forest, largely due to recent, dramatic staffing cuts. Additional staffing cuts are expected, which will further impair the agency's efforts to conduct required monitoring. Thus, Plaintiffs' NOIs demonstrate that the monitoring protocols underlying the BiOps and concurrences for the allotments at issue are not being implemented or enforced, leading to widespread riparian habitat degradation (including critical habitat) and harm to listed species.

Consequently, the Forest Service has "subsequently modified" the action "in a manner that causes [] effect[s] to the listed species or critical habitat that w[ere] not considered in the [BiOp] or written concurrence." 40 C.F.R. § 402.16. The Forest Service and FWS's failure to reinitiate *and complete* consultation *prior* to authorizing any further grazing on the Tonto National Forest, violates the ESA, its implementing regulations, and the APA.

227.    Available evidence, including data and photographs submitted with the 2022 November, 2025 January, and 2025 September NOIs, indicates that the amounts of incidental take specified in many of the ITSs at issue have been exceeded. For example:

- **Dagger Allotment**: The 1995 ITS for the Dagger Allotment did not authorize any take of the flycatcher, yet evidence of widespread habitat degradation and deterioration demonstrate that ongoing grazing activities are, at the very least, harassing flycatchers within the meaning of the ESA and its implementing regulations. Such take is unauthorized

and in clear excess of the "zero" take level set by the 1995 ITS. With respect to the razorback sucker, the 1995 ITS specified that take would be exceeded if such monitoring programs "are decreased or discontinued," 1995 ITS at 16, On information and belief, the Forest Service is not implementing the required monitoring programs for the razorback sucker on the Dagger Allotment, as required by the 1995 ITS. Accordingly, reinitiation is required for both the flycatcher and the razorback sucker. Yet, despite the fact that take for *both* species has been exceeded—and, consequently, the ITS's safe harbor provision has been invalidated—the Forest Service continues to rely on the 1995 BiOp when issuing yearly AOIs to authorize grazing on the Dagger Allotment, in clear violation of the ESA, its implementing regulations, and the APA.

- **Tonto Basin Allotment**: The 2014 ITS for the Tonto Basin Allotment did not authorize any take of the flycatcher, yet evidence of widespread habitat degradation and deterioration—including severe grazing impacts to the TCRU—demonstrate that ongoing grazing activities are, at the very least, harassing flycatchers within the meaning of the ESA and its implementing regulations. Such take is unauthorized and in clear excess of the "zero" take level set by the 2014 ITS. Accordingly, reinitiation is required for the flycatcher. Yet, despite the fact that take has been exceeded—and, consequently, the ITS's safe harbor provision has been invalidated—the Forest Service continues to rely on the 2014 BiOp when issuing yearly AOIs to authorize grazing on the Tonto Basin Allotment, in clear violation of the ESA, its implementing regulations, and the APA.

120

1   Consequently, the Forest Service and FWS must reinitiate *and complete* the long-

2   promised forest-wide consultation prior to authorizing any further grazing on allotments

3   where (1) listed species are or may be present, or (2) designated critical habitat is present.

4         228.   For these reasons, the Forest Service and FWS have violated Section

5   7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2), and 50 C.F.R. §§ 402.14, 402.16, by failing

6   to reinitate, let alone complete, formal consultation prior to allowing grazing to continue

7   on allotments in the Tonto National Forest where listed species and/or critical habitat are

8   or may be present. The agencies' failures constitute arbitrary and capricious agency

9   action in violation of 5 U.S.C. § 706(2).

10   **Claim IV – FWS's Violations of the ESA and APA in Issuing the 2022 BiOp for the**
    **<u>Red Lake Complex</u>**

11

12         229.   Plaintiffs hereby incorporate all preceding paragraphs by reference.

13         230.   By determining that ongoing grazing in the Red Lake Complex will not

14   jeopardize the Chihuahua leopard frog's survival or recovery prospects, FWS violated

15   Section 7(a)(2) of the ESA, its implementing regulations, and acted arbitrarily and

16   capriciously in violation of the APA, 5 U.S.C. § 706(2).

17         231.   By determining that ongoing grazing in the Red Lake Complex will not

18   destroy or adversely modify the frog's designated critical habitat, FWS violated Section

19   7(a)(2) of the ESA, its implementing regulations, and acted arbitrarily and capriciously in

20   violation of the APA, 5 U.S.C. § 706(2).

21         232.   In issuing the 2022 BiOp—including its conclusions that the proposed

22   action will not jeopardize the frog's survival or recovery prospects, or destroy or

23   adversely modify designated critical habitat—FWS failed to rely on the best available

24   scientific evidence, and thus violated Section 7(a)(2) of the ESA, its implementing

25   regulations, and acted arbitrarily and capriciously in violation of the APA, 5 U.S.C.

26   § 706(2).

27         233.   By relying on the unwarranted assumption that the Foret Service's

28

1  preferred grazing regime—which to date, has failed to forestall (much less improve)

2  riparian and critical habitat relied upon by the frog—will nevertheless work *this time* to

3  avoid either jeopardizing the frog's survival and recovery prospects, or destroying or

4  adversely modifying its critical habitat, FWS's no-jeopardy and no-adverse-modification

5  determinations violated Section 7(a)(2) of the ESA and its implementing regulations, and

6  were arbitrary and capricious in violation of the APA, 5 U.S.C. § 706(2).

7     234.   By adopting grazing utilization metrics that FWS recognizes will result in

8  substantial harm to the frog and significantly degrade its habitat (including critical

9  habitat), combined with the Forest Service's serious, chronic failure to achieve these

10  utilization standards in the past (which FWS failed to analyze, including for purposes of

11  jeopardy and destruction or adverse modification of critical habitat), FWS violated

12  Section 7(a)(2) of the ESA, its implementing regulations, and acted arbitrarily and

13  capriciously in violation of the APA, 5 U.S.C. § 706(2).

14     235.   By relying on the unexplained assumption that the Forest Service will

15  conduct routine exclosure monitoring and promptly notify the permittee of any incursions

16  to conclude the proposed action will not result in jeopardy or destruction or adverse

17  modification of critical habitat—despite years of evidence demonstrating the ineffectual

18  nature of this approach—FWS violated Section 7(a)(2) of the ESA, its implementing

19  regulations, and acted arbitrarily and capriciously in violation of the APA, 5 U.S.C.

20  § 706(2).

21     236.   For myriad reasons described herein, FWS has itself failed to ensure against

22  jeopardy of the frog and to safeguard against destruction or adverse modification of

23  critical habitat for the species, in violation of Section 7(a)(2) of the ESA, its

24  implementing regulations, and the APA, 5 U.S.C. § 706(2).

25  **Claim V – The Forest Service's Violations of the ESA in Relying on the 2022 BiOp to Authorize Grazing in the Red Lake Complex**

26

27     237.   Plaintiffs hereby incorporate all preceding paragraphs by reference.

28

122

238.    By continuing to authorize livestock grazing in the Red Lake Complex, the Forest Service has failed to ensure that its actions will not jeopardize the frog's survival or recovery, in violation of Section 7(a)(2) of the ESA and its implementing regulations.

239.    By continuing to authorize livestock grazing in the Red Lake Complex, the Forest Service has failed to ensure that its actions will not destroy or adversely modify the frog's critical habitat, in violation of Section 7(a)(2) of the ESA and its implementing regulations.

240.    To the extent the Forest Service relies on FWS's 2022 BiOp, that consultation document is fatally flawed for the reasons explained herein and cannot and does not relieve the Forest Service of its independent duties to avoid jeopardy and destruction or adverse modification of critical habitat, thereby resulting in ongoing violation of Section 7(a)(2) of the ESA and its implementing regulations.

241.    By providing inaccurate information to FWS regarding the Forest Service's ability to satisfy the terms and conditions of the 2022 BiOp (and the underlying BA)—despite years of failing to satisfy functionally identical terms and conditions of BiOps and concurrences for similarly situated allotments and complexes across the Tonto National Forest—the Forest Service is violating Section 7(a)(2) of the ESA and its implementing regulations.

**Claim VI – FWS's Violations of the ESA and APA in Issuing the 2025 BiOp for the Lower Verde Complex**

242.    Plaintiffs hereby incorporate all preceding paragraphs by reference.

243.    By determining that ongoing grazing in the Lower Verde Complex will not jeopardize the yellow-billed cuckoo's survival or recovery prospects, FWS violated Section 7(a)(2) of the ESA, its implementing regulations, and acted arbitrarily and capriciously in violation of the APA, 5 U.S.C. § 706(2).

244.    In issuing the 2025 BiOp—including its conclusions that the proposed action will not jeopardize the cuckoo's survival or recovery prospects—FWS failed to

rely on the best available scientific evidence, and thus violated Section 7(a)(2) of the ESA, its implementing regulations, and acted arbitrarily and capriciously in violation of the APA, 5 U.S.C. § 706(2).

245.    By skewing the proposed action for consultation to exclude any interim consideration of grazing's effects prior to full completion of all purportedly beneficial mitigation measures, and by failing to address the effects that will result from the grazing until all proposed mitigation measures can be implemented (including whether those effects will result in jeopardy), FWS violated Section 7(a)(2) of the ESA, its implementing regulations, and acted arbitrarily and capriciously in violation of the APA, 5 U.S.C. § 706(2).

246.    By relying on the unwarranted assumption that the Foret Service's preferred grazing regime—which to date, has failed to forestall (much less improve) riparian and upland habitat relied upon by the cuckoo—will nevertheless work *this time* to avoid jeopardizing the cuckoo's survival and recovery prospects, FWS's no-jeopardy determination violated Section 7(a)(2) of the ESA and its implementing regulations, and was arbitrary and capricious in violation of the APA, 5 U.S.C. § 706(2).

247.    By adopting grazing utilization metrics that FWS recognizes will cause substantial harm to the cuckoo and significantly degrade important breeding and foraging habitat, combined with the Forest Service's serious, chronic failure to achieve these utilization standards in the past (which FWS failed to analyze, including for purposes of jeopardy), FWS violated Section 7(a)(2) of the ESA, its implementing regulations, and acted arbitrarily and capriciously in violation of the APA, 5 U.S.C. § 706(2).

248.    By relying on the unexplained assumption that the Forest Service will conduct routine exclosure monitoring and promptly notify the permittee of any incursions to conclude the proposed action will not result in jeopardy—despite years of evidence demonstrating the ineffectual nature of this approach—FWS violated Section 7(a)(2) of the ESA, its implementing regulations, and acted arbitrarily and capriciously in violation

of the APA, 5 U.S.C. § 706(2).

249.    By relying on an arbitrary surrogate to specify the amount of incidental take authorized by the 2025 BiOp—e.g., triggers that are unexplained and that mask the localized impact of take of the cuckoo—FWS violated Section 7(a)(2) of the ESA, its implementing regulations, and acted arbitrarily and capriciously in violation of the APA, 5 U.S.C. § 706(2).

250.    For myriad reasons described herein, FWS has itself failed to ensure against jeopardy of the cuckoo, in violation of Section 7(a)(2) of the ESA, its implementing regulations, and the APA, 5 U.S.C. § 706(2).

**Claim VII – The Forest Service's Violations of the ESA in Relying on the 2025 BiOp <u>to Authorize Grazing in the Lower Verde Complex</u>**

251.    Plaintiffs hereby incorporate all preceding paragraphs by reference.

252.    By continuing to authorize livestock grazing in the Lower Verde Complex, the Forest Service has failed to ensure that its actions will not jeopardize the cuckoo's survival or recovery, in violation of Section 7(a)(2) of the ESA and its implementing regulations.

253.    To the extent the Forest Service relies on FWS's 2025 BiOp, that consultation document is fatally flawed for the reasons explained herein and cannot and does not relieve the Forest Service of its independent duty to avoid jeopardy, thereby resulting in ongoing violation of Section 7(a)(2) of the ESA and its implementing regulations.

254.    By providing inaccurate information to FWS regarding the Forest Service's ability to satisfy the terms and conditions of the 2025 BiOp (and the underlying BA)—despite years of failing to satisfy functionally identical terms and conditions of BiOps and concurrences for similarly situated allotments and complexes across the Tonto National Forest—the Forest Service is violating Section 7(a)(2) of the ESA and its implementing regulations.

**Claim VIII – Failure to Develop and Implement a Program to Conserve Listed
Species and Their Habitat Violates the ESA**

255.    Plaintiffs hereby incorporate all preceding paragraphs by reference.

256.    The Forest Service has violated its affirmative obligation to "carry[] out
programs for the conservation" of listed species, 16 U.S.C. § 1536(a)(1), by failing to
implement a program that conserves the southwestern willow flycatcher, yellow-billed
cuckoo, razorback sucker, Gila chub, northern Mexican gartersnake, narrow-headed
gartersnake, spikedace, or Chiricahua leopard frog, and instead carrying out its grazing
program in a manner that knowingly and significantly impairs habitat for these species,
including critical habitat, and by otherwise subverting the species' prospects for recovery.
Indeed, the Forest Service has repeatedly failed to implement mitigation measures that
FWS deemed necessary for the species' survival and recovery. Under such
circumstances, the agency's citation to a few minor actions taken to reconstruct
ineffective fences cannot suffice to demonstrate that the agency has developed, in
consultation with FWS, a comprehensive program designed to meaningfully conserve
listed species and their habitat in the Tonto National Forest. Thus, the Forest Service has
violated the ESA, its implementing regulations, and the APA.

257.    Because the Forest Service failed, in response to the ongoing harm wrought
by its authorization of ongoing grazing activities, to meaningfully offset the devastating
impacts of the agency's grazing program on listed species and their designated habitat,
and, rather, has simply stated that it will undergo consultation at some time in the future
(which keeps getting pushed back), even as it continues to implement the grazing
program without developing any mitigation plan whatsoever to address ongoing harm to
listed species and their habitat, the Forest Service has violated and continues to violate
Section 7(a)(1) of the ESA, 16 U.S.C. § 1536(a)(1).

# **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court enter an Order:

(1)     Declaring that Defendants have violated the ESA and the APA;

(2)     Enjoining the Forest Service from authorizing livestock grazing (e.g., through the issuance of yearly AOIs or other grazing authorization) in occupied habitat for the southwest willow flycatcher, yellow-billed cuckoo, Gila chub, razorback sucker, spikedace, northern Mexican gartersnake, narrow-headed gartersnake, and Chiricahua leopard frog in the Tonto National Forest, including making "any irreversible or irretrievable commitment of resources with respect to" that action in violation of 16 U.S.C. § 1536(d), until consultation has been reinitiated and completed;

(3)     Setting aside all active Forest Service grazing authorizations in the Tonto National Forest that allow livestock grazing in occupied flycatcher, cuckoo, Gila chub, razorback sucker, spikedace, northern Mexican gartersnake, narrow-headed gartersnake, and frog habitat on the allotments at issue;

(4)     Setting aside the 2022 BiOp and 2025 BiOps;

(5)     Remanding the affected Forest Service grazing authorizations (e.g., AOIs), the 2022 BiOp, and the 2025 BiOp to Defendants with instructions to immediately reinitiate consultation to address the impacts of proposed grazing on the flycatcher, cuckoo, Gila chub, razorback sucker, spikedace, northern Mexican gartersnake, narrow-headed gartersnake, and frog;

(6)     Awarding Plaintiffs their attorneys' fees and costs in this action; and

(7)     Granting Plaintiffs any further relief as the Court may deem just and proper.

Respectfully submitted this 3rd day of February 2026.

*(Attorney signatures on next page)*

1    /s/Elizabeth L. Lewis
2    Elizabeth L. Lewis
     (*pro hac vice* application forthcoming)
3    EUBANKS & ASSOCIATES, PLLC
4    1629 K Street NW, Suite 300
     Washington, DC 20006
5    Phone: (202) 618-1007
     Email: lizzie@eubankslegal.com
6
     William S. Eubanks II
7    (*pro hac vice* application forthcoming)
8    EUBANKS & ASSOCIATES, PLLC
     1629 K Street NW, Suite 300
9    Washington, DC 20006
     Phone: (970) 703-6060
10   Email: bill@eubankslegal.com
11
12   *Attorneys for Plaintiffs*
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28